# UNITED STATES DISTRICT COURT
# IN THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

BARBARA A. ELLIS,

      Plaintiff,

No. 2:14-cv-11168
Hon. Laurie J. Michelson

v.

CHASE HOME FINANCE, LLC, JPMORGAN
CHASE BANK, N.A., DEUTSCHE BANK
NATIONAL TRUST COMPANY, as Trustee,
and UNKNOWN TRUST, the currently
unknown asset-backed security at issue,

      Defendants.

---

| | |
|---|---|
| Adam J. Gantz (P58558)<br>Attorneys for Plaintiff<br>**GANTZ ASSOCIATES**<br>27750 Middlebelt Road, Suite 100<br>Farmington Hills, MI 48334<br>Telephone: (248) 987-6505<br>agantz@gantzassociates.com | Joseph H. Hickey (P41664)<br>Kyle R. Dufrane (P58809)<br>Thomas H. Trapnell (P74345)<br>Attorneys for JPMorgan Chase Bank, N.A., and Deutsche Bank National Trust Company, as Trustee<br>**DYKEMA GOSSETT PLLC**<br>400 Renaissance Center<br>Detroit, MI 48243<br>(313) 568-6529<br>kdufrane@dykema.com<br>ttrapnell@dykema.com |

---

# PLAINTIFF'S BRIEF IN RESPONSE TO MOTION TO DISMISS

# TABLE OF CONTENTS

Response to Order to Show Cause ……………………………........ iii-iv

Table of Authorities …………………………………………........ v

Statement of Issues Presented…………..…….…….……...……...…......……...vi-viii

Statement of Controlling Authority…………………………………....ix-xi

    A.    The standard of review for a motion to dismiss. ………………..…

    B.    Pertinent states and case-law………………………………….

Statement of the Case...…………………………………...........................1-4

Argument ……………………………………………………...4-25

    A.    Plaintiff has alleged colorable claims against the Trustee……….

    B.    Plaintiff has alleged that she suffered harm as a result of the defects in the chain of title.

    C.    Third parties have standing to challenge the validity of mortgage assignments on the grounds that they are void as a result of forgery.

    D.    The failure to transfer the indebtedness of the Mortgage and the Note constituted a substantial irregularity justifying Plaintiff's legal challenge to the foreclosure, pursuant to MCL 600.3204.

    E.    Plaintiff has recourse pursuant to MCL 600.3205a-c.

    F.    Plaintiff has standing to bring a claim for violation of 12 USC 2609.

    G.    Plaintiff's RESPA claims are not all barred by the statute of limitations.

    H.    The Statute of Frauds relative to financial institutions does not bar Plaintiff's claims breach of contract or promissory estoppel.

i

I.     Plaintiff has stated a claim for breach of the mortgage contract.

J.     Plaintiff has stated a claim for fraud.

K.     Plaintiff has stated a claim for civil conspiracy.

L.     Plaintiff has stated claims for violations of the Regulation of Collection Practices Act and Fair Debt Collection Practices Act.

M.     Plaintiff has stated a claim sufficient to survive a motion for judgment on the pleadings regarding the sheriff's sale being conducted by a corporation unlicensed to transact business in Michigan.

N.     Summary Judgment would be premature where the parties have not had time sufficient to engage in discovery.

Conclusion ……………………………………………………………..…..25

Certificate of Service …………………………………………………..…..26

ii

## RESPONSE TO ORDER TO SHOW CAUSE

On February 28, 2014, Plaintiff filed the instant action in State Court. On March 20, 2014, Defendants removed the instant action to Federal Court (Dkt. 1). Former associate for Gantz Associates, Nickolas C. Buonodono, was the attorney in charge of the file at the time. On April 16, 2014, Defendants filed a Motion to Dismiss (Dkt. 4). On April 18, 2014, Mr. Buonodono filed a Motion to Remand (Dkt. 9) on behalf of Plaintiff. On May 9, 2014, Mr. Buonodono and counsel for Defendants stipulated to stay the deadline to respond to Defendants' Motion to Dismiss until 14 days after the determination of Plaintiff's Motion to Remand.

On May 23, 2013, Mr. Buonodono ceased his employment at Gantz Associates, leaving the attorney left to manage the file, Adam J. Gantz, unaware of the agreement regarding the deadline to respond to the Motion to Dismiss.

On June 6, 2014, the Court issued a nine page Memorandum and Order Denying Plaintiff's Motion to Remand ("Order"). The last sentence of the nine page Memorandum and Order references the stipulation between the parties, in ordering Plaintiff to file a Response to the Motion to Dismiss within 14 days.

Unfortunately, during the week the Order was entered, Mr. Gantz was not at the office, but at home in bed, extremely fatigued, and otherwise rather ill. He has since been in the care of a rheumatologist, and is awaiting results of testing. He was aware that the Order had been entered, because the email notification came to

iii

his cell phone, and he used his cell phone to skim over the Court's analysis from his bed, while suffering his symptoms. However, given that he was skimming the Order in bed on his cell phone while rather sick, he did not read the last sentence containing the deadline.

As a result, on June 26, 2014, the Court issued an Order to Show Cause (Dkt. 17), requiring a response by July 2, 2014. The next day, on June 27, 2014, Mr. Gantz contacted opposing counsel to inquire as to whether he would be agreeable to an extension to submit the instant Brief, to the extent the Court would grant the same. For some reason, opposing counsel felt compelled to take this procedural (not substantive) question to his client, and it took him several days before he eventually (though kindly) agreed to a 30 day extension.

Unfortunately, his agreement to a 30 day extension after 6pm on the evening of July 1, 2014 was too close to the deadline of July 2, 2014 to gamble with whether the Court would actually grant the extension. As such, even though opposing counsel has stipulated to a 30 day extension, counsel for Plaintiff is submitting the Response Brief today, along with his apologies to the Court for the error which caused the delayed filing.

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps">Cases:</span>

*Abel v. Eli Lilly and Co.*, 418 Mich. 311, 338, 343 N.W.2d 164 (1984) .....Page(s) 22

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).......Page(s) x

*Bolone v. Wells Fargo Home Mortg., Inc. .*, 858 F.Supp.2d 825 (ED MI 2012 – Lawrence P/ Zatkoff).......Page(s) xii, 16

*Chalmers v. JPMorgan Chase Bank, N.A.*, No. 12-10903, 2012 U.S. Dist. LEXIS 146463 (E.D. Mich. Oct. 11, 2012) (unpub. op.).......Page(s) 7

*Davenport v. HSBC Bank USA*, 275 Mich. App. 344, 739 N.W.2d 383 (2007), *overruled in part on other grounds by Kim v. JPMorgan Chase Bank, N.A.*, 493 Mich. 98, 825 NW2d 329 (2012).......Page(s) 11

*Dohm v. Haskin*, 88 Mich. 144, 50 N.W. 108 (1891).......Page(s) 11

*Erickson v. Pardus,* 550 U.S. 89 (2007).......Page(s) x

*Fair v. Moody*, 278906, 2008 WL 5382648 (Mich. Ct. App. Dec. 23, 2008).......Page(s) 8

*Frost v. Wells Fargo Bank, N.A.*, 901 F.Supp.2d 999 (ED MI 2012 – Janet T. Neff).......Page(s) xii, 16, 17

*Gregory v. CitiMortgage, Inc.*, 890 F. Supp. 2d 791 (E.D. Mich. 2012). .....Page(s)

*Kim v. JPMorgan Chase Bank, N.A.*, 493 Mich. 98, 825 N.W.2d 329 (2012).......Page(s) 7, 10, 11

*Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.*, 487 Mich. 349, 792 N.W.2d 686 (2010).......Page(s) 12

*Langley v. Chase Home Finance, LLC*, No. 1-10-cv-604, 2011 U.S. Dist. LEXIS 32845 (W.D. Mich. Mar. 28, 2011) (unpub. op.).......Page(s) 7

*Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898 (6th Cir. 2004).......Page(s) x

*Mielke v. Bank of Am. Home Loan Servicing LP*, No. 2:10-cv-11576, 2011 U.S. Dist. LEXIS 41617 (E.D. Mich. Apr. 18, 2011). .....Page(s) 24

*Mitan v Fed Home Loan Mortgage Corp, 703 F.3d 949 (CA6, Dec 12, 2012)* .....Page(s) 13

*Sobh v. Bank of Am., N.A.*, No. 308441, 2013 Mich. App. LEXIS 993 (Mich. App. June 6, 2013) (*per curiam*) (unpub. op., request for pub. pending).......Page(s) 7, 10, 11

*Robinson v. Bus. Funding Corp.*, 225815, 2002 WL 31956967 (Mich. Ct. App. Dec. 20, 2002).......Page(s) 8

*Smith v. Werkheiser*, 152 Mich. 177, 115 N.W. 964 (1908).......Page(s) 11

*Sparos v. Edwards*, 249 Mich. 400, 228 N.W. 765 (1930).......Page(s) 11

*Tower Air, Inc.,* 416 F.3d 229, 237 (3d Cir. 2005)…...Page(s) xi

*VanderWall v. Midkiff*, 166 Mich.App 668; 421 NW2d 263 (1988)…...Page(s) 8

*Vega v. First Federal Sav. & Loan Assoc.,* 622 F.2d 918, 925 (6th Cir. 1980)…...Page(s) 14

*Williams v. Saxon Mortg. Services, Inc.,* 2014 WL 765055 (ED MI 2014 – Sean F. Cox)…...Page(s) xii, 18

Yates v. U.S. Bank Nat. Ass'n, 912 F.Supp.2d 478 (ED MI 2012 – Lawrence P. Zatkoff)…...Page(s) xii, 17, 18

## STATUTES AND RULES:

Mich. Comp. Laws § 445.251.

Mich. Comp. Laws § 445.252.

Mich. Comp. Laws § 600.3204.

# STATEMENT OF ISSUES PRESENTED

1.    Has Plaintiff stated claims sufficient to survive a motion for judgment on the pleadings against the Trustee?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

2.    Has Plaintiff alleged that she suffered harm as a result of the defects in the chain of title?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

3.    Do third parties have standing to challenge the validity of mortgage assignments on the grounds that they are void as a result of forgery?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

4.    Does the failure to transfer the indebtedness of the Mortgage and the Note constitute a substantial irregularity justifying Plaintiff's legal challenge to the foreclosure, pursuant to MCL 600.3204?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

5.    Does Plaintiff have recourse pursuant to MCL 600.3205a-c?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

6.    Does Plaintiff have standing to bring a claim for violation of 12 USC 2609?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

7.    Are all of Plaintiff's claims regarding escrow, including claims relative to failures to correct errors during required escrow analysis each six months dating, back for the past three years, barred by the three year statute of limitations?

Plaintiff's answer is "no".
Defendants' answer is "yes".
The Court' answer should be "no".

8.    Does the Statute of Frauds relative to financial institutions bar Plaintiff's claims breach of contract and/or promissory estoppel, where the Trial Period Plan contained correspondence signed by an identifiable representative of Defendant, Chase?

Plaintiff's answer is "no".
Defendants' answer is "yes".
The Court' answer should be "no".

9.    Has Plaintiff stated a claim sufficient to survive a motion for judgment on the pleadings for breach of the mortgage contract?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

10.    Has Plaintiff has stated a claim sufficient to survive a motion for judgment on the pleadings for fraud?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

11.    Has Plaintiff stated a claim sufficient to survive a motion for judgment on the pleadings for civil conspiracy?

Plaintiff's answer is "yes".

Defendants' answer is "no".
The Court' answer should be "yes".

12.     Has Plaintiff stated claims sufficient to survive a motion for judgment on the pleadings for violations of the Regulation of Collection Practices Act and Fair Debt Collection Practices Act?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

13.     Are Plaintiff's claim relative to the sheriff's sale having been conducted by an unlicensed corporation "coherent" and otherwise sufficient to survive a motion for judgment on the pleadings?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

14.     Would summary judgment be premature, where the parties have not had time sufficient to engage in discovery?

Plaintiff's answer is "yes".
Defendants' answer is "no".
The Court' answer should be "yes".

## STATEMENT OF CONTROLLING AUTHORITY

**A.    The standard of review for a motion to dismiss.**

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004.)

In deciding a Rule 12(b)(6) motion, a district court must view the complaint in the light most favorable to the plaintiff and take all well-pleaded factual allegations as true, as the moving party has the burden of proving that no claim exists. *Erickson v. Pardus,* 550 U.S. 89 (2007). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

When viewing the complaint under the above standards, to survive a motion to dismiss, a complaint must contain (1) "enough facts to state a claim to relief that is plausible," (2) more than "a formulaic recitation of a cause of action's elements," and (3) allegations that suggest a "right to relief above a speculative level." *Twombly,* 550 U.S. at 555–56. "[A] plaintiff will not be thrown out of court on a

x

Rule 12(b)(6) motion for lack of detailed facts." *In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005).

## B.    Pertinent states and case-law.

Count 1 seeks declaratory and injunctive relief, as well as monetary damages, for foreclosure without a record chain of title. Plaintiff relies primarily on MCL 600.3204 with respect to this claim.

Count 2 seeks declaratory and injunctive relief, as well as monetary damages, for foreclosure in violation of Michigan's statutory modification laws. Plaintiff relies primarily on MCL 600.3204 and MCL 600.3205a-c with respect to this claim.

Counts 3 and 10 erroneously contain the same claim for declaratory and injunctive relief, as well as monetary damages, for violations of the Truth in Lending Act. Plaintiff relies primarily on 15 USC 1641(g) for this claim.

Count 4-9 and Count 11 seek declaratory and injunctive relief, as well as monetary damages, for violations of the Real Estate Settlement Procedures Act ("RESPA"). Plaintiff relies primarily on 12 USC 2605 for these claims.

Counts 13, 14 and 15 seeks injunctive relief and monetary damages for breach of contract/promissory estoppel. Plaintiff relies on basic principles of contract law relative to breach of the mortgage, and case-law interpreting claims for breach of contract and promissory estoppel notwithstanding the statute of

frauds relative to financial institutions, relative to the contract to modify the mortgage, including *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805 (WD MI 2011 – Janet T. Neff), *Bolone v. Wells Fargo Home Mortg., Inc.* ., 858 F.Supp.2d 825 (ED MI 2012 – Lawrence P/ Zatkoff), *Frost v. Wells Fargo Bank, N.A.*, 901 F.Supp.2d 999 (ED MI 2012 – Janet T. Neff), *Yates v. U.S. Bank Nat. Ass'n*, 912 F.Supp.2d 478 (ED MI 2012 – Lawrence P. Zatkoff), and *Williams v. Saxon Mortg. Services, Inc.,* 2014 WL 765055 (ED MI 2014 – Sean F. Cox).

Count 20 seeks relief for violations of Michigan's Regulation of Practices Act, and as such, Plaintiff will rely upon the Act, being MCL 445.251. Similarly, Count 21 seeks relief for violations of Michigan's Fair Debt Collection Practices Act, and as such, Plaintiff will rely upon the Act, being MCL 339.918.

## STATEMENT OF THE CASE

On February 27, 2004, Plaintiff executed a Mortgage and related note in favor of Washington Mutual Bank ("WaMu"), which then pooled the loan with a number of others, and sold the bundle to various investors as an "asset-backed-security" ("ABS"), leaving WaMu as "Master Servicer", only.

From the outset, Plaintiff has been victimized by improper servicing. First, she was intentionally defrauded out of thousands of dollars via her escrow for flood insurance by WaMu. (*See* Complaint, at Paragraphs 13-20.)

Shortly thereafter, Washington Mutual was seized by the Office of Thrift Supervision ("OTS"), and placed it into receivership with the FDIC. A few days later, on September 28, 2008, the FDIC sold the servicing rights to Plaintiff's loan to Defendant, Chase Bank. From that point on, Plaintiff received monthly billing statements from Defendant Chase Servicing. (*See* Complaint, at Paragraphs 21-28.)

After the financial crash, the government enacted bailout programs offering servicers money to take HAMP applications, and then offering to pay the lenders those servicers represent up to 100 cents on the dollar to reimburse them for "toxic" i.e. foreclosed loans. In other words, our government incentivized foreclosure, leading unscrupulous servicers to trick paying customers, like Plaintiff, into default and foreclosure. (*See* Complaint, at Paragraphs 34-37.)

In this case, in late 2009, Plaintiff began working with Chase Servicing on a

modification. In February, 2010, Chase Servicing offered Plaintiff a loan modification, and Plaintiff accepted, creating a binding contract. At the same time however, Chase was engaging in the same type of fraudulent conduct that WaMu had engaged in, but this time with respect to Plaintiff's escrow for hazard insurance. Specifically, Chase fraudulently placed multiple, duplicative, grossly expensive and entirely unnecessary policies on Plaintiff's home, when Plaintiff already had insurance, and Chase knew it. (*See* <u>Complaint</u>, at Paragraphs 41-47.)

Chase Servicing then used its misconduct an excuse to dishonor the contract and force Plaintiff to apply all over again, and then it put Plaintiff through "Paperwork Hell" - well documented by Plaintiff - continuously asking for the same documents, until Plaintiff was so far behind that she could not avoid foreclosure and a bailout to Defendants. (*See* <u>Complaint</u>, at Paragraphs 48-59.)

Defendants then retained a foreclosing law firm to conduct the statutory modification process governed by MCL 600.3205a-c, but the firm denied Plaintiff the opportunity to participate in the process. (*See* <u>Complaint</u>, at Paragraphs 64-65.)

Meanwhile, Defendants were conspiring to forge documents sufficient to create the appearance of a record chain of title required for foreclosure pursuant to MCL 600.3204. Specifically, on or about April 25, 2012, an Assignment of Mortgage (the "Forged Assignment"), was prepared by a document preparation company known as Nationwide Title Clearing ("NTC"), a now disgraced robo-

signing, forgery, and mortgage document fraud mill, located in Palm Harbor, Florida, which is currently the subject of a criminal investigation by Michigan's Attorney General, Bill Schuette. (*See* Complaint, at Paragraphs 67-68.)

Although the document is purported to have been executed by a Chase Bank Vice President in Louisiana, and notarized by a Louisiana notary public, the document was actually illegally forged in the offices of NTC, in Palm Harbor, Florida, by an employee of NTC. (*See* Complaint, at Paragraph 70.)

The Forged Assignment bears the signature of Laquina Wilson Doaty ("Doaty"), purportedly acting as "Vice President" of Chase, which was purportedly acting pursuant to a certain Power of Attorney. However, "Doaty" is an infamous robo-signer, who works at NTC in Palm Harbor, Florida, not a Vice President of Chase employed in Louisiana. (*See* Complaint, at Paragraphs 71-72.)

The signature on the Forged Assignment is not even Doaty's, as evidenced by a comparison of signatures. (*See* Complaint, at Paragraphs 72-75.) Moreover, even if it is Doaty's signature, Doaty was not a Vice President of WaMu, and the document is therefore still a forgery. (*See* Complaint, at Paragraph 77.)

The same problems exist with respect to the notary public who purportedly witnessed Doaty's signature. The signature of the notary, "Eva Reese" ("Reese"), was forged and otherwise improperly placed on the document by an employee of NTC, in Palm Harbor, Florida, masquerading as a notary public licensed and acting

3

in Louisiana at the offices of Chase. (*See* Complaint, at Paragraphs 78-79.)

Plaintiff ultimately threw up her hands and agreed to a short sale solely as a means to stop the bleeding on her credit report. Chase Servicing intentionally slowed down and held up the short sale, until it sold Plaintiff's home at sheriff's sale, thereby harming her credit more. Chase Servicing continued to misrepresent, both orally and in writing, that the short sale would be approved during the redemption period, while it was actually running out the clock on the redemption period to reach a bailout, at which point Plaintiff's credit was harmed even more, and continues to be harmed to this date. (*See* Complaint, at Paragraphs 80-85.)

## ARGUMENT

### A.   PLAINTIFF HAS ALLEGED COLORABLE CLAIMS AGAINST THE TRUSTEE.

Defendants claim that Plaintiff has not alleged colorable claims against the Trustee. (*See* Defendants' Motion, at pg. 8.) Plaintiff concedes that certain claims, such as Counts 3 through 15, and Counts 20 through 22, only apply to Chase, in its capacity as servicer of the mortgage loan, and Plaintiff would not object to the entry of an Order dismissing the Trustee as it pertains to those claims.

However, Count 1 of the Verified Complaint seeks declaratory relief and damages against the Trustee, based upon the securitization of the loan and the failure to ensure a record chain of title required by MCL 600.3204 prior to the sheriffs sale. (*See* Complaint, at Paragraphs 120-129.)

4

Count 2 seeks declaratory relief against the Trustee pursuant to MCL 600.3205a-c, for the reason that the statute requires the person with authority to modify the loan, i.e. the Trustee, to participate in the process, yet it was the Servicer, which did not have authority to modify the loan, which participated in the statutory modification process. (*See* Complaint, at Paragraphs 141-145.)

Counts 16 and 17 seek declaratory relief and monetary damages against the Trustee relative to a fraudulent conspiracy with the servicer to force the loan into foreclosure, at which point the Trustee would obtain a windfall profit via bailout, a portion of which would then be shared with Chase in the form of a foreclosing servicer's bonus. (*See* Complaint, at Paragraphs 206-243.)

Count 18 seeks declaratory relief and monetary damages against the Treasurer for tortuous interference with contractual relations, on the grounds that the Trustee is not a party to the mortgage loan, but instructed Chase to breach the same.  (*See* Complaint, at Paragraphs 245-250.)

Count 19 seeks declaratory relief and monetary damages against the Trustee for Civil Conspiracy, because the Trustee conspired with Chase Servicing to fraudulently place the loan of Plaintiff, a paying customer, into foreclosure, to obtain a bailout. (*See* Complaint, at Paragraphs 251-255.)

Plaintiff has therefore stated claims sufficient to survive FRCP Rule 12(b)(6), as it relates to Counts 1 through 2, and Counts 16 through 19.

## B.    PLAINTIFF HAS ALLEGED THAT SHE SUFFERED HARM AS A RESULT OF THE DEFECTS IN THE CHAIN OF TITLE.

Defendants claim that Plaintiff has not alleged that she suffered any harm as a result of the defects in the chain of title. (*See* Defendants' Motion, at pg. 11.)

However, the Complaint alleges that the defects in the chain of title caused by the forgery of the Assignment harmed her and caused her damages. (*See* Complaint, at Paragraphs 128-129.)[1]

Plaintiff also alleged that the forgery of the Assignment was an act of intentional fraud interposed to trick her into allowing an illegal foreclosure of her home, and that it caused her damages. (*See* Complaint, at Paragraphs 231-236.)

Plaintiff has therefore alleged prejudice as required by *Kim* to set aside the Sheriff's Deed.  (*See* 493 Mich. at 115-16; Complaint, at Paragraphs 231-236.)

For those who "claim a continuing right to lawful ownership and possession based on defects in the process used by Defendants to divest them of those rights," the Courts have stated that "it is hard to imagine a person with a better claim to

---

[1] Plaintiff also alleges that "Plaintiff has further suffered prejudice and will suffer additional prejudice as a result of Defendants' noncompliance with all applicable foreclosure laws, because she has been forced to pay attorneys fees to save the Property from foreclosure, and could lose her home if the Court does not enforce the applicable laws with respect to the foreclosure." (*See* Complaint, at Paragraphs 128-129.)

standing to challenge the process at issue."[2]  This principal was reaffirmed in

*Chalmers v. JPMorgan Chase Bank, N.A.*, No. 12-10903, 2012 U.S. Dist. LEXIS

146463 (E.D. Mich. Oct. 11, 2012). [3] (*See Chalmers* – **Ex. "A"** hereto.)

Accordingly, given that Plaintiff in this case seeks money damages and/or

declaratory and equitable relief, Defendants' arguments regarding standing fail.

**C.    Third parties have standing to challenge the validity of mortgage assignments on the grounds that they are void as a result of forgery.**

Defendants next claim that Plaintiff does not have standing to challenge the

validity of the Forged Assignment, because they are third parties to the document,

based on the unpublished case of *Livonia Property Holdings, LLC v. 12840-12976*

*Farmington Road Holdings, LLC,* 717 F.Supp. 2d 724, 737 (E.D. Mich. 2010).

(*See* Defendants' Motion, at pg. 11.)

Here, Plaintiff contends that the Assignment was forged by a robo-signer

---

[2] *Langley v. Chase Home Finance, LLC, No. 1-10-cv-604, 2011 U.S. Dist. LEXIS 32845, at *7-9, n. 2 (W.D. Mich. Mar. 28, 2011) (unpub. op. attached as ex. 2) see also Gregory v. CitiMortgage, Inc.*, 890 F. Supp. 2d 791, 797-98 (E.D. Mich. 2012) (quoting *Langley* and denying dismissal). (*See Langley* – **Ex. "B"** hereto.)

[3] In *Chalmers*, the Court stated: "[Plaintiff] Chalmers has alleged he suffered an injury in fact due to the foreclosure of his home, by losing his home.  Chalmers has sufficiently alleged that the injury was caused by JP Morgan Chases' conduct, specifically by failing to accept his payments and by its misrepresentations including that Chalmers not to communicate with Trott & Trott.  Chalmers has also sufficiently alleged that the injury will be redressed if Chalmers were to obtain a favorable decision by way of monetary damages or alternatively, injunctive relief.  Defendants' Motion to Dismiss based on standing should be denied." *Id.* at *10.

employed by nationally disgraced forgery outfit, NTC, and that it is therefore void as opposed to merely voidable. (*See* Complaint, at Paragraphs 67-79.) Plaintiff's position is consistent with Michigan law, and therefore Plaintiff has stated claims sufficient to survive a motion for judgment on the pleadings.

Specifically, in *Fair v. Moody*, 278906, 2008 WL 5382648 (Mich. Ct. App. Dec. 23, 2008), the Court of Appeals impliedly held that a forged Assignment is void and confers no rights, such as the right to conduct a foreclosure, upon the holder. (*See* Fair – **Ex. "C"** hereto.)

In *Robinson v. Bus. Funding Corp.*, 225815, 2002 WL 31956967 (Mich. Ct. App. Dec. 20, 2002), the Michigan Court of Appeals discussed the fully binding and rather instructive authority derived from the factually similar case of *VanderWall v. Midkiff*, 166 Mich.App 668; 421 NW2d 263 (1988), in holding that a forged signature renders a document "void and unenforceable", and indicating that "there can be no such thing as a bona fide holder under a forgery". (*See* Robinson – **Ex. "D"** hereto.)

In fact, the Supreme Court of Michigan has held that mortgagor (or borrower) litigants, such as Plaintiff, have standing to challenge assignments of mortgages or the lack thereof, in the *Kim* case cited by Defendants. In *Kim*, just like here, the borrowers granted a mortgage to WaMu, until it failed, was taken over by the FDIC, and the servicing rights ended up with Chase. There was no

assignment from FDIC to Chase, but Chase conducted a foreclosure by advertisement anyway. *Id.* at 103.

The Supreme Court of Michigan held that the plaintiffs could void the foreclosure sale because of the missing assignment to Chase as the foreclosing party. *Id.* at 102-103. The Court stated that "a mortgagee cannot validly foreclose a mortgage by advertisement before the mortgage and *all assignments of that mortgage* are duly recorded." *Id.* at 106 (emphasis added).

The Michigan Court of Appeals recently affirmed the *Kim* case in *Sobh v. Bank of Am., N.A.*[4] In *Sobh*, the foreclosing entity, Bank of America, relied upon an assignment of the mortgage from Chase. *Id.* at *2. Chase, however, never received an assignment of the mortgage that it was assigning to Bank of America. *Id.* Bank of America and Chase argued that it did not matter that an assignment in the chain of title was missing. *Id.* at *6. Instead, they agued that it was only necessary for Bank of America, as the last link in the chain of title and the foreclosing party, to have an assignment in its favor. *Id.* The Court of Appeals expressly rejected this argument. *Id.* at *7. Thus, the plaintiffs in *Sobh* had standing to challenge the foreclosure. *Id.* at *2 & 7. *(See Sobh –* **Ex. "E"** hereto.)

---

[4] *Sobh v. Bank of Am., N.A.*, No. 308441, 2013 Mich. App. LEXIS 993 (Mich. App. June 6, 2013) (*per curiam*) (unpub. op., request for pub. pending).

This case is analogous to *Kim* and *Sobh*. Plaintiff is challenging whether a record chain of title existed at the time of the sheriff's sale, which was absolutely required by MCL 600.3204. As such, Count 1 of the Verified Complaint states a claim sufficient to survive a motion for judgment on the pleadings, and Defendants' Motion should therefore be denied.

**D.     The failure to transfer the indebtedness of the Mortgage and the Note constituted a substantial irregularity justifying Plaintiff's legal challenge to the foreclosure, pursuant to MCL 600.3204.**

Defendants next claim that Count 1 of Plaintiff's Complaint, seeking to set aside the sheriff's deed at issue on the grounds that the underlying obligation of the Note was not transferred to Defendants, is ripe for dismissal on the alleged grounds that "mortgage and underlying debt obligation need not be in the same hands". (*See* Complaint, at Paragraphs 120-129; and Defendant's Motion, at pg. 11.)

In support of their argument, Defendants cite the *Saurman* case, wherein the Supreme Court of Michigan held that MERS has standing to foreclose as nominee pursuant to MCL 600.3204, notwithstanding the fact that it does not own an interest in the underlying debt. (*See* Defendants' Motion, at pg. 11.)

However, Plaintiff is not challenging MERS' ability to conduct a sheriff's sale, and Defendants' reliance upon Saurman is therefore misplaced. In fact, the sheriff's sale at issue was conducted by Chase Servicing, not MERS. Plaintiff relies upon *Gregory*, 890 F. Supp. 2d at 804-06, which Defendants strangely cited

in support of their Motion (See <u>Defendants' Motion</u>, at pg. 12).

In *Gregory*, the Court held that "the note can only be sold without prior notice when it is transferred 'together' with the mortgage. The defendants' transfer of the note into the trust without the mortgage and without notifying the plaintiff would violate that provision of the contract as so read." *Id.* at 806.

This is the same claim Plaintiff alleges in this case – that she never received any prior notice that the Mortgage and the Note were transferred. Moreover, Chase has no proof that the Trustee has the right to enforce the Note. Plaintiff has therefore stated a claim for relief similar to *Gregory*.

Moreover, homeowners have standing to challenge any missing or improper transfer of indebtedness to the foreclosing party.[5]

*Kim*, *Davenport*, and *Sobh* did not announce new rights. Under Michigan law, homeowners have always had standing to challenge mortgage assignments.[6]

---

[5] *Davenport v. HSBC Bank USA*, 275 Mich. App. 344, 348, 739 N.W.2d 383 (2007), *overruled in part on other grounds by Kim, id.* In Davenport, the Court held that a mortgagor had standing to assert that the foreclosing party "did not own the mortgage or an interest in the mortgage" on the date of publication for the sheriff's sale. 275 Mich. App. at 347 & 345. As a result, the Court held that the foreclosing party "lacked the statutory authority to foreclose." Id. at 348.

[6] *See Smith v. Werkheiser*, 152 Mich. 177, 182, 115 N.W. 964 (1908) (holding that the mortgagors "had right to assert the claim of fraud in defense of the proceeding taken by" the assignee of the mortgagees "to foreclose her mortgage"). *See also Dohm v. Haskin*, 88 Mich. 144, 147-48, 50 N.W. 108 (1891) (third party foreclose sale bidder had standing to set aside invalid sheriff's sale and challenge validity of assignment of mortgage); *and see Sparos v. Edwards*, 249 Mich. 400, 402, 228

11

Moreover, under Michigan's "long-standing historical approach to standing[:]", the Court should "in its discretion, determine whether a litigant has standing", by ascertaining if the litigant "has *a special injury or right*, or *substantial interest*, that will *be detrimentally affected* in a manner different from the citizenry at large". *Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.*, 487 Mich. 349, 372, 792 N.W.2d 686 (2010) (emphasis added; footnotes omitted).

Plaintiff clearly has a special injury, right and/or a substantial interest **in her own home** that would be detrimentally affected by an illegal foreclosure in a manner different from any other citizen at large. This cannot realistically be disputed by Defendants. As such, Plaintiff has standing to enforce MCL 600.3204's requirement for a record chain of title prior to sheriff's sale. *Id.*

**E.   PLAINTIFF HAS RECOURSE PURSUANT TO MCL 600.3205a-c.**

Count 2 of Plaintiff's Verified Complaint seeks declaratory relief for violation of the statutory modification process governed by MCL 600.3205a-c. (*See Complaint* at Paragraphs 131-146.)

Defendants argue that Plaintiff does not have recourse pursuant to MCL 600.3205a-c, because the foreclosure has already been completed, citing the unpublished case of *Pettiford v. JPMorgan Chase Bank, N.A.*, No. 2:12-cv-11349,

---

N.W. 765 (1930) ("where a breach of a fiduciary relation and fraud are charged, and the *cancellation of a written assignment of a real estate mortgage* and note is sought, equity undoubtedly has jurisdiction") (emphasis added).

2013 U.S. Dist. LEXIS 98170, at *9-10. *See* <u>Defendants' Motion</u>, at pg. 12.

However, because Defendants did not comply with the Statutory Modification law, the sheriff's deed is void under Michigan law.

In *Mitan v Fed Home Loan Mortgage Corp, 703 F.3d 949 (CA6, Dec 12, 2012)*, the 6th held that "the failure to comply with the loan-modification process as outlined in the statute is a structural defect because it deprives the borrower of the opportunity to demonstrate eligibility for a loan modification that would avoid foreclosure altogether."

In fact, "as a matter of Michigan law, a lender that fails to follow the loan-modification procedures set forth by the statute has engendered a structural defect and is thus without authority to commence a foreclosure. Without a valid foreclosure, the redemption period has not begun, and the owner of the property retains an interest conferring standing to sue." *Id.* at p 15-16; *see also Kim, id.*

Plaintiff has therefore stated a claim for violation of the statutory modification laws that is sufficient to survive a motion for judgment on the pleadings, and Defendants' Motion should be denied.

**F.   Plaintiff has standing to bring a claim for violation of 12 USC 2609.**

Defendants claim that "Plaintiff cannot state a claim under 12 USC 2609 (Count IV), because there is no private right of action under that provision", and in support, Defendants cite a 5th Circuit case and a 7th Circuit case holding, as alleged

by Defendants in this case, that there is no private right of action under the provision in the 5th or 7th Circuits. *See* <u>Defendants' Brief</u>, at pg. 15.

The crushing problem for the Defendants is that we are neither in the 5th Circuit nor the 7th Circuit. As a matter of fact, the 6th Circuit **does recognize** a private right of action for Plaintiff to sue Defendants for violations of 12 USC 2609, as set forth in Count 4 of Plaintiff's Verified Complaint, and Defendants' Motion on these grounds must therefore be denied. *See Vega v. First Federal Sav. & Loan Assoc.,* 622 F.2d 918, 925 (6th Cir. 1980).

**G.    Plaintiff's RESPA claims are not all barred by the statute of limitations.**

Counts 4 through 9 and Count 11 state claims against Chase Servicing for violations of RESPA relative to the intentional, fraudulent placement of duplicative forced-place hazard insurance policies on Plaintiff's account, as well as for violations relative to the failure to notify Plaintiff of the assignment of her loan. (*See Complaint* at Paragraphs 152-175 and 181-184.)

Defendants argue that statute of limitations justifies the Court in taking a machete to all of Plaintiff's RESPA claims, although in reality, if anything, a scalpel is required. In other words, Defendants argue that since the <u>first</u> violations of RESPA occurred over three years ago, <u>all</u> subsequent violations are time-barred. (*See* <u>Defendants' Motion</u>, at pg. 15.)

However, Defendants' argument fails to take into account that its'

14

misconduct relative to the escrow account was not an isolated incident, but an ongoing act of fraud against Plaintiff, which was never corrected, and which was the primary reason for both Defendants' refusal to honor the modification contract, and for the ultimate foreclosure. (*See Complaint* at Paragraphs 41-48.)

In addition, this argument fails to take into account the fact that RESPA requires Defendants to perform an annual escrow analysis. *See* 12 USC 2609(c)(2). In other words, every year since the original misconduct relative to the escrow in 2010, Defendants have committed additional violations of RESPA, and Plaintiff has therefore stated claims sufficient to survive a motion for judgment on the pleadings for RESPA violations which occurred within three years from the date of the filing of the Verified Complaint on February 28, 2014, in Counts , 7, 8 and 9. With respect to Counts 6 and 11, Plaintiff would agree to dismiss those claims.

## H.    The Statute of Frauds relative to financial institutions does not bar Plaintiff's claims breach of contract or promissory estoppel.

Defendants next claim that Count 13 (Breach of Contract) and Count 14 (Promissory Estoppel), are precluded by MCL 566.132(2), which bars actions based on a financial institution's alleged promise to modify a loan, unless the agreement is in writing and signed with an authorized signature by the financial institution." (*See* Defendants' Motion, at pgs. 17-18.)

However, Defendants vastly overstate the reach of MCL 566.132(2), and conveniently left out any analysis of any judicial opinion which has ever

interpreted its requirements. Several courts have held that allegations **__identical__** to those raised by Plaintiff state a cause of action for breach of contract and/or promissory estoppel, notwithstanding the requirements of MCL 566.132(2).

Specifically, in *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805 (WD MI 2011 – Janet T. Neff), the Court was faced with a Trial Period Plan ("TPP") with language almost identical to the TPP in this case. Just like in this case, the Defendants used their own failure to send a permanent modification to Plaintiff, after the successful completion of the TPP, as "evidence" that there was no contract between the parties. *Id.* However, Judge Neff denied the Defendants' Motion for Judgment on the Pleadings, on both the Breach of Contract and Promissory Estoppel claims, based specifically on the Plaintiff's compliance with all of the requirements of the TPP. *Id.* (*See* Darcy -- **Ex. "F"** herein.)

Similarly, in *Bolone v. Wells Fargo Home Mortg., Inc.*, 858 F.Supp.2d 825 (ED MI 2012 – Lawrence P. Zatkoff), the Court was confronted with a TPP that was essentially identical to the TPP in the case at bar, and held that TPPs are valid contracts, and that the failure to send a permanent modification after successful completion of a TPP states an actionable claim for breach of contract that defeats the statute of frauds relative to financial institutions. *Id*, at 832-836.

Moreover, in *Frost v. Wells Fargo Bank, N.A.*, 901 F.Supp.2d 999 (ED MI 2012 – Janet T. Neff), the Court was once again confronted with another TPP

practically identical to the TPP in this case. Judge Neff reminded us that the statute is required to be applied on a case-by-case basis. She then analyzed the facts, which are nearly identical to the facts of this case, and concluded that the TPP and related writings, including TPP checks cashed by the Defendants, constituted a binding contract to permanently modify the mortgage. *Id*, at 1006-1008.

Shortly after the *Frost* decision, the issue again fell to Judge Zatkoff, who again found a binding contract notwithstanding the statute, in *Yates v. U.S. Bank Nat. Ass'n*, 912 F.Supp.2d 478 (ED MI 2012 – Lawrence P. Zatkoff).

In *Yates*, the basic facts were identical to this case, i.e. the offer of a TPP, acceptance and performance of the requirements of the TPP by the Plaintiff, followed by the failure of Defendants to permanently modify, and held that:

> when viewing the facts in a light most favorable to Plaintiffs, once Plaintiffs signed the Plan, Plaintiffs accepted Defendants' offer. Therefore, the Court concludes that there was a mutuality of agreement and a mutuality of obligation of the parties. As the parties do not dispute that any of the other three elements of a valid, binding contract exist in this case, the Court concludes that there is sufficient evidence in the record to support a finding that the Plan constitutes a valid, binding contract between the parties. *Id*, at 487-488.

Judge Zatkoff then turned to the argument regarding the statute of frauds relative to financial institutions, and held that the TPP, which was in writing, took the case entirely out of the realm of the statute of frauds relative to financial institutions, and denied the Defendants' motion to dismiss on those grounds. *Id.*

In the instant action, the TPP was accompanied by a letter which was actually signed by a named representative of Defendants. As such, Judge Zatkoff's analysis in Yates applies, and requires that Defendants Motion be denied.

Finally, in *Williams v. Saxon Mortg. Services, Inc.*, 2014 WL 765055 (ED MI 2014 – Sean F. Cox), Judge Cox denied the Defendants' motion to dismiss pursuant to FRCP 12(b)(6), based on the statute of frauds relative to financial institutions, where "Defendant's signature on the TPP constituted an offer to modify Plaintiffs' loan if Plaintiffs complied with the terms of the trial period and if all of Plaintiff's representations about their financial situation continued to be true at the end of the trial period. Plaintiffs allege that all three of those events took place, yet Defendant failed to offer them a permanent modification of their mortgage." *Id*, at *2 (*See Williams* – **Ex. "G"** hereto.)

The instant action is analogous to *Williams*, in that in this case, the TPP is accompanied by a cover letter, which is signed by Mary Ann Callahan, "Chase National Homeownership Center Manager", and for this reason, Defendants' Motion must be denied. (*See* TPP attached as **Ex. "L"** to Complaint.)

## I.      Plaintiff has stated a claim for breach of the mortgage contract.

Defendants next claim that Plaintiff's breach of contract claim relative to the Mortgage should be dismissed, because Plaintiff allegedly failed to allege a breach of the contract by Defendants. (*See* <u>Defendants' Motion</u>, at pg. 19-21.)

However, Plaintiff clearly alleged a breach of the contract by Defendants, in Paragraph 203 of the Verified Complaint.[7]

Defendants next argue that Plaintiff failed to allege that the improper escrow activity caused her injury. However, Plaintiff's Verified Complaint states that "[a]s a result of Defendants' breach of contract, Plaintiff has suffered damages, as more specifically set forth herein." (*See* Verified Complaint, at Paragraph 205.)

The Common Allegations also explain that the damage caused to Plaintiff was the fact that the improper escrow activity was the direct cause of the denial of permanent modification even after the successful completion of the TPP (Complaint at Paragraph 48), and that Defendants' actions in putting numerous fraudulently inflated insurance policies on the Property, and charging Plaintiff for all of them, has muddled the foreclosure process, by causing Defendants to request thousands of dollars more from Plaintiff to keep the loan out of foreclosure than to reinstate the loan. (*See* Verified Complaint, at Paragraphs 89-91.)

In addition, Plaintiff alleged that as a result of Defendants' breach of the mortgage, "Plaintiff purchased her own hazard insurance policy" at which point

---

[7] Defendants, by their conduct as described herein, have breached these requirements of the contract, by failing to credit Plaintiff for payments made for escrow items, by failing to pay escrow items, by force-placing fake and ridiculously expensive and duplicative insurance policies on Plaintiff's account, and by foreclosing instead of cleaning up their own mistake. (*See* Verified Complaint, at Paragraph 203.)

the actions of Defendants caused damages to Plaintiff, in that she was unnecessarily forced to pay $2,201.44 per year out of pocket for hazard insurance, while at the same time Defendants were billing her $4,518 for a duplicative forced place policy on the same house. (*See* Complaint, at Paragraph 47.)

## J.    Plaintiff has stated a claim for fraud.

Counts 16 and 17 seek redress for intentional and/or constructive fraud, based on three issues. The first is Plaintiff's assertion that Defendants placed duplicative hazard insurance policies on her escrow account.

Defendants contend that although they sent Plaintiff numerous written correspondence containing material misrepresentations regarding the status of her escrow account, she could not satisfy the requirement that she relied upon the misrepresentations. (*See* Defendants' Motion, at pg. 21.)   However, Plaintiff specifically alleged that as a result of Chase Servicing's insistence that the misrepresentations were true, she was unable to pay the sums requested by Chase Servicing to reinstate her loan, and she therefore ceased disputing Chase Servicing's misrepresentations and agreed to Chase Servicing's request for her to agree to a short sale. (*See* Complaint at Paragraphs 40-48; 61-62 and 80).

Plaintiff's Verified Complaint next claimed a separate act of fraud relative to Chase Servicing lying to her and improperly advising her that she needed to fall behind in her mortgage to qualify for modification, and promising her that if she

stopped making payments and called back when in default, her loan would be modified. (*See* Complaint at Paragraphs 214 and 221).

Defendants first contend that Plaintiff did not provide enough factual detail. (*See* Defendants' Motion, at pg. 22.) However, Plaintiff makes it clear that Chase Servicing's telephone customer service representative made the representations at issue over the telephone in late 2009. (*See* Complaint at Paragraphs 39-40).

Defendants next contend that the Trial Period Plan, which Plaintiff accepted and performed, required that she remained bound by the original terms of the Mortgage. (*See* Defendants' Motion, at pg. 22.)

However, Defendants misrepresent the provisions of the TPP. In reality, the TPP states that "all terms and provisions of the Loan Documents, **except as expressly modified by this agreement**, remain in full force and effect." (*See* TPP, at Paragraph 3h - attached as **Ex. "L"** to the Verified Complaint.) Here, the loan documents were modified to accommodate for the TPP and ultimately permanent modification, and as such, Plaintiff states a valid claim for fraud relative to Defendants' use of the modification process to trick her into foreclosure.

Defendants next strangely contend that since Plaintiff **ultimately** threw up her hands, gave up her fight against Chase Servicing, and agreed to participate in a short sale to save what was left of her credit, Plaintiff somehow contradicted her claim that in the years **before** agreeing to a short sale, Defendants strung her along

21

with promises of a modification. (*See* <u>Defendant's Motion</u>, at pg. 22.)

However, Plaintiff's allegations state a claim sufficient to survive a motion for judgment on the pleadings. Specifically, Plaintiff alleges that Defendants strung her along with promises from late 2009 all the way through approximately October, 2012, and that she relied upon those promises for all that time, until she finally stopped relying upon the representations, and agreed to a short sale.

Defendants next make the most absurd claim – that since Plaintiff remained bound by the Mortgage during the trial period, Defendants were entitled to defraud her with intentional misrepresentations. (*See* <u>Defendants' Motion</u>, at pg. 22.)

Clearly, there are no provisions in the loan documents allowing Defendants to fraudulently misrepresent facts to Plaintiff, and Defendants do not cite any provisions in the loan documents allowing for the same.

## K.   Plaintiff has stated a claim for civil conspiracy.

Defendants next assert that Plaintiff's claim for civil conspiracy fails because Plaintiff allegedly has not stated a separate, actionable tort that that the Defendants conspired to commit. *See* <u>Defendants' Motion</u>, at pg. 24.)

However, to state a claim for civil conspiracy under Michigan law, "a plaintiff need only allege that the defendants were jointly engaged in tortious activity as a result of which the plaintiff was harmed." *Abel v. Eli Lilly and Co.*, 418 Mich. 311, 338, 343 N.W.2d 164 (1984).

Plaintiff makes such allegations here, and therefore Defendants' Motion should be denied.[8]

**L.    Plaintiff has stated claims for violations of the Regulation of Collection Practices Act and Fair Debt Collection Practices Act.**

Defendants argue that Plaintiff's claims for violation of the Regulation of Collection Practices Act and Fair Debt Collection Practices Act are insufficient, in that they do not contain enough factual support. (*See* <u>Defendants' Brief</u>, at pg. 24.)

However, this argument is untrue. Plaintiff alleges that Chase made false statements as to its standing to foreclose. (*See* Complaint at Paragraphs 258 and 264.) Chase failed to disclose in its communications to Plaintiff that Chase is merely a servicer of the loan. Instead, Chase fraudulently and intentionally held itself out as the mortgagee. Such facts state a claim under the statute.[9]

Plaintiff also alleges Chase failed "to implement a procedure to prevent a violation [of Michigan's Regulation of Collection Practices Act] designed by an employee," thereby stating a claim for relief. (*See* Complaint at Paragraph 258.)

---

[8] Plaintiff's Complaint alleges that "Defendants have illegally, maliciously, and/or wrongfully conspired with one another with the intent to violate the Fair Debt Collection Practices Act, Michigan's counterpart statutes, and/or the various other torts alleged within the Counts contained within this Complaint, for the improper purpose of forcing Plaintiff into foreclosure, such that Defendants could effectuate a bailout". (*See* Compl. at ¶¶ 252-254.)

[9] MCL 445.252(a); *see also* MCL 445.252(e) (prohibiting "making an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt or concealing or not revealing the purpose of a communication when it is made in connection with collecting a debt.").

Defendants are on reasonable notice of the legal and factual basis of Plaintiffs' claim under Act, and their Motion should therefore be denied. [10]

**M.    Plaintiff has stated a claim sufficient to survive a motion for judgment on the pleadings regarding the sheriff's sale being conducted by a corporation unlicensed to transact business in Michigan.**

Defendants claim that Count 22 of the Complaint, seeking declaratory relief on the grounds that the foreclosure was conducted by an entity that is not authorized to transact business in Michigan is "incoherent", because the "Sheriff's Deed attached to the Complaint (Ex. "X" to the Complaint) repeatedly lists JPMorgan Chase Bank, N.A. as the holder of the mortgage, the foreclosing entity, and the Sheriff's Sale purchaser." (*See* Defendants' Motion, at pgs. 24-25.)

However, as alleged in the Verified Complaint, and backed up by evidence in the form of the Legal News publication attached an exhibit thereto, Chase Home Finance, LLC conducted the foreclosure, although it is not licensed to do so in the State of Michigan. (*See* Verified Complaint, at Paragraphs 267-268.)

At the very least, the statements contained within the Sheriff's Deed referencing Chase Bank as the foreclosing entity, and the statements contained within the Legal News publication identifying Chase Home Finance, LLC, create a question of fact as to which entity actually conducted the foreclosure, which is not

---

[10] *See, e.g., Mielke v. Bank of Am. Home Loan Servicing LP*, No. 2:10-cv-11576, 2011 U.S. Dist. LEXIS 41617, at *22-23 (E.D. Mich. Apr. 18, 2011) (unpub. op. attached as **Ex. "H"** hereto.) (holding that the plaintiff stated a claim under the Michigan Act and denying a motion to dismiss)

appropriately resolved on a FRCP 12(b)(6) motion for judgment on the pleadings.

**N.      Summary Judgment would be premature where the parties have not had time sufficient to engage in discovery.**

Plaintiff has not yet been afforded sufficient time to develop facts essential to justify her opposition to Defendants' Motion through the discovery process, and summary judgment would therefore be premature. *CenTra*, 538 F.3d at 420. [11]

## CONCLUSION

For the reasons stated above, this Court should deny Defendants' Motion, and award Plaintiff costs and reasonable attorney fees, so wrongfully incurred.

Respectfully submitted:                    **GANTZ ASSOCIATES**

Dated:  July 2, 2014

By:     /s/ Adam J. Gantz
        Adam J. Gantz (P58558)
        Attorneys for Plaintiff
        27750 Middlebelt Road, Suite 100
        Farmington Hills, MI 48334
        Telephone: (248) 987-6505
        agantz@gantzassociates.com

---

[11] *See also* <u>Routman</u>, 873 F.2d at 971; and *Mott v. Bank of America, N.A.*, No. 1:12-cv-00462 (W.D. Mich. 2012 - Hon. Jonker) (noting that, with respect to the plaintiff's claims, "the best time to address them all is after each side has a full opportunity to develop the record"). (*See* <u>Mott</u> – **Ex. "I"** herein.)

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2014, I electronically filed **PLAINTIFFS' BRIEF IN RESPONSE TO MOTION TO DISMISS,** using the Court's ECF system, which will automatically send notice of such filing to all attorneys of record.  I further certify that I did not serve this document on any party via U.S. Mail.

Respectfully submitted:

**GANTZ ASSOCIATES**

Dated:  July 2, 2014          By:   /s/ Adam J. Gantz
                                    Adam J. Gantz (P58558)
                                    Attorneys for Plaintiff
                                    27750 Middlebelt Road, Suite 100
                                    Farmington Hills, MI 48334
                                    Telephone: (248) 987-6505
                                    agantz@gantzassociates.com

# EXHIBIT "A"

Chalmers v. JP Morgan Chase Bank, NA, Not Reported in F.Supp.2d (2012)

2012 WL 4839861
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Scott CHALMERS, Plaintiff,
v.
JP MORGAN CHASE BANK, NA, Defendant.

No. 12–10903.   |   Oct. 11, 2012.

**Attorneys and Law Firms**

Benjamin J. Henry, Brad B. Aldrich, Aldrich Legal Services, PLLC, Plymouth, MI, for Plaintiff.

Kyle R. Dufrane, Dykema Gossett, Nasseem S. Ramin, Dykema Gossett, Detroit, MI, for Defendant.

Opinion

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS*

DENISE PAGE HOOD, District Judge.

**I. BACKGROUND**

**\*1** On February 8, 2012, Defendants JP Morgan Chase Bank, NA ("JP Morgan Chase"), Mortgage Electronic Registration Systems, Inc. ("MERS"), and Federal National Mortgage Association ("FNMA") (collectively "Defendants") removed to this Court the Complaint filed by Plaintiff Scott Chalmers ("Chalmers") before the Wayne County Circuit Court, State of Michigan. Chalmers alleges claims of: Breach of Contract (Count I); Innocent Misrepresentation (Count II); Silent Misrepresentation (Count III); and Injunctive Relief (Count IV).

Chalmers is the owner and resident of property commonly known as 22444 Outer Drive, Dearborn, MI 48124. (Comp., ¶ 8) Chalmers executed a note and mortgage on the subject property to MERS dated November 2, 2007. (Comp., ¶ 9) The mortgage was assigned to JP Morgan Chase on March 11, 2010. (Comp., ¶ 11) The monthly payment, including principal, interest, taxes and insurance was $946 .25. (Comp., ¶ 12) Chalmers missed the monthly payment for November 2009. (Comp., ¶ 13) Chalmers made a payment in December 2009. (Comp., ¶ 14) Chalmers missed his monthly payments

for January and February 2010. (Comp., ¶ 16) Chalmers mailed a payment for the missed payments in addition to the March 2010 payment to JP Morgan Chase in March 2010. (Comp., ¶ 16) JP Morgan Chase refused this payment and returned the payment to Chalmers. (Comp., ¶ 17) JP Morgan Chase instructed Chalmers to contact the Chase Fulfillment Center in an attempt to refinance his home which Chalmers did on numerous occasions between March and July 2010. (Comp., ¶¶ 18–19) Chalmers claims JP Morgan Chase refused to accept payments from Chalmers during this period of time. (Comp., ¶ 20)

Chalmers received a letter from Trott & Trott dated July 14, 2010 stating that he must pay $9,244.51 to bring his loan current. (Comp ., ¶ 21) Chalmers claims he was able to pay this amount at that time. (Comp., ¶ 22) Chalmers contacted JP Morgan Chase to verify that Trott & Trott was affiliated with JP Morgan Chase. (Comp., ¶ 24) JP Morgan Chase instructed Chalmers not to communicate with Trott & Trott regarding his mortgage and note but to continue contacting JP Morgan Chase directly, which Chalmers did. (Comp., ¶¶ 25–26) Chalmers asserts he repeatedly supplied JP Morgan Chase documents it required to consider him for a modification or other loan assistance, but JP Morgan Chase repeatedly lost this information. (Comp., ¶¶ 27–28) Chalmers claims during this period JP Morgan Chase continued to refuse payment from Chalmers. (Comp., ¶ 29)

In a letter dated April 27, 2011, JP Morgan Chase informed Chalmers that he did not qualify for any assistance programs. (Comp ., ¶ 30) Chalmers received little to no communication from JP Morgan Chase following this denial. (Comp., ¶ 31) The property was sold at a foreclosure sale on May 11, 2011 and JP Morgan Chase was the purchaser. (Comp., ¶¶ 32–33) The property was transferred to FNMA in a quit claim deed dated September 30, 2011. (Comp., ¶ 34) Eviction proceedings commenced on December 9, 2011 before the 19th District Court in Dearborn, Michigan. (Comp., ¶ 35) FNMA received a Judgment for Possession and an Order of Eviction for February 15, 2012. (Comp., ¶ 36)

**\*2** This matter is before the Court on all three Defendants' Motion to Dismiss. Defendants move to dismiss the action based on lack of standing or subject matter jurisdiction under Rule 12(b)(1), failure to state a claim upon which relief may be granted under Rule 12(b)(6) and failure to specifically allege the elements of fraud under Rule 9(b). A response and reply have been filed.

## II. ANALYSIS

### A. Standard of Review

Rule 12(b) (1) of the Rules of Civil Procedure provides for dismissal for lack of jurisdiction over the subject matter. Fed.R.Civ.P. 12(b)(1). Motions under Rule 12(b)(1) fall into two general categories: facial attacks and factual attacks. *See, RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir.1996). A facial attack challenges the pleading itself. In considering this type of attack, the court must take all material allegations in the complaint as true, and construe them in light most favorable to the non-moving party. *Id.* Where subject matter jurisdiction is factually attacked, the plaintiff bears the burden of proving jurisdiction to survive the motion, and "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* In a factual attack of subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* Rule 12(b) (6) of the Rules of Civil Procedure provides for a motion to dismiss based on failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted). Although not outright overruling the "notice pleading" requirement under Rule 8(a)(2) entirely, Twombly concluded that the "no set of facts" standard "is best forgotten as an incomplete negative gloss on an accepted pleading standard." *Id.* at 563. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* at 557. Such allegations are not to be discounted because they are "unrealistic or nonsensical," but rather because they

do nothing more than state a legal conclusion-even if that conclusion is cast in the form of a factual allegation. Ashcroft v. Iqbal, 556 U.S. 662, 681, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In sum, for a complaint to survive a motion to dismiss, the non-conclusory "factual content" and the reasonable inferences from that content, must be "plausibly suggestive" of a claim entitling a plaintiff to relief. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not shown that the pleader is entitled to relief. Fed.R.Civ.P. 8(a) (2). The court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir.2001).

### B. Standing

**\*3** Defendants argue that Chalmers does not have standing to challenge the foreclosure sale because he no longer has a legal interest in the property after the expiration of the redemption period on November 11, 2011. Chalmers responds that he is alleging a breach of contract claim, along with misrepresentation claims against Defendants and that his Complaint is not simply one for wrongful foreclosure. Chalmers argues that because of JP Morgan Chase's refusal to accept his payments as required under the contract, and JP Morgan Chase's misrepresentations that Chalmers should not contact Trott & Trott, Chalmers was injured in that his house was foreclosed upon.

Standing is a jurisdictional matter and is a threshold question to be resolved by the court before the court may address any substantive issues. *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir.1987). Article III of the United States Constitution limits the federal courts' jurisdiction to "cases and controversies." In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the United States Supreme Court set forth three elements to establish standing: 1) that he or she suffered an injury in fact, which is both concrete and actual or imminent; 2) that the injury is caused by defendants' conduct; and 3) that it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. "A plaintiff bears the burden of demonstrating standing and must plead its components with specificity." *Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir.1999) (citing *Valley Forge Christian College v.*

*Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

In Michigan, once the redemption period following foreclosure of a parcel real property has expired, the former owners' rights in and title to the property are extinguished. *Piotrowski v. State Land Office Bd.,* 302 Mich. 179, 187, 4 N.W.2d 514 (1942); *Overton v. Mortgage Electronic Registration Systems,* 2009 WL 1507342, *1 (Mich.App.2009) (unpublished); and *Smith v. Wells Fargo Home Mortgage, Inc.,* Case No. 09–13988 (E.D.Mich.2010) (unpublished); *Awad v. GMAC,* 2012 WL 1415166 (Mich.App.2012) (unpublished). Filing of a lawsuit does not toll the redemption period and once that period expired, the plaintiff lacked standing to challenge the foreclosure proceedings. *Overton,* 2009 WL 1507342 at * 1.

A review of Chalmers' Complaint shows that he is not necessarily challenging the foreclosure proceedings. Chalmers alleges claims of breach of contract and misrepresentations by JP Morgan Chase. Chalmers does not assert claims under Michigan's foreclosure statutes. The *Overton* opinion and its progeny hold that once the redemption period following foreclosure of a parcel real property has expired, the former owners' rights in and title to the property are extinguished. *Overton, supra.* These cases challenge whether Michigan's foreclosure statutes were followed. Chalmers' requested relief for the breach of contract and misrepresentation claims include monetary damages *or* as alternative relief, for an order setting aside the foreclosure sale. It is not until the causes of action are resolved that the Court needs to consider the relief requested.

 *4  Applying the three elements to establish standing to Chalmers' breach of contract and misrepresentation claims, the Court finds he has met the elements. Chalmers has alleged he suffered an injury in fact due to the foreclosure of his home, by losing his home. Chalmers has sufficiently alleged that the injury was caused by JP Morgan Chases' conduct, specifically by failing to accept his payments and by its misrepresentations including that Chalmers not to communicate with Trott & Trott. Chalmers has also sufficiently alleged that the injury will be redressed if Chalmers were to obtain a favorable decision by way of monetary damages or alternatively, injunctive relief. Defendants' Motion to Dismiss based on standing should be denied.

**C. Laches**

Defendants move to dismiss the Complaint claiming that the doctrine of laches bars Chalmers' claims. Chalmers responds that his failure to file suit earlier is neither unexcused nor unexplained since he was attempting to modify his loan with JP Morgan Chase during the redemption period.

The doctrine of laches is an equitable principle that bars recovery in circumstances in which a plaintiff's delay in seeking a judicial remedy prejudices a defendant. *Bylinski v. City of Allen Park,* 169 F.3d 1001, 1003 (6th Cir.1999). A party invoking this equitable principle must show that the plaintiff unreasonably delayed in bringing suit and that the defendant was prejudiced by the delay. *Id.*

Defendants assert that Chalmers delayed brining the suit until after the foreclosure sale occurred and that JP Morgan Chase was prejudiced because it relied upon the validity of the sale when it transferred its title interest to FNMA. Chalmers asserts that he was attempting to modify his loan with JP Morgan Chase during the redemption period. He presumed mortgage companies and the courts would prefer homeowners attempt to reach an agreement regarding the mortgage rather than involving the courts in foreclosure proceedings. Chalmers argues that JP Morgan Chase and the other Defendants are not in a worse condition since he was still in possession and is still in possession of the property. It is Chalmers who stands to lose his home.

The Court finds that Chalmers did not unreasonably delay in brining the suit in light of his allegations in the Complaint that he was attempting to resolve the payment issue with JP Morgan Chase. Chalmers also alleges JP Morgan Chase refused to accept his payments and that it was JP Morgan Chase's misrepresentations which caused the foreclosure proceedings. Defendants are not prejudiced by the delay since Chalmers alone has been in possession of the property at issue. Defendants have not argued that the statute of limitations has run as to Chalmers' breach of contract and misrepresentation claims. Defendants' Motion to Dismiss based on the laches doctrine should be denied.

**D. Collateral Attack**

Defendants argue that the instant suit is barred by the doctrine of *res judicata.* Chalmers argues that his claims are not a collateral attack on the district court's judgment of possession since he seeks money damages as well as reversal of the foreclosure sale.

**\*5** In its modern form, the doctrine of *res judicata* involves both "claim preclusion" and "issue preclusion." *See Migra v. Warren City School District Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Claim preclusion involves three elements: 1) there must be a final judgment on the merits on the prior lawsuit; 2) the same claims are involved; and 3) the same parties or their privies are involved. *EEOC v. United States Steel Corp.,* 921 F.2d 489, 493 (3rd Cir.1990); *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *James v. Gerber Products Co.,* 587 F.2d 324, 327–28 (6th Cir.1978). *Res judicata* requires that a plaintiff initially raise all claims in prior suits and therefore bars those claims from being litigated at some future time. *See Rivers v. Barberton Board of Education,* 143 F.3d 1029, 1031–32 (6th Cir.1998).

In the district court judgment of possession, there is no dispute that there exists a final judgment on the merits. As to whether the same claims were involved, the claims in this case allege breach of contract and misrepresentation claims. The claim involved in the judgment of possession involved the foreclosure proceedings and the redemption period expiration, which, as Chalmers asserts in his response, he is not challenging. Chalmers asserts he is seeking money damages and that the injunctive relief requested is to stay the judgment of possession until his claims of breach of contract and misrepresentations are resolved. The Court finds that based on Chalmers' allegations in his Complaint and arguments in his response to the motion, *res judicata* is not applicable as to his breach of contract and misrepresentation claims. Chalmers does not challenge the foreclosure proceedings.

### E. Fraud (Counts II and III)

#### 1. Rule 9(b)
Defendants argue that Chalmers failed to plead his fraud claims with specificity. Chalmers responds that he is not claiming the fraud claims which require a more demanding notice pleading under Rule 9(b), but that he is alleging misrepresentation claims under Michigan law, which do not require such stringent pleading requirements.

The Sixth Circuit has interpreted Rule 9(b) as requiring a plaintiff to allege the time, place, and content of the alleged misrepresentation on which they relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud. *See, Yuhasz v. Brush Welman, Inc.,* 341 F.3d 559, 563 (6th Cir.2003). In Michigan, a

claim for innocent misrepresentation is shown where a party detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the misrepresentation. *Roberts v. Saffell,* 280 Mich.App. 397, 404, 760 N.W.2d 715 (2008). It is unnecessary to prove that the party making the representation had knowledge that it was false. *Id.* There must be privity of contract between the party making the representation and the party claiming to have detrimentally relied on it. *Id.* Innocent misrepresentation is different from fraudulent misrepresentation in that in a common law fraud action, the plaintiff must establish that the defendant knowingly or recklessly misrepresent a material fact with the intent that the other party rely on it. *Id.* As to silent fraud, a plaintiff must prove the defendant knew of a material fact but concealed or suppressed the truth through false or misleading statements or actions with the intent to deceive. *Id.* at 405, 760 N.W.2d 715.

**\*6** Chalmers claims that JP Morgan Chase instructed him not to communicate with Trott & Trott and that he detrimentally relied on the representation and that such fact was material. Because Chalmers claims that he is not seeking to enforce any type of promise, but to hold Defendants responsible for the misrepresentation that he not contact Trott & Trott (but to continue to contact the "Chase Fulfillment Center") Chalmers asserts that he has stated an innocent misrepresentation and silent fraud claim.

Based on Chalmers' representation that he is not claiming a common law fraud claim, but is alleging innocent misrepresentation and silent fraud claims in his Complaint. Chalmers has not specifically stated when and who told him not to contact Trott & Trott. The Sixth Circuit has held that claims, including innocent misrepresentation and silent fraud claims under Michigan law must meet the particularity requirements under Rule 9(b). *Smith v. Bank of America, Corp.,* 2012 WL 2301645 (6th Cir. Jun.8, 2012) (unpublished). The Court will allow Chalmers to amend his Complaint to allege sufficient facts to support the claims in Counts II and III, the misrepresentation and fraud claims, as required under Rule 9(b).

#### 2. Statute of Frauds
Defendants move to dismiss the fraud-based claims asserting that any promise by Defendants that they would not foreclose on the property must be in writing as required under the statute of frauds. Chalmers responds that he is not seeking to enforce any type of promise, but to hold Defendants responsible for the misrepresentation that he not contact Trott & Trott, but

continue to contact the "Chase Fulfillment Center." Based on Chalmers' representation that he is not relying on any promises by Defendants that they would not foreclose on his home and that he is merely seeking damages for their misrepresentations, the Court finds that the statute of frauds is not implicated. The motion to dismiss must be denied based on the statute of frauds argument.

### F. Breach of Contract (Count I)

Defendants move to dismiss arguing that Chalmers failed to state a breach of contract claim but not identifying the contract at issue. In response, Chalmers argues that there is no confusion that he alleges that Defendants breached the note and mortgage between the parties by failing to accept his payments he submitted in full.

The elements of a breach of contract claim under Michigan law are: 1) the existence of a contract between the parties; 2) the terms of the contract require performance of certain actions; 3) a party breached the contract; and 4) the breach caused the other party injury. *Webster v. Edward D. Jones & Co., L.P.,* 197 F.3d 815, 819 (6th Cir.1999). Defendants' only argument in its motion is that Chalmers does not identify the contract between the parties. Since Chalmers in his response indicated the contract at issue is the Note and Mortgage, which he attached to his Complaint, the motion to dismiss must be denied. Chalmers asserts that JP Morgan Chase's failure to accept his payments in full caused Chalmers injury. Defendants argue that Chalmers was in "default" as defined in the Note and that JP Morgan Chase had the authority to foreclose in his mortgage. However, the Note also provides that the "Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount." (Note, ¶ 6) Chalmers asserts that he provided the full amount he was required to pay, yet JP Morgan Chase refused to accept the amount. The motion to dismiss based on the breach of contract claim must be denied.

### G. Injunctive Relief (Count IV)

**\*7** Defendants seek to dismiss the Injunctive Relief count because the 19th District Court has already issued a Judgment of Possession. In response, Chalmers argues that he is likely to prevail on a preliminary injunction in this case.

The Injunctive Relief Count is not a claim or cause of action, but rather a request for relief. As Chalmers argues in his response, in this "count" he is seeking preliminary injunction. Rule 65, E.D. Mich. LR 65.1 governs any preliminary injunction motion. LR 65.1 states that such motions must brought in "a separate motion." E.D. Mich. LR 65.1. The CM/ECF policies and procedures state that "a complaint must not be combined with a motion for preliminary relief." R5, Elec. Filing Pol. & Proc. However, given that Chalmers did not file the Complaint originally with this Court, but that it was removed by Defendants, the Court will not strike the Complaint. The Court will not consider Count IV as a claim or cause of action. Defendants' Motion to Dismiss Count IV as a claim is granted, but denied as a relief to be sought by Chalmers, by way of a motion, if he so chooses.

### III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the Motion to Dismiss (**Doc. No. 7**) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the breach of contract claim remains in Count I. As to Counts II and III, the misrepresentation and silent fraud claims, Plaintiff may amend these claims to allege facts with particularity as required under Rule 9(b) by the date set forth in the Scheduling Order. If Plaintiff does not amend the Complaint, Counts II and III are deemed DISMISSED. Count IV, the injunctive relief claim is DISMISSED as a "claim or cause of action," but will be considered as a relief requested by Plaintiff.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "B"

Langley v. Chase Home Finance, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 1130926
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
W.D. Michigan,
Southern Division.

Sylvester LANGLEY, Plaintiff,
v.
CHASE HOME FINANCE, LLC, et al., Defendants.

No. 1:10–cv–604.    |    March 28, 2011.

**Attorneys and Law Firms**

Sylvester Langley, Benton Harbor, MI, pro se.

Courtney D. Roschek, David E. Hart, Maddin Hauser Wartell
Roth & Heller PC, Southfield, MI, for Defendants.

**Opinion**

*ORDER APPROVING REPORT AND
RECOMMENDATION AND REMANDING
SOLE REMAINING STATE LAW CLAIM*

ROBERT J. JONKER, District Judge.

**\*1** The court has reviewed the Report and Recommendation
filed by the United States Magistrate Judge in this action.
The Report and Recommendation advises this Court to grant
the Defendants' dispositive motions in all but one respect:
namely, Plaintiff's procedural challenge under Michigan
law to various aspects of the foreclosure by advertisement
procedure used by Defendants. As to this remaining state
law claim, the Magistrate Judge recommends that this Court
decline to continue exercising supplemental jurisdiction, and
remand the matter to State court because there is no ongoing
basis for original federal jurisdiction on either a federal
question or diversity basis.

Plaintiff has not objected to the Report and
Recommendation. **Accordingly, to the extent the
Report and Recommendation recommends a grant
of Defendants' dispositive motions, the Report and
Recommendation of the Magistrate Judge, filed March**
**11, 2011, is approved and adopted as the opinion of the
court.**

Under the Federal Rules of Civil Procedure, where a party has
objected to portions of a Report and Recommendation, "[t]he
district judge ... has a duty to reject the magistrate judge's
recommendation unless, on de novo reconsideration, he or
she finds it justified." 12 WRIGHT, MILLER, & MARCUS,
FEDERAL PRACTICE AND PROCEDURE § 3070.2, at
381 (2d ed.1997). Specifically, the Rules provide that:

> The district judge must determine
> de novo any part of the magistrate
> judge's disposition that has been
> properly objected to. The district
> judge may accept, reject, or modify
> the recommended disposition; receive
> further evidence; or return the
> matter to the magistrate judge with
> instructions.

FED R. CIV. P. 72(b)(3). De novo review in these
circumstances requires at least a review of the evidence
before the Magistrate Judge. *Hill v. Duriron Co.,* 656 F.2d
1208, 1215 (6th Cir.1981). Defendant Chase has objected
to the portion of the Report and Recommendation advising
the Court to deny its dispositive motions on the Plaintiff's
challenge under State law to the process used for foreclosure
by advertisement. Defendant Trott & Trott has not objected
to this aspect of the Report and Recommendation. The Court
has reviewed de novo the claims and evidence presented
to the Magistrate Judge on this issue; the Report and
Recommendation itself; and all other matters of record. After
its review, the Court finds the Magistrate Judge's Report
and Recommendation to be both factually sound and legally
correct on this disputed issue.

Defendant Chase first objects that it has, in fact, addressed
Plaintiff's State law claims on the merits, and that the
Magistrate Judge was wrong to conclude otherwise. It is
true that Chase addressed the Plaintiff's claim that State
law foreclosure requires production by the initiating party
of an originally signed, so-called "blue ink" copy, of the
Promissory Note. But Plaintiff's response to the Chase
dispositive motions goes beyond this claim and asserts
other procedural challenges that have not been the subject
of merits briefing. When construing pro se pleadings and
other papers filed by litigants like Plaintiff in this case, the
Magistrate Judge properly pointed out the need for some
level of judicial caution and indulgence in assessing the

Langley v. Chase Home Finance, LLC, Not Reported in F.Supp.2d (2011)

nature of the claims actually presented. Even these liberal construction standards were not enough in the Magistrate Judge's view to save some of Plaintiff's other claims, but with respect to the State law foreclosure issues, the Court agrees that there is enough of record to warrant denial of the Defendants' dispositive motions on this issue at this time. Most of Plaintiff's challenges to the State law foreclosure process root in some way in the role of MERS. The Court notes that application of State law foreclosure proceedings in the particular factual context of mortgages handled by MERS present especially challenging legal and factual issues. The issues are bedeviling experienced commercial attorneys and judges, *see, e.g. In re Agard,* ―― B.R. ――, 2011 WL 499959 (Bkrtcy.E.D.N.Y. Feb.10, 2011)[1], and so it is especially important to exercise restraint in reviewing *pro se* pleadings on the same issues. In addition, of course, Trott & Trott has not even objected to the Magistrate Judge's Report and Recommendation, and so to the extent Plaintiff's State law foreclosure challenge is asserted against Defendant Trott & Trott, it survives based on the lack of objection alone.

**\*2** Second, Chase suggests that remand would be inappropriate, and that Plaintiff's claim on this issue lacks ripeness because no foreclosure sale has yet occurred. This Court disagrees with Chase's claim that the issues are not ripe. It may be that no forced sale has yet occurred, but that is hardly the test for ripeness to challenge the foreclosure process. Everyone agrees that the foreclosure process has been initiated, and this is enough to trigger a Plaintiff's right

to object. Indeed, in some contexts, the Michigan foreclosure statute expressly authorizes actions to enjoin a foreclosure process, such as this one, that is underway but not yet complete. *See, e.g.* Mich. Comp. Laws Ann. § 600.3205a(5) (authorizing actions to enjoin foreclosure in certain home mortgage cases). Of course, Plaintiff would need to persuade a Court on the merits that some kind of emergent relief was appropriate. But plainly ripeness is not a problem.[2] As the Magistrate Judge urged, the merits of this strictly State law claim are best handled in the first instance by the State Court, now that all federal claims have been dismissed, and in the absence of any other basis for original federal subject matter jurisdiction.

Accordingly, the Court rejects the only objection lodged by any party to the Report and Recommendation, and **adopts the Report and Recommendation on the only issue subject to objection.** Based on this decision, and on the Court's adoption the portions of the Report and Recommendation to which no party has objected, **all of Plaintiff's federal claims are dismissed with prejudice, and all but one of Plaintiff's state law claims are dismissed with prejudice.** The sole remaining claim is Plaintiff's challenge under State law to the foreclosure by advertisement process initiated by the Defendants. **This issue is remanded to the State Court** under 28 U.S.C. § 1367(c)(3).

**IT IS SO ORDERED.**

Footnotes

1   This Court takes no position at this time on the questions addressed by Judge Grossman in the *Agard* decision on the role of MERS, and its limits, in foreclosure matters. The Court simply notes at this time that the structure of MERS appears to raise new issues under mortgage law, and is not necessarily a simple extension of established securitization practices in which loan packages—including both the original note and its securing mortgage—were assigned and became collateral for a mortgage-backed investment of some kind. In those established arrangements, the note and mortgage stayed together as a package. Purported ownership interests, whether legal or equitable, in the note and mortgage were not severed, as they appear to have been in MERS transactions like this one. Moreover, the servicing agent in the transaction did not purport to take title to anything, whether "as nominee" or otherwise. Ultimately, these and other differences in the legal structure may not be dispositive. After all, as Defendants point out, Plaintiff is in admitted default on his obligation because he simply has not made his loan payments to anyone. Ultimately, a borrower that doesn't pay on a secured debt obligation should not be surprised to find out that he or she is going to lose rights in the underlying security. Indeed, it would seem that the continuing liquidity of any secondary market for mortgage financing depends on the ability of *bona fide* creditors to recover their collateral under established legal procedures in the event of default. Sooner or later, it would seem a borrower who mortgaged property to secure a note is going to have to pay up on the note, or lose all rights to the mortgaged property. But at this point in the case, the unique documentation and legal structure of MERS complicates the factual and legal picture and warrants denial of the Defendants' dispositive motions on the challenge to the foreclosure process.

2   The problem most Plaintiffs seem to encounter in this area is the opposite of ripeness. This Court has a rising number of mortgage foreclosure cases on its docket. Many of the cases originate after a Sheriff's sale of the property, and often near or shortly after the redemption deadline. In such cases, Defendants routinely seek dismissal based on an unpublished decision of the Michigan Court

Langley v. Chase Home Finance, LLC, Not Reported in F.Supp.2d (2011)

of Appeals, *Overton v. MERS*, 2009 Mich.App. Lexis 1209 (May 28, 2009). Many Defendants suggest the basis for the ruling in *Overton* is a lack of Plaintiff's standing once the redemption period expires, but the Court of Appeals does not actually say this. Nor would it seem like Article III standing could possibly be in doubt. After all, the Plaintiffs in such cases are the last lawful owner and possessor of the property. Moreover, they often remain in continuing possession of the property notwithstanding any Sheriff's sale and expiration of a redemption period. Moreover, Plaintiffs in such cases claim a continuing right to lawful ownership and possession based on defects in the process used by Defendants to divest them of those rights. This certainly seems to satisfy the basic Article III requirement of "injury in fact," as well as any prudential considerations tied to a "zone of interests" analysis. Indeed, it is hard to imagine a person with a better claim to standing to challenge the process at issue. Of course, having standing to bring a claim does not mean you have a valid claim on the merits. That is a different question. *Overton* is best viewed as a merits decision, not a standing case. In any case, *Overton,* whatever it means, does not apply to any issue in dispute here.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "C"

2008 WL 5382648
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Darwyn FAIR and Volante Council Fair, Plaintiffs-
Counterdefendants-Appellants-Cross-Appellees,
v.
Willie MOODY, Jasen Coon, Greg Payne, First
Financed Mortgage Corp, Laurie M. McDonald,
Title Quest Insurance Agency, and Mortgage
Electronic Registration Systems, Inc., Defendants,
and
Lasalle Bank, Defendant-Counterplaintiff-
Appellee-Cross-Appellant.

Docket No. 278906.   |   Dec. 23, 2008.

**Synopsis**
**Background:** Alleged homeowners filed suit against alleged
purchaser and others seeking to quiet title to home and
asserting fraud and other claims in connection with real estate
transaction in which home was allegedly sold to purchaser.
Assignee of mortgage executed by purchaser intervened and
filed counterclaim for equitable mortgage. The Circuit Court,
Oakland County, ruled that closing documents were forged
and struck them, and imposed equitable mortgage on home to
benefit of assignee of mortgage. Plaintiffs appealed.

**Holdings:** The Court of Appeals held that:

[1] trial court did not abuse its discretion in allowing assignee
of mortgage to intervene and substitute in for company that
was nominee of assignor of mortgage after start of trial;

[2] imposition of equitable mortgage on home to benefit of
assignee of mortgage was warranted; and

[3] miscellaneous closing costs in connection with real estate
transaction in which homeowners allegedly sold their home
to purchaser were not to be included in computing amount of
equitable mortgage.

Affirmed in part and reversed in part.

West Headnotes (10)

[1]   Parties
      Assignees
      Trial court did not abuse its discretion in
      allowing assignee of mortgage executed by
      alleged purchaser to intervene and substitute
      in for company that was nominee of assignor
      of mortgage after start of trial, in suit brought
      by alleged homeowners against company and
      others seeking to quiet title to property and
      asserting fraud and other claims in connection
      with real estate transaction in which property
      was allegedly sold to purchaser; before trial,
      homeowners agreed that assignor endorsed note
      to assignee, that company was nominee of
      assignee, and that assignee was current holder
      of note and mortgage, assignee claimed interest
      related to property and transaction that was
      subject of action and it was so situated that
      disposition of action might have impaired its
      ability to protect that interest, and homeowners
      were not prejudiced. MCR 2.202(B), 2.205(A),
      2.209(A)(3).

      Cases that cite this headnote

[2]   Parties
      Proceedings in Cause After Intervention
      Counterclaims for unjust enrichment and
      equitable mortgage by assignee of mortgage
      executed by alleged purchaser were properly
      and timely filed, in suit brought by alleged
      homeowners against purchaser and others
      seeking to quiet title to property and asserting
      fraud and other claims in connection with
      real estate transaction in which property
      was allegedly sold to purchaser, as assignee
      attached its answer and counterclaims to its
      motion to intervene, and assignee could not
      file counterclaims before it had successfully
      intervened in action. MCR 2.203(E), 2.209(C)
      (2).

Cases that cite this headnote

**[3]   Pleading**
   ⟳ Hearing, Determination, and Order

Trial court had authority, on reconsideration of request of intervening assignee of mortgage to file counterclaims, to grant request, in suit brought by alleged homeowners against purchaser who had executed mortgage and others seeking to quiet title to property and asserting fraud and other claims in connection with real estate transaction in which property was allegedly sold to purchaser, absent any demonstration of palpable error, as there was nothing in rule governing motions for reconsideration precluding court from giving a party a second chance or rethinking its position. MCR 2.119(F)(3).

Cases that cite this headnote

**[4]   Pleading**
   ⟳ New Set-Off or Counterclaim

Even if counterclaims for unjust enrichment and equitable mortgage asserted by intervening assignee of mortgage executed by alleged purchaser were considered to be amendment of pleadings, such amendment was justified, in suit brought by alleged homeowners against purchaser and others seeking to quiet title to property and asserting fraud and other claims in connection with real estate transaction in which property was allegedly sold to purchaser, as amendment resulted in no undue delay, bad faith, dilatory motives, repeated failures to cure deficiencies by previous amendments, undue prejudice to opposing party, or futility, and homeowners were not prejudiced by amendment, in that the evidence that would support or run contrary to an equitable mortgage was necessarily encompassed by the extensive and fully developed evidence presented at trial. MCR 2.118(A)(2).

Cases that cite this headnote

**[5]   Mortgages**
   ⟳ Equitable Mortgage

Imposition of equitable mortgage on home to benefit of assignee of mortgage executed by alleged purchaser was warranted, in suit brought by alleged homeowners against purchaser and others seeking to quiet title to property and asserting fraud and other claims in connection with real estate transaction in which property was allegedly sold to purchaser, as trial court found that warranty deed and closing documents had been forged, such that assignee could not rely on deed, mortgage, or any closing documents as against homeowners to establish enforceable mortgage, and loan and accompanying mortgage obtained by purchaser inured, partly, to direct benefit of homeowners with respect to amount that went to paying off their underlying mortgage, their Internal Revenue Service (IRS) tax lien, property taxes and water bills.

1 Cases that cite this headnote

**[6]   Mortgages**
   ⟳ Equitable Mortgage

Miscellaneous closing costs in connection with real estate transaction in which homeowners allegedly sold their home to purchaser were not to be included in computing amount of equitable mortgage imposed on home to benefit of assignee of mortgage executed by alleged purchaser, as closing costs did not inure to homeowners' benefit, and, given that trial court concluded that transaction was forged, it would not be equitable to make homeowners accountable for closing costs.

1 Cases that cite this headnote

**[7]   Vendor and Purchaser**
   ⟳ Protection Against Fraud or Other Invalidity in Prior Conveyances

When a deed is forged, those ostensibly acquiring an interest under the forged deed, even innocently, are in no better position with respect to title than if the acquisition of the interest was with notice of the forgery.

Cases that cite this headnote

[8]   **Vendor and Purchaser**
   Protection Against Fraud or Other
Invalidity in Prior Conveyances

There is no such thing as a bona fide holder under
a forged deed, whose good faith would confer a
right against the party whose name was forged,
or those claiming under him.

Cases that cite this headnote

[9]   **Judgment**
   Codefendants

**Judgment**
   Matters Admitted

An admission to liability predicated on the
entry of a default operates solely against the
particular party who defaulted; it does not bind
a codefendant who appears and contests the
litigation.

Cases that cite this headnote

[10]   **Bills and Notes**
   Instruments Given as Collateral Security

A mortgage instrument is not a "negotiable
instrument." MCL 440.3104(1).

1 Cases that cite this headnote

Oakland Circuit Court; LC No.2005-063458-CH.

Before: MURPHY, P.J., and SAWYER and WHITBECK, JJ.

**Opinion**

PER CURIAM.

  *1  Plaintiffs appeal as of right the judgment entered by the
trial court following a bench trial in this case arising out
of a nefarious real estate transaction orchestrated by various
defendants, and allegedly plaintiffs, on August 19, 2004.
The transaction involved the purported sale of plaintiffs'
home to defendant Willie Moody for $378,000. A scheduled
foreclosure sale of the home was days away when the
transaction at issue supposedly took place. Plaintiffs' existing
mortgage debt of $260,051, a tax lien in the amount of

$23,641, and property taxes and water bills totaling $6,011
were paid off pursuant to a new mortgage obtained by Moody.
The chief question at trial was whether plaintiffs actually
participated in the closing on their house and executed
a purchase agreement, warranty deed, and other closing
documents, or whether the closing documents were all forged
without plaintiffs having any knowledge of the sale. The trial
court, while suggesting that the evidence left it unclear what
actually transpired, concluded that the closing documents
were forged. The court struck the documents and quieted
title in favor of plaintiffs. But the court also imposed an
equitable mortgage on the home to the benefit of defendant
LaSalle Bank (LaSalle), assignee of the Moody mortgage.
The amount of the equitable mortgage awarded by the
court was approximately $300,000, not the full amount of
the $378,000 loan and mortgage obtained by Moody. The
equitable mortgage equaled the amount of plaintiffs' debt
that was satisfied by the mortgage funds, which included
the payoff of the existing mortgage, tax lien, property taxes,
and water bills, plus $9,711 in miscellaneous closing costs.
Plaintiffs appeal the trial court's ruling imposing the equitable
mortgage in favor of LaSalle. [1] Subject to us holding that
the equitable mortgage ruling constituted error, LaSalle cross
appeals the trial court's determination that the deed and other
real estate closing documents were forged, thereby depriving
LaSalle of its status as a mortgagee pursuant to contract
without need to resort to equity to recognize and enforce a
mortgage. We affirm the imposition of an equitable mortgage,
but reduce it by $9,711.

By way of additional background, plaintiffs had repeatedly
defaulted on their mortgage with American General Financial
Services over a three-year period and multiple foreclosure
proceedings had been initiated. The foreclosure proceedings
were halted by three Chapter 13 bankruptcy petitions filed by
Mrs. Fair that were subsequently dismissed, two voluntarily
and one involuntarily, which were followed twice by large
payments by plaintiffs that temporarily stopped further
foreclosure proceedings. The third bankruptcy filing in 2004
was involuntarily dismissed by the bankruptcy court, and
Mrs. Fair was barred by the court from filing a new petition
for 180 days. Around this time, the spring and summer of
2004, plaintiffs were faced with a continuing default on
the mortgage and yet another foreclosure proceeding. Mr.
Fair attempted to refinance through Home Team Mortgage
Company and its president Ramsey Zawideh, but refinancing
and a new mortgage could only be obtained if the IRS tax
lien were subordinated to the new mortgage. As Zawideh
assisted Mr. Fair with processing a loan application and

negotiated with the IRS for subordination on plaintiffs' behalf, Mr. Fair also began communicating with defendant Jasen Coon, a mortgage broker linked to defendant First Financed Mortgage Corporation (FFMC). Coon was able to procure an adjournment of a foreclosure sale scheduled on August 10, 2004, after Mr. Fair asked Coon for assistance in obtaining an adjournment and Coon supplied American General with a signed purchase agreement, showing a conveyance of plaintiffs' home to Moody. Plaintiffs denied ever executing the purchase agreement, and Mr. Fair testified that he did not know how Coon was able to negotiate an adjournment of the sale. The new date set for the foreclosure sale was August 24, 2004, giving, from American General's perspective, time for plaintiffs to close on the sale with Moody.

**\*2** The home was purportedly sold on August 19, 2004, to defendant Moody for $378,000 pursuant to a new mortgage with defendant Mortgage Electronic Registration Systems, Inc. (MERS), acting solely as a nominee for lender BNC Mortgage, Inc.,[2] resulting in satisfaction of the American General mortgage ($260,051), the IRS tax lien ($23,641), and other debts, including an unsecured loan in the amount of nearly $80,000 supposedly held by FFMC, as invoiced by Coon.[3] The buyer's closing took place at the offices of defendant Title Quest, with Coon and Moody present, and under the auspices of a Title Quest agent and closer, defendant McDonald, who also served as the notary. According to McDonald, the sellers' closing took place at plaintiffs' home later in the day with plaintiffs, Coon, and herself being present, at which time plaintiffs executed the warranty deed and all of the closing documents.[4] Plaintiffs testified that there was no closing in their home, that Coon and McDonald had never been in their home, that plaintiffs never executed a purchase agreement, warranty deed, or any closing documents, that they never authorized anyone to sell the house, that they had no plans to sell the house, and that they did not sell the house to Moody; it was a blanket denial to any transaction having occurred. Evidence was presented regarding various email and fax communications between Mr. Fair and Coon on August 19 and 20, 2004, which, at a minimum, seem odd and puzzling, given plaintiffs' claims. MERS and, following intervention and substitution, LaSalle proceeded on the theory that plaintiffs' plan was to sell the house to Moody and for Moody then to sell the home back to plaintiffs on a land contract for $325,000;[5] a plan emphatically denied by plaintiffs who pointed to their attempts to obtain refinancing through Zawideh and Home Team Mortgage.[6] According to MERS and LaSalle, this plan

would give plaintiffs some time to find new financing and, when financing was obtained, plaintiffs would purchase the fee or legal title back from Moody.

After the purported transaction, Moody failed to make payments on the new mortgage, nor did plaintiffs make any mortgage or land contract payments. In January 2005, after allegedly first learning of the purported transaction, plaintiffs filed suit. Pursuant to an amended complaint filed in November 2005, plaintiffs sought to quiet title and additionally alleged fraud, emotional distress, and unlawful notarization. Plaintiffs also requested injunctive relief barring MERS from foreclosing on the property. In March 2005, plaintiffs became entangled in a district court action brought by Moody seeking an order of eviction against plaintiffs for forfeiture of the land contract. The district court entered an order staying the eviction proceedings until the current litigation was concluded in the circuit court. Plaintiffs, however, were ordered to make monthly escrow payments in the amount of $2,771, which they did for four months before stopping, without court authorization, when MERS initiated foreclosure proceedings in light of the fact that no payments were being made on the new mortgage.

**\*3** The litigation in this case entailed a seven-day bench trial in which numerous exhibits were admitted, including real estate documents and copies of emails, and the court took testimony from plaintiffs, Payne, Moody, Coon (deposition transcript only), McDonald, Zawideh, Blake Bradsher (branch manager for American General), and Duanne Barber (testified regarding business meeting with Mr. Fair at local restaurant on August 19, 2004).[7] The trial court also heard from plaintiffs' handwriting expert, Michael Sinke, who testified that his analysis positively eliminated plaintiffs as authoring the signatures on the closing documents. LaSalle's handwriting expert, Todd Welch, testified that he could not come to a conclusion one way or the other following his analysis. Both experts compared known exemplars against the signatures on the closing documents. For the most part, the signatures at issue looked nothing like the exemplars, and the "n" at the end of Mr. Fair's first name was missing on all of the challenged signatures, while being included on all of the exemplars.[8] Both experts noted that, while their was some fluency in Mrs. Fair's exemplars and her purported signatures, the signatures on the documents at issue showed signs of many stops and starts, hesitation, slowness, pen lifts, and blunt beginning and ending strokes. This would be typical of a simulated forgery, i.e., one in which the forger from memory or observation tries to recreate the

signature so that it appears similar to a true signature. Welch opined that the challenged signatures showed clear signs of simulated forgeries, given the stops and starts, slowness, and pen lifts, but the problem was that they looked nothing like the exemplars. Although Welch's analysis was inconclusive, he opined that the signatures at issue lent themselves to being disguised or auto forgeries, i.e., an attempt by a person to sign his or her name in a style different than normal so that the signature could be disavowed later. Sinke disagreed that these were disguised or auto forgeries.

The trial court ruled as indicated above, and plaintiffs appeal as of right the imposition of an equitable mortgage, while LaSalle cross appeals on the possibility that we reverse the trial court's imposition of an equitable mortgage. [9]

This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. *Alan Custom Homes, Inc. v. Krol,* 256 Mich.App. 505, 512, 667 N.W.2d 379 (2003), citing MCR 2.613(C) and *Chapdelaine v. Sochocki,* 247 Mich.App. 167, 169, 635 N.W.2d 339 (2001). Similarly, equitable decisions are reviewed de novo, and the underlying factual findings made by the trial court in support of its equitable rulings are subject to the clearly erroneous standard of review. *Wengel v. Wengel,* 270 Mich.App. 86, 91, 714 N.W.2d 371 (2006). In the application of the clearly erroneous standard, "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake was made. *Walters v. Snyder,* 239 Mich.App. 453, 456, 608 N.W.2d 97 (2000). Questions of law, in general, are reviewed de novo. *Richards v. Tibaldi,* 272 Mich.App. 522, 528, 726 N.W.2d 770 (2006). Plaintiffs also raise issues regarding the trial court's decision allowing LaSalle to intervene in the action and substitute in for MERS and allowing LaSalle to file a counterclaim. [10] A trial court's decision on a motion to intervene or for substitution of a party is reviewed for an abuse of discretion. *Vestevich v. West Bloomfield Twp.,* 245 Mich.App. 759, 761, 630 N.W.2d 646 (2001); *Mather Investors, LLC v. Larson,* 271 Mich.App. 254, 260, 720 N.W.2d 575 (2006). A trial court's decision on a motion to add a counterclaim is likewise reviewed for an abuse of discretion on appeal. See *Weymers v. Khera,* 454 Mich. 639, 658, 563 N.W.2d 647 (1997). An abuse of discretion occurs when the trial court chooses an outcome falling outside a principled

range of outcomes. *Maldonado v. Ford Motor Co.,* 476 Mich. 372, 388, 719 N.W.2d 809 (2006).

**\*4** **[1]** We first address procedural issue raised by plaintiffs. Plaintiffs argue that the trial court erred in allowing LaSalle to intervene after the start of trial. Plaintiffs maintain that MERS, as the mortgagee and entity that initiated foreclosure proceedings, was the proper party to handle the suit, that MERS was carrying out the litigation without any contention that LaSalle should have been a named defendant, that LaSalle's interest was adequately protected by MERS, and that LaSalle had notice of the pendency of the action prior to trial but did not act at that point, nor in a timely manner in general. LaSalle argues that plaintiffs suffered no prejudice when the court allowed LaSalle to intervene and substitute in for MERS, that it was a necessary party but not named as a party by plaintiffs, that it has an interest in the property that LaSalle is entitled to protect, that MERS was merely a nominee and not an authorized agent or representative of LaSalle, and that any judgment against MERS would have been binding on LaSalle under MCR 3.411(H). [11]

The mortgage obtained by Moody indicates that MERS is a separate corporation that is acting solely as a nominee for the lender, BNC Mortgage, and the lender's successors and assigns. The mortgage also indicates that MERS is the mortgagee under the security instrument. Plaintiffs did not initially name any mortgagee as a defendant in the complaint because no foreclosure proceedings on the Moody mortgage had commenced, but when they did, plaintiffs filed an amended complaint in November 2005 naming MERS as a defendant. Plaintiffs also obtained a stipulated order in October 2005 allowing BNC to be added as a party defendant; however, plaintiffs never followed up on bringing BNC into the litigation. The notice of foreclosure is in the name of MERS as nominee of the lender and states that MERS is the mortgagee. A final pretrial order signed days before trial commenced provides that plaintiffs did not contest that Moody executed a promissory note in favor of lender BNC, that Moody executed a mortgage in favor of MERS as nominee for BNC, that BNC subsequently endorsed the note to LaSalle, and that MERS is also the nominee of LaSalle, who is the current holder of the note and mortgage executed by Moody. Five days of trial took place in March of 2006 with MERS participating as a defendant and LaSalle not participating as a party. The trial was adjourned and set to be continued in July 2006 and, in May 2006, LaSalle filed a motion to intervene as a party defendant "on behalf of LaSalle

Bank, National Association, the Trustee of Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates Series 2004-10." MERS filed a motion agreeing to LaSalle's intervention, indicating that it held the mortgage for the benefit of LaSalle. MERS also stated that on May 18, 2006, it executed a corporate assignment of mortgage in favor of LaSalle relative to the Moody promissory note and mortgage. The document was provided to the court. [12] Accordingly, MERS asked the court to allow LaSalle to substitute in for MERS. The trial court granted the motion to intervene and allowed LaSalle to substitute in for MERS. The parties do not provide any insight regarding the legal parameters with respect to a lender's nominee or the nature of MERS.

**\*5** To our knowledge, there is no published Michigan case law substantively addressing lender nominees and MERS. In *MERSCORP, Inc. v. Romaine,* 8 N.Y.3d 90, 96, 861 N.E.2d 81, 828 N.Y.S.2d 266 (2006), the New York court explained:

> In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.
>
> The initial MERS mortgage is recorded in the County Clerk's office with "Mortgage Electronic Registration Systems, Inc." named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage. [Footnotes omitted.]

In *Landmark Nat'l. Bank v. Kesler,* 40 Kan.App.2d 325, 192 P.3d 177, 179 (Kan.App., 2008), the Kansas appellate court stated that MERS mortgages designate an entity, MERS, as the mortgagee even though it is not the lender, which left the court pondering whether MERS truly is a mortgagee even though it lent no money nor had any rights to loan repayments. MERS argued in *Kesler* that it was a necessary party to foreclosure proceedings and not just the lender, claiming it

held title to the mortgage, although not the real estate. *Id.* The Kansas court held that MERS was merely an agent for the lender and that the lower court did not err in not allowing intervention by MERS, given that MERS was not the lender, despite being labeled as mortgagee, had no right to repayment of the underlying debt, and had no role in handling mortgage payments.

*Kesler* would suggest that MERS here need not have been included in the litigation commenced by plaintiffs and that BNC and then LaSalle were the parties holding the interest that properly would be subject to the injunctive relief sought by plaintiffs. We, however, find it unnecessary for our purposes to define MERS' interest, MERS' relationship to BNC and LaSalle, or to define the relationship between MERS and Moody. Before trial, plaintiffs agreed that BNC endorsed the note to LaSalle, that MERS was the nominee of LaSalle, and that LaSalle was the current holder of the note and mortgage executed by Moody. LaSalle should have been named as a party defendant and, considering that MERS later assigned whatever interest it had in the mortgage to LaSalle, it is unquestionable that LaSalle ultimately held the interest that would be compromised by an unfavorable ruling by the trial court.

**\*6** We conclude that the trial court did not abuse its discretion in allowing LaSalle to intervene and substitute in for MERS. LaSalle had a right to intervene, where it claimed an interest relating to the property and the transaction that was the subject of the action, and where it was so situated that the disposition of the action may as a practical matter have impaired or impeded LaSalle's ability to protect that interest. MCR 2.209(A)(3). Further, LaSalle' interest would not have adequately been represented by MERS. *Id.* Although LaSalle does not appear to dispute plaintiffs' contention that it was aware of the litigation in January 2006, calling into question the timeliness of LaSalle's motion, MCR 2.209(A)("[o]n timely application"), the motion was filed a short few months later, MERS did not assign its interest to LaSalle until May of 2006, plaintiffs never pursued the matter despite knowing of LaSalle's interest, and absolutely no prejudice occurred to plaintiffs even after five days of trial had been completed. Moreover, inclusion of LaSalle in the suit was proper under MCR 2.205(A)(necessary joinder), where LaSalle had such an interest in the subject matter of the action that its presence was essential to permit the court to render complete relief. Furthermore, substitution on the basis of transfer of interest was appropriate under MCR 2.202(B). [13]

[2]    [3]   Plaintiffs also assert that the trial court erred in allowing LaSalle to file a counterclaim. LaSalle attached a proposed answer and counterclaim to its motion to intervene. The proposed counterclaim alleged claims of unjust enrichment and equitable mortgage. While the trial court granted the motion to intervene, it denied LaSalle's request to file a counterclaim, finding it untimely. More than a month before trial resumed, LaSalle filed a motion for reconsideration relative to the denial of the counterclaim request. On the second to last day of trial on July 6, 2006, the court ruled on the motion, changing its position and allowing the filing of a counterclaim. The trial court reasoned that no additional witnesses would need to testify because of the counterclaim, no adjournment was being sought, no further discovery was necessary, and the filing of a counterclaim would not delay conclusion of the trial. The formal order granting reconsideration and an amended counterclaim were not filed until after trial, but before the court issued its written opinion in the case. Plaintiffs complain that the counterclaim was inexcusably untimely and that no palpable error was demonstrated for purposes of the motion for reconsideration. Plaintiffs and LaSalle view this issue as one involving amendment of the pleadings, and plaintiffs wish to attribute the entire time period that MERS was in the litigation to LaSalle with respect to examining the length of the delay. MERS never filed a counterclaim.

We first note that this is not a case concerning amendment of the pleadings, considering that LaSalle sought to file an answer and counterclaim immediately on intervention; there was nothing to amend. Further, plaintiffs cite no authority for their proposition that LaSalle is tied to the pleadings filed by MERS. Under MCR 2.209(C)(2), a motion to intervene must "be accompanied by a pleading stating the claim or defense for which intervention is sought." LaSalle attached such pleadings, an answer and a counterclaim, to its motion to intervene. Generally speaking, a counterclaim must be filed with an answer. MCR 2.203(E). Again, this was effectively accomplished by attaching an answer and counterclaim to the motion to intervene. LaSalle could not file a counterclaim before intervention, and we have already determined that intervention was proper. Furthermore, demonstrating palpable error was not required in order for the court to reconsider its prior ruling. MCR 2.119(F)(3) provides:

> *7   Generally, *and without restricting the discretion of the court,* a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court ... will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error. [Emphasis added.]

A trial court can, and did so here, give a party a second chance or rethink its position, and nothing in MCR 2.119(F)(3) precludes a trial court from exercising such discretion. *Kokx v. Bylenga*, 241 Mich.App. 655, 659, 617 N.W.2d 368 (2000). While it would have been preferable for the court to grant the request when initially made, doing so on reconsideration was permissible.

[4]   Even if we treated this issue as one involving amendment of the pleadings, we find no undue delay, bad faith, dilatory motives, repeated failures to cure deficiencies by previous amendments, undue prejudice to the opposing party, or futility. MCR 2.118(A)(2); *Weymers, supra* at 658, 563 N.W.2d 647. Plaintiffs speak of prejudice to their case, but they fail to explain how they were prejudiced, nor do we see any prejudice. The evidence that would support or run contrary to an equitable mortgage was necessarily encompassed by the extensive and fully developed evidence presented at trial regarding the nature of the transaction and the actions of the parties, which related to the claims pursued by plaintiffs. We additionally note that, even had there been no counterclaim, the trial court was faced with a request by plaintiffs to enjoin enforcement of the mortgage and foreclosure proceedings, and we do not believe that it would have gone beyond the court's equitable authority to reject the request on the basis that LaSalle was entitled to an equitable mortgage, thereby granting LaSalle the same relief sought in the counterclaim.

[5]    [6]    [7]    [8]   We now turn to the substantive issues presented on appeal. The trial court found that the warranty deed and closing documents had been forged, and it struck those documents. When a deed is forged, those ostensibly acquiring an interest under the forged deed, even innocently, are in no better position with respect to title than if the acquisition of the interest was with notice of the forgery. *Felcher v. Dutton*, 265 Mich. 231, 233, 251 N.W. 332 (1933)("The mortgage to the loan association rests on a deed which is in effect a forgery and at any rate is null and void.); *Horvath v. Nat'l. Mortgage Co.*, 238 Mich. 354, 360, 213 N.W. 202 (1927); *Special Prop. VI, LLC v. Woodruff*, 273

Mich.App. 586, 591, 730 N.W.2d 753 (2007); *Horton v. Verhelle,* 231 Mich.App. 667, 677, 588 N.W.2d 144 (1998), overruled in part on other grounds in *Smith v. Globe Life Ins. Co.,* 460 Mich. 446, 597 N.W.2d 28 (1999); *VanderWall v. Midkiff,* 166 Mich.App. 668, 685, 421 N.W.2d 263 (1988). There is no such thing as a bona fide holder under a forged deed, whose good faith would confer a right against the party whose name was forged, or those claiming under him or her. *Felcher, supra* at 233, 251 N.W. 332; *Horvath, supra* at 360, 213 N.W. 202; *Special Prop VI, supra* at 591, 730 N.W.2d 753; *Horton, supra* at 677, 588 N.W.2d 144; *VanderWall, supra* at 685, 421 N.W.2d 263. Therefore, LaSalle cannot rely on the deed, new mortgage, or any closing documents as against plaintiffs to establish an enforceable mortgage.

**\*8** With respect to equitable mortgages, "[a] court of equity may impose and foreclose an equitable mortgage on a parcel of real property when no valid mortgage exists but some sort of lien is required by the facts and circumstances of the parties' relationship ." 1 Cameron, *Michigan Real Property Law* (3d ed), Mortgages, § 18.5, p 681. In *Schram v. Burt,* 111 F.2d 557, 562 (C.A.6, 1940), the United States Court of Appeals for the Sixth Circuit observed:

> The whole doctrine of equitable mortgages is founded upon the ancient, cardinal maxim of equity which regards that as done which was agreed to be done and should have been done and in applying this rule the court will treat the subject matter as to collateral consequences and incidences as if the acts contemplated by the parties had been done at the beginning of the transaction, always regarding the substance and not the form.

"Generally an equitable mortgage will be imposed if it is shown that there was an intention to place a lien on the real estate or a promise that the real estate would be used as security but for some reason the intended purpose was not accomplished." Cameron, *supra* at § 18.5, pp 681-682. An equitable lien or mortgage generally arises from an agreement that identifies the property and reflects an intention that the property will be security for an obligation. *In re Moukalled Estate,* 269 Mich.App. 708, 719, 714 N.W.2d 400 (2006). "In an equitable action, a trial court looks at the entire matter and grants or denies relief as dictated by good conscience." *Id.*

Equity will declare a lien or mortgage on considerations of right and justice and those maxims that lie at the foundation of equity jurisprudence, where a written mortgage contract is lacking but the parties' conduct and relationship demands application of equitable principles. *Senters v. Ottawa Savings Bank, FSB,* 443 Mich. 45, 53, 503 N.W.2d 639 (1993). In *Senters, supra* at 53-54, 503 N.W.2d 639, our Supreme Court, quoting *Chef v. Haan,* 269 Mich. 593, 598, 257 N.W. 894 (1934), stated that " '[e]quity will create a lien only in those cases where the party entitled thereto has been prevented by fraud, accident or mistake from securing that to which he was equitably entitled.' " We conclude that equitable principles dictate the imposition of an equitable mortgage under the circumstances of this case.

An equitable mortgage case that is almost directly on point is *Richardson v. Richardson,* 266 Mich. 194, 253 N.W. 265 (1934), wherein the plaintiff executed and delivered a warranty deed on her farm to her son and daughter-in-law, who then proceeded to give a mortgage on the property to People's State Bank incident to a loan of $4,000. The plaintiff then sought cancellation of the deed and mortgage on the ground that her son had induced her to sign the deed by means of a trick and false representations. The plaintiff's theory in her complaint was that the deed obtained by trick and false representations was "in effect a forged instrument which vested no rights whatever in the grantees or in the subsequent mortgagee." *Id.* at 195, 253 N.W. 265. The Supreme Court affirmed the circuit court's finding that the deed should be held void and cancelled as the proofs fully sustained that conclusion. *Id.* at 196, 253 N.W. 265. But the *Richardson* Court reversed the circuit court's ruling that the plaintiff was also entitled to have the bank's mortgage cancelled, explaining:

> **\*9** Because the deed was found to be invalid as to the grantees, the circuit judge concluded that plaintiff was also entitled to have the mortgage to the People's State Bank of Belleville canceled. In so holding he relied upon *Horvath v. National Mortgage Co.,* 238 Mich. 354 (56 ALR 578). We think decision in the Horvath Case is not controlling of the rights of the People's State Bank in the instant case. Except as hereinafter noted, in the former case the money obtained by the mortgage loan did not inure in any way to the benefit of the plaintiff who sought cancellation of the mortgage. *But in the instant case the proceeds of the mortgage loan were used in part, at least, to pay a past-due mortgage on plaintiff's farm, accrued interest thereon, past-due taxes, and to make improvements or repairs on the farm buildings.* The items are as follows: Principal

of farm mortgage, $1,350; interest thereon, $195; past-due taxes, $478.35; improvements and repairs, $121; total, $2,144.35. Under plaintiff's own testimony she understood that her son Ross acting for her was, in some way, to take care of the various obligations above noted. In so doing the son, in effect, acted as plaintiff's agent. Interest on the Ross Richardson mortgage was paid to December 13, 1930. From that date the People's State Bank of Belleville is entitled to interest at 7 per cent., as provided in the mortgage, on the computed amount of $2,144.35. Plaintiff is in a court of equity seeking equitable relief. Such relief will not be granted except on condition of plaintiff's doing equity.

"Equitable relief by way of cancellation is not strictly matter of right, but rather remedy the granting of which rests in sound discretion of court; and rescission should not be granted where result thus obtained would be unjust or inequitable." *Amster v. Stratton* (syllabus), 259 Mich. 683, 244 N.W. 201.

To the extent above indicated the money received upon the mortgage given by Ross Richardson and his wife to the People's State Bank has inured to the direct benefit of plaintiff, and for the most part was used to relieve her property from the liens of a past due mortgage and unpaid taxes. Plain everyday honesty forces the conclusion that the People's State Bank to the extent indicated is entitled to have its mortgage lien declared to be valid and existing as such. *[Richardson, supra* at 196-198, 253 N.W. 265 (emphasis added).]

Here, the $378,000 loan and accompanying mortgage obtained by Moody inured, partly, to the direct benefit of plaintiffs with respect to that amount that went to paying off the underlying American General mortgage, the IRS tax lien, the property taxes, and the water bills. We do agree with plaintiffs that the miscellaneous closing costs in the amount of $9,711, which was included in the court's computation of the equitable mortgage, should not have been included because the payment did not inure to plaintiffs' benefit. Given the trial court's ruling of a forged transaction, it would hardly be equitable to make plaintiffs accountable for the closing costs. In its appellate brief, LaSalle does not make any argument in response to plaintiffs' claim that, minimally, the equitable mortgage should be reduced by $9,711. Accordingly, we reduce the equitable mortgage by $9,711.

**\*10** Plaintiffs raise numerous arguments in challenging the trial court's ruling, but we find them unavailing. Plaintiffs

argue that the trial court erred in finding that they had unclean hands on the basis of the bankruptcy petitions and the failure to continue making escrow payments to the district court. Plaintiffs continue the argument by correctly contending that, even if those actions were improper, they had no relationship to the real estate transaction and resulting mortgage. The "clean hands" doctrine was discussed by this Court in *McFerren v. B & B Investment Group*, 253 Mich.App. 517, 522-523, 655 N.W.2d 779 (2002), wherein the Court stated:

> A court acting in equity looks at the whole situation and grants or withholds relief as good conscience dictates. A party seeking the aid of equity must come in with clean hands. The clean hands maxim is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. The clean hands doctrine applies to quiet-title actions. [Citations and quotations omitted.]

First, we do not find any basis to conclude that BNC, MERS, or LaSalle had unclean hands such that an equitable mortgage should be denied. With regard to plaintiffs, we do believe that the multiple bankruptcy petitions were questionable, given the failure to file, in all three proceedings, any Chapter 13 plan, bankruptcy schedules A-J, and a statement of financial affairs, and considering the order of the bankruptcy court temporarily precluding new filings. Also, while there may have been a sound reason to stop making escrow payments to the district court in the eviction action, i.e., Moody's failure to use that money to pay toward the new mortgage resulting in foreclosure proceedings, the proper process would have been to seek the appropriate order from the district court and not unilaterally decide to halt payments. There is some merit, however, to plaintiffs' argument that the bankruptcy filings and failure to continue making escrow payments were wholly unconnected to the forged real estate transaction. Regardless, we find that issues regarding the bankruptcy petitions and the escrow payments are essentially irrelevant for purposes of determining the legitimacy of the equitable mortgage. None of the authorities cited above with respect to the law of equitable mortgages state that an equitable mortgage is only appropriate if the equitable mortgagors have unclean hands.

Indeed, *Richardson, supra*, the main case upon which we rely, involved imposing an equitable mortgage on the property of a party who engaged in absolutely no improper or unethical conduct. It was the fact that the mortgage, in part, inured to her benefit and that the bank did not engage in improper conduct that supported the imposition of an equitable mortgage.

Plaintiffs accurately cite the principle that benefit alone is not the test for a court of equity to impose a quasi or constructive contract. *Belle Isle Grill Corp. v. Detroit,* 256 Mich.App. 463, 478, 666 N.W.2d 271 (2003). Plaintiffs, however, fail to acknowledge the additional component, which is that an inequity must also result. *Id.* Here, an inequity would result if LaSalle were not allowed to somewhat recoup monies paid out under the mortgage.

**\*11** Plaintiffs also argue that adverse inferences should have been recognized with respect to Coon, Moody, and Payne because they invoked their Fifth Amendment rights. In *Phillips v. Deihm,* 213 Mich.App. 389, 399-400, 541 N.W.2d 566 (1995), this Court stated:

> The privilege against self-incrimination not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also permits him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. However, the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the amendment does not preclude the inference where the privilege is claimed by a party to a civil cause. [Citations omitted.]

We first note that Coon's deposition transcript was admitted into evidence and that Payne and Moody did provide some testimony before invoking the Fifth Amendment. Regardless, we question the relevance of plaintiffs' argument to the issue of an equitable mortgage. The trial court struck the closing documents, finding them to be forged. Any adverse inferences arising from Coon, Moody, and Payne invoking

the Fifth Amendment would have led to this same conclusion. Plaintiffs' argument does not merit reversal.

**[9]** Plaintiffs also argue that all of the allegations in their complaint in regard to Coon, Moody, Payne, and FFMC should have been accepted or admitted as true because those parties all defaulted and that LaSalle had no standing to challenge such admissions. A default judgment is a conclusive adjudication and is just as binding on the parties relative to matters essential to support the judgment as a judgment that has been rendered following an answer and litigation. *Barnes v. Jeudevine,* 475 Mich. 696, 705, 718 N.W.2d 211 (2006). It is an established principle of law that the entry of a default settles the question of liability with regard to all well-pleaded allegations and precludes the defaulting party from engaging in litigation over liability. *Kalamazoo Oil Co. v. Boerman,* 242 Mich.App. 75, 79, 618 N.W.2d 66 (2000). Again, as with the argument concerning invocation of the Fifth Amendment, we fail to see what plaintiffs hope to accomplish with this argument, given that the trial court struck the closing documents and concluded that a forged transaction occurred. There is no correlation to the equitable mortgage, and there was no evidence suggesting that BNC, MERS, or LaSalle had anything to do with the alleged malfeasance perpetrated by Coon, Moody, Payne, and FFMC. Moreover, plaintiffs are simply wrong in maintaining that LaSalle lacked standing, in light of the defaults, to argue that plaintiffs executed the closing documents and participated in the sale. An admission to liability predicated on the entry of a default operates solely against the particular party who defaulted; it does not bind a codefendant who appears and contests the litigation. *Allstate Ins. Co. v. Hayes,* 442 Mich. 56, 73 n. 20, 499 N.W.2d 743 (1993); *Klimmer v. Klimmer,* 66 Mich.App. 310, 313, 238 N.W.2d 586 (1975). Indeed, even "where a party's sole source of liability is vicarious, a default entered against a coparty does not preclude the former from contesting its vicarious liability." *Rogers v. J B Hunt Transport, Inc.,* 466 Mich. 645, 655, 649 N.W.2d 23 (2002). Plaintiffs' accompanying argument that the doctrine of collateral estoppel barred LaSalle from challenging the admissions resulting from the defaults is, aside from being irrelevant to the equitable mortgage issue, barely worthy of comment. Collateral estoppel relates to multiple lawsuits and has no application here. See *Monat v. State Farm Ins. Co.,* 469 Mich. 679, 692-693, 677 N.W.2d 843 (2004)(collateral estoppel is intended to relieve parties of the cost and vexation of multiple lawsuits). Reversal is unwarranted.

*12  Plaintiffs further argue that because the warranty deed was forged even an equitable mortgage cannot be ordered by the court. Plaintiffs rely on *Lee v. Kellogg*, 108 Mich. 535, 536, 66 N.W. 380 (1896), for this proposition, wherein the Court stated, "Forged papers cannot be made the basis of a recovery, either at law *or in equity*, against the supposed maker, or those in good faith holding and owning the genuine papers." (Emphasis added.) *Lee* addressed a situation in which a mortgagee assigned a mortgage and notes to an assignee and then forged a like mortgage and notes for assignment to another assignee who accepted them in good faith. The Court found that the assignee of the forged documents acquired no rights as against the assignee of the genuine documents. We first find that *Lee* is factually distinguishable in that it dealt with two innocent mortgage assignees and ascertainment of their rights as against each other, neither of whom received a windfall to the detriment of the other. The case has no application to the concept of an equitable mortgage under the facts presented in the case at bar. The forged papers here are not being made the basis of the recovery; rather, the basis of recovery was the fact that plaintiffs had major debts paid off without spending a penny through use of lender monies and, if plaintiffs had their way, to the detriment of the lender. To the extent that *Lee* may support plaintiffs' argument, it conflicts with *Richardson, supra,* which is a more recent pronouncement on equitable mortgages and thus controlling. *Washington Mut. Bank, FA v. ShoreBank Corp.,* 267 Mich.App. 111, 119, 703 N.W.2d 486 (2005) ("We are obligated to follow the most recent pronouncement of the Supreme Court on a principle of law.").

Plaintiffs next launch into a discussion regarding why LaSalle is not entitled to any relief under the doctrines of unjust enrichment and equitable subrogation, which subrogation claim was included in the amended counterclaim. Considering that the trial court did not award relief to LaSalle under either doctrine and that LaSalle does not challenge the court's failure to do so, it is simply not necessary to address this argument.

Finally, plaintiffs argue that LaSalle was not a good faith purchaser or assignee, nor a holder in due course, where it acquired its interest after the lawsuit was filed with full knowledge of the forgery claims; therefore, LaSalle took the assigned mortgage subject to plaintiffs' claims that the mortgage was not valid and that an equitable mortgage could not be awarded. Plaintiffs place reliance on MCL 440.3302, which defines a holder in due course, and MCL 440.3306, which provides that a person who is not a holder in due course takes an instrument subject to a property or possessory right in the instrument.

[10]  We first note that MCL 440.3302 and MCL 440.3306 are part of the Uniform Commercial Code (UCC) on Negotiable Instruments, MCL 440.3101 *et seq.,* and "[a] mortgage instrument is not a negotiable instrument." *Mox v. Jordan*, 186 Mich.App. 42, 46, 463 N.W.2d 114 (1990), citing MCL 440.3104(1). Moreover, we are not addressing competing mortgage interests. We fail to see, and plaintiffs fail to adequately explain, how the UCC has any application to or bearing on whether LaSalle was entitled to an equitable mortgage. We do agree that equity, for purposes of an equitable mortgage, could require consideration in some instances of the fact that a party seeking recognition of an equitable mortgage acquired its interest knowing of litigation regarding the validity of the underlying real estate transaction. Plaintiffs point to the lack of documentary evidence concerning any transfer of the mortgage interest from BNC to LaSalle. As reflected in the pretrial order, however, plaintiffs agreed that BNC endorsed the documents to LaSalle. When this took place is not revealed in the record; it is possible that it occurred before this litigation commenced. Nevertheless, even if LaSalle obtained its interest from BNC after the lawsuit was initiated and even though the corporate assignment from MERS to LaSalle did not take place until well after suit was commenced, we see no reason to deny LaSalle an equitable mortgage. Whether awarded to BNC, MERS, or LaSalle, an equitable mortgage was called for in this case given the circumstances. We conclude that reversal is unwarranted.

*13  We affirm the imposition of an equitable mortgage, but reverse that portion of the judgment that includes within the mortgage $9,711 in closing costs. Accordingly, the equitable mortgage is hereby reduced by $9,711.

Footnotes

1    Plaintiffs essentially desire to retain ownership of the home without the burden of any mortgage or tax lien despite the fact that they
     paid nothing toward those debts and were on the verge of foreclosure.

2    LaSalle is an assignee of BNC and MERS.

3   Evidence presented at trial made it clear that there was no such unsecured loan. Defendants FFMC, Coon, Moody, and Payne, who was an associate of Coon and also linked to FFMC, all answered the complaint, as well as the amended complaint, and participated in the early stages of the trial, with Payne and Moody providing some testimony. However, on the third day of the trial, all three individual defendants invoked their Fifth Amendment right against self-incrimination. Along with FFMC, they subsequently formally withdrew theirs answers, and default judgments were later entered against all four defendants. We further note that defendants Title Quest and McDonald settled with plaintiffs before trial commenced.

4   There was testimony and a sketch by McDonald regarding the layout of plaintiffs' home that was consistent with plaintiffs' description of their home, including identification of a black refrigerator.

5   Coon faxed Mr. Fair a land contract on August 20, signed by Moody and notarized by McDonald, which she denied notarizing, but the space designated for Fair's signature on the land contract is blank. Mr. Fair testified repeatedly that he wanted nothing to do with any deal suggested by the land contract, but he did not feel the need to reply to Coon's faxing of the land contract, despite the fact that the contract showed Moody selling plaintiffs' house back to Fair.

6   Zawideh expressed disbelief when he discovered that the house had been sold, as he felt that he was close to obtaining subordination of the IRS tax lien, although he conceded that procuring subordination from the IRS was very difficult.

7   The court heard much testimony regarding the events that transpired, or that supposedly transpired, on August 19, 2004. We note that the timelines testified to by Barber regarding his restaurant meeting with Mr. Fair, in which Fair reviewed some legal documents, is inconsistent with Mr. Fair's testimony regarding timelines.

8   We note that Mr. Fair's signature on a Home Team Mortgage loan application, which he conceded was his signature, was also missing an "n," although, again, none of his exemplars from that time period revealed a missing "n." The evidence reflected that the loan application omitted information regarding the tax lien and various judgment liens.

9   With respect to the cross appeal, LaSalle argues that plaintiffs did not establish a claim of forgery by clear and convincing evidence. LaSalle states, "In the event that this Court concludes that an equitable mortgage in favor of LaSalle Bank was not warranted, the circuit court's opinion and order should be reversed and judgment should be entered in favor of LaSalle Bank on Plaintiffs' claim to quiet title." Because we affirm the imposition of an equitable mortgage, while reducing it slightly, it is unnecessary to reach the issue on cross appeal. We do note that our close inspection of the record leads us to cast some doubts regarding plaintiffs' position that they had no role in the real estate transaction.

10   LaSalle's counterclaim initially alleged causes of action for unjust enrichment and an equitable mortgage, and an amended counterclaim added a claim of equitable subrogation.

11   MCR 3.411(H) provides that "[e]xcept for title acquired by adverse possession, the judgment determining a claim to title, equitable title, right to possession, or other interests in lands under this rule, determines only the rights and interests of the known and unknown persons who are parties to the action, and of persons claiming through those parties by title accruing after the commencement of the action."

12   No document was ever provided showing the "endorsement" or an assignment as between BNC and LaSalle. The document assigning the mortgage from MERS to LaSalle does state that it was a mortgage executed by Moody to BNC Mortgage.

13   We also note that the order granting intervention and substitution is entitled a "stipulated order," and there were statements made at the hearing on the motion suggesting that plaintiffs were not fighting the substitution of LaSalle for MERS, only the introduction of a counterclaim attached to the motion. To that extent, the issue was waived.

End of Document                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "D"

Robinson v. Business Funding Corp., Not Reported in N.W.2d (2002)

2002 WL 31956967
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Guy **ROBINSON**[1] and
Marian Nowosatko, Plaintiffs,
and
Mike NOWOSATKO, Plaintiff-Appellant,
v.
BUSINESS FUNDING
CORPORATION, Defendant-Appellee.
Guy **ROBINSON** and Mike Nowosatko, Plaintiffs,
and
Marian NOWOSATKO, Plaintiff-Appellant,
v.
BUSINESS FUNDING
CORPORATION, Defendant-Appellee.

Nos. 225815, 226647.   |   Dec. 20, **2002**.

Before: O'CONNELL, P.J., and WHITE and B.B.
MACKENZIE,* JJ.

**Opinion**

[UNPUBLISHED]

PER CURIAM.

*1 Plaintiff Mike Nowosatko appeals by delayed leave
granted in Docket No. 225815, and his wife, plaintiff
Marian Nowosatko, appeals as of right in Docket No.
226647, challenging the trial court's order granting summary
disposition to defendant Business Funding Corporation. We
affirm.

Mike Nowosatko was the sole shareholder of Wellington
Imperial Limousine, Ltd., d/b/a Fortune Graphics, and
plaintiff Guy Robinson was a former stockholder of
Advertising Dimensions, Inc., a Michigan corporation. They
personally guaranteed the obligations of their companies. In
1990, the companies began factoring invoices with defendant.
Plaintiffs alleged that their companies began to experience

financial problems in late 1990 and 1991, whereupon they
began preparing phony invoices which were then sold to
defendant. In 1992, plaintiffs executed an "Agreement for
Redemption of Fraud" after defaults between the parties. The
parties subsequently executed a new settlement agreement in
December 1993, whereby plaintiffs agreed to repay defendant
$145,000. Plaintiffs made monthly payments under that
agreement until January 1999, and then commenced this
action in March 1999, challenging the agreements based on
usury, unconscionability, and duress, and challenging the
validity of a mortgage on the Nowosatko home that was
executed in August 1991.

The trial court granted defendant's motion for summary
disposition, ruling that any usury defense would not apply to
the transactions at issue because they did not involve loans,
and that the defenses of duress and unconscionability did
not apply because the settlement agreements were executed
after significant negotiations with the assistance of counsel.
Additionally, the court determined that, under the unclean
hands doctrine, Mike was estopped from challenging the
validity of the mortgage on the Nowosatko home on the basis
that he allegedly forged Marian's signature. The court also
determined that laches barred Marian from challenging the
validity of the mortgage.

We conclude that this case is governed by the "clean hands"
doctrine that was recently discussed in *Rose v. National
Auction Group,* 466 Mich. 453; 646 NW2d 455 (**2002**).
In *Rose,* the plaintiffs, George and Francis Rose, owned
an island in Lake Huron that they decided to sell. George
approached the defendant about selling the island at an
auction. A representative of the defendant proposed the use of
a "shill" or false bidder to make a phony bid, to which George
agreed. During the auction, the high bid was $175,000, far
below the $850,000 that the Roses wanted. The shill failed to
enter the bidding, which closed at $175,000. George signed
a purchase agreement for $175,000, and then brought an
action to put the plaintiffs where they allegedly would have
been had the shill performed. They argued that they would
have cancelled the auction but for the lure of the shill bidder
scheme. *Id.* at 456-461.

Our Supreme Court held that the plaintiffs' claims of fraud
and misrepresentation were "barred by the bedrock principle
that the preservation of the judicial system means no court
acting in equity can allow its conscience to be moved to
give such a plaintiff relief ." *Id.* at 462. The Court noted
that "the maxim that one 'who comes into equity must come

with clean hands' is 'the expression of one of the elementary and fundamental conceptions of equity jurisprudence." ' *Id.* (citation omitted). Citing earlier decisions, the Court went on to describe the purpose of the clean hands doctrine as "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief *however improper may have been the behavior of the defendant." Id.* at 463 (emphasis in the original; citation omitted). The Court added that "even underhanded conduct that does not rise to the level of being legally prohibited can nevertheless require the application of the clean hands doctrine[.]" *Id.* at 466.

**\*2** With regard to Docket No. 225815, Mike agreed that his company had been submitting phony invoices to defendant, and claimed that he forged his wife's signature on a mortgage to entice defendant to purchase more invoices. Pursuant to *Rose, supra,* we conclude that the doors of equity are closed to him.

In Docket No. 226647, Marian claims that the mortgage on her home with her husband Mike, because it was allegedly forged, was therefore void and unenforceable, and that laches does not bar her claim. We disagree.

A trial court's application of laches is reviewed for clear error. *Gallagher v. Keefe,* 232 Mich.App 363, 369; 591 NW2d 297 (1998). Laches is an equitable affirmative defense primarily based on circumstances that render inequitable the granting of relief to a dilatory plaintiff. *In re Contempt of United States Stationers Supply Co,* 239 Mich.App 496, 503-504; 608 NW2d 105 (2000). It is caused by the plaintiff's "failure to do something that should have been done under the circumstances or the failure to claim or enforce a right at the proper time." *Schmude Oil Co v. Omar Operating Co,* 184 Mich.App 574, 583; 458 NW2d 659 (1990). Laches applies when there has been "an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice...." *Dep't of Public Health v. Rivergate Manor,* 452 Mich. 495, 507; 550 NW2d 515 (1996). The defendant bears the burden of proving a lack of due diligence on the part of the plaintiff and resultant prejudice. *Gallagher, supra.* "[E]ach case must be determined on its own particular facts." *City of Troy v. Papadelis (On Remand),* 226 Mich.App 90, 97; 572 NW2d 246 (2000).

In this case, the mortgage was signed in 1991. Marian knew of the alleged forgery as early as 1996, but remained silent until 1999. In reliance on that mortgage, defendant continued

to purchase invoices from Mike and Robinson, and refrained from pursuing available collection remedies for more than six years. Marian did not offer an explanation or excuse for her delay of three years before enforcing the claim. Given all the facts of this case, the trial court did not clearly err in finding that laches applied. *Gallagher, supra; City of Troy, supra.*

Affirmed.

WHITE, J. (concurring in part and dissenting in part).

WHITE, J.

I respectfully dissent in Docket No. 226647. I conclude that a genuine issue of fact remained on the question whether plaintiff Marian Nowosatko's signature on the mortgage was forged. Further, although Marian Nowosatko knew of the forgery as of June 24, 1996, when she signed an affidavit so stating, there is no evidence that she was aware of the mortgage (or her forged signature) earlier. Marian Nowosatko was not a party to either of the settlement agreements for redemption of fraud that Mike Nowosatko and Guy Robinson entered into with defendant, in 1992, and in 1993. I also note that Mike Nowosatko testified at his August 26, 1999 deposition that defendant had been notified by letter about two years earlier, i.e., around August 1997, that Marian Nowosatko's signature on the mortgage form was forged. Thus, the facts defendant advanced below in support of the application of the doctrine of laches, i.e., that it had not learned of the forgery until plaintiffs filed their motion for summary disposition and submitted Marian Nowosatko's affidavit, were contested. [1]

**\*3** It is undisputed that Marian Nowosatko was at all times the sole owner of the residence that is the subject of the mortgage. The mortgage form, dated August 13, 1991, bears signatures purporting to be Marian Nowosatko's and Mike Nowosatko's. [2] In support of their motion for summary disposition, plaintiffs submitted Marian Nowosatko's affidavit attesting that the signature on the mortgage purporting to be hers was a forgery, [3] and Mike Nowosatko's deposition testimony [4] that he forged his wife's signature on the mortgage. Mike Nowosatko's answers to defendant's requests for admission, [5] contained in the lower court record, are in accord.

Under Michigan law a forged signature on a mortgage renders it void and unenforceable. *McGinn v. Tobey*, 62 Mich. 252; 28 NW 818 (1886); see also 17 Mich. Civil Jur, Mortgages, § 27, p 573 ("A mortgage is a nullity if the signature of the mortgagor is a forgery, and the lien will be voided since it is predicated on a forged conveyance," citing *McGinn, supra,*) and *id.,* § 101, p 643 ("A forged mortgage is no mortgage and a nullity," citing *LaPrad v. Sherwood,* 79 Mich. 520; 44 NW 943 (1890), *Waterbury v. Andrews,* 67 Mich. 281; 34 NW 575 (1887), and *Camp v. Carpenter,* 52 Mich. 375; 18 NW 113 [1884].)

A false statement regarding title to real estate constitutes fraud. See *Zaino v. North Woodward Const Co,* 355 Mich. 425, 429-430; 95 NW2d 33 (1959). In *Horvath v. National Mortgage Co,* 238 Mich. 354, 360; 213 NW 202 (1927), the Supreme Court determined that a signature on a deed procured by fraud was "in law a forgery," and that "those who subsequently innocently acquired interests under the forged instrument are in no better position as to title than if they had purchased with notice." The *Horvath* Court further noted:

> "There can be no such thing as a *bona fide* holder under a forgery, whose good faith gives him any rights against the party whose name has been forged or his heirs." *Austin v. Dean,* 40 Mich. 386 [1879].

The *Horvath* rule has been applied to mortgages, as well as deeds. See e.g., *Matthews v. Aluminum Acceptance Corp,* 1 Mich.App 570, 576; 137 NW2d 280 (1965).

In *VanderWall v. Midkiff,* 166 Mich.App 668; 421 NW2d 263 (1988), Gelderloos, who subsequently died intestate, gave power of attorney to one of his stepdaughters, Rowbotham. Rowbotham signed a deed in Gelderloos' name to the family home and cottage, without indicating she was doing so pursuant to a power of attorney, and transferred it to one of her siblings, Midkiff. Midkiff sold the home to the Rays. Gelderloos' nephew, VanderWall, brought suit. The jury concluded that Rowbotham had not acted under Gelderloos' direction, and the trial court ordered transfer of title to the home to the Rays. Regarding title to the home, this Court concluded:

> The Rays ... claim that they are insulated from plaintiff's claim because they are bona fide purchasers of the home. There can be no such thing as a bona fide holder under a forged deed, whose good faith

confers any rights against the party whose name has been forged, or those claiming under him. Where a deed is forged, those innocently acquiring interests under the forged deed are in no better position as to title than if they had purchased with notice. It cannot be disputed that the signature of Gelderloos on the quitclaim deed to Midkiff was forged. Rowbotham admitted that it was she, and not Gelderloos, who signed his name to the deed. Although Rowbotham claimed that she acted at the direction of Gelderloos, the jury found otherwise. As a forged document, the deed did not operate to convey title in the property to Midkiff. This, in turn, precluded the Rays from taking good title from Midkiff, and the fact that they took without notice does not insulate them from plaintiff's claim. [*VanderWall, supra* at 685.]

**\*4** In *Geel v. Valiquett,* 292 Mich. 1, 18; 289 NW 306 (1939), the Supreme Court held that where "there was fraud in the transactions relating to the deed and land contract, ... the same should be declared void as against public policy." The *Geel* Court declined to apply the doctrine of laches to a contract that was void as against public policy:

> It is urged by defendants that plaintiffs are guilty of laches and rely upon *Merrill v. Wilson,* 66 Mich. 232 [; 33 NW 716 (1887) ], where we said:
>
> > "A person * * * who has been defrauded, must act promptly; and, if he would repudiate the contract, he must do nothing in affirmance of it after ascertaining the facts."
>
> In the case at bar, we hold that the deed and land contract are void as against public policy. In such cases the doctrine of laches has no application.
>
> In 6 R.C.L. p. 819, it is said:
>
> > "However, the doctrine of estoppel by conduct or by laches has no application to a contract or instrument which is void because it violates an express mandate of the law or the dictates of public policy. Such a contract

has no existence whatever. It has no legal entity for any purpose, and neither action nor inaction of a party to it can validate it; and no conduct of a party to it can be invoked as an estoppel against asserting its invalidity. The authorities are uniformly agreed on this principle. [*Geel, supra* 292 Mich. at 18.]

I would thus remand for determination whether Marian Nowosatko's signature on the mortgage form was a forgery. If the fact-finder were to conclude that it was a forgery, the doctrine of laches would not apply under the cases discussed above.

**Footnotes**

1    In No. 225815, Guy Robinson was dismissed by stipulation and order of this Court on 10/4/2000. In No. 226647, Guy Robinson was not a party to the appeal.

\*    Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

1    Plaintiffs' complaint, filed on March 12, 1999, alleged that Marian Nowosatko's signature on the mortgage form was a forgery, and that:

24. The Plaintiff, Marian Nowosatko, is not and never has been an officer, director, stockholder, employee, agent or representative of A.D.I. or Wellington.

25. The Plaintiff, Marian Nowosatko, is the wife of the Plaintiff, Michael Nowosatko, and she is the sole owner of certain real property located in the City of Troy.... 119 Nottingham.

26. Upon information and belief, the Defendant, Business Funding Corporation, has filed a lien, in the form of a mortgage, against the above captioned property, which, as indicated, is titled in the sole name of the Plaintiff, Marian Nowosatko[,] a copy of which lien is attached hereto ...

27. Upon information and belief, the mortgage purports to secure the obligations of A.D.I. and Wellington as set forth in the Agreements (Exhibits A & B) between A.D.I. and Wellington and the Defendant, Business Funding Corporation.

29. The Plaintiff, Marian Nowosatko, did not sign the mortgage, did not authorize to sign the mortgage on her behalf and the signature on the mortgage which purports to be the signature of the Plaintiff, Marian Nowosatko, is not, in fact, the signature of the Plaintiff, Marian Nowosatko, and, therefore, the mortgage is null and void and of no force or effect.

30. The Plaintiff did not receive any consideration for the mortgage and, therefore, the mortgage is null and void and of no force or effect.

31. The mortgage has become a cloud and slander on the title to the property of the Plaintiff, Marian Nowosatko, and the Plaintiff, Marian Nowosatko, is fearful that if the cloud and slander upon her title to the property is not removed ... the Defendant ... will attempt to foreclose upon the mortgage or assign, encumber, sell or otherwise dispose of the property of the Plaintiff, Marian Nowosatko, causing her irrefutable harm and injury.

2    The mortgage form states that it was drafted by Harold Nimchonok, an employee of defendant, bears witness signatures of Gary Rotenberg and Sandra Phillips, and the signature of Kathleen M. Sadoway, as notary. Mike Nowosatko's answers to requests for admission denied that Sadoway was either present, witnessed or notarized the execution of the mortgage on August 13, 1991. Mike Nowosatko testified at deposition that Gary Rotenberg, accountant for Advertising Dimensions and Fortune Graphics, had him (Mike Nowosatko) sign for Marian Nowosatko, and that there were no witnesses. Mike Nowosatko testified he did not who Kathleen Sadoway is.

3    Marian Nowosatko's affidavit, dated June 24, 1996, stated:

1. I am married to Michael Nowsoatko [sic].

2. I am the sole owner of the home located at 119 Nottingham, Troy, Michigan.

3. I have not granted a mortgage to Business Funding Corporation on my home.

4. The signature on the attached mortgage to Business Funding dated August 13, 1991, is not my signature and I have no knowledge as to who signed my name to the mortgage.

5. I am competent to testify and if called upon to testify, I will testify as to the truth and accuracy of the facts contained in this Affidavit.

4    Only certain pages of Mike Nowosatko's deposition transcript are before us.

5    Plaintiff Mike Nowosatko answered defendant's first request for admission to him as follows:

1. Please admit or deny that you executed the Mortgage Form dated August 13, 1991 from Michael Nowosatko and Marian Nowosatko to Business Funding Corporation, (Copy attached), as a Mortgagor.

ANSWER: Admit.

2. Please admit or deny that Kathleen M. Sadoway was present on August 13, 1991, and witnessed and notarized execution of the attached Mortgage.

   ANSWER: Deny.

3. Please admit or deny that the signature set forth on the attached Mortgage dated August 13, 1991 is that of your spouse, Marian Nowosatko.

   ANSWER: Deny.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "E"

2013 WL 2460022
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Cheryl SOBH and Sam Sobh, Plaintiffs–Appellants,
v.
BANK OF AMERICA, NA, JP Morgan
Chase Bank, Trott & Trott, and American
Premiere Title, Defendants–Appellees.

Docket No. 308441.   |   June 6, 2013.

Wayne Circuit Court; LC No. 11–008363–CH.

Before: WILDER, P.J., and STEPHENS and RONAYNE
KRAUSE, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiffs appeal by right the trial court's order granting
summary disposition to defendants and dismissing their
claims in this mortgage foreclosure action. For the reasons set
forth below, we hold that defendant Bank of America lacked
standing to foreclose under MCL 600.3204(3); accordingly,
the foreclosure was voidable. We therefore reverse and
remand for further proceedings consistent with this opinion.

**I. BASIC FACTS**

The property at issue in this case is located at 19035 Parke
Lane, in Gross Isle, Michigan. In April, 2006, plaintiffs
borrowed approximately $510,000 from Washington Mutual
Bank (Washington Mutual), and in exchange, granted
Washington Mutual a mortgage interest in the property.
In 2008, Washington Mutual went into receivership, with
the FDIC appointed as receiver. Chase acquired all of
Washington Mutual's assets, including plaintiffs' mortgage,
on September 25, 2008, via a voluntary Purchase and
Assumption Agreement. There is no indication in the lower
court record that Chase recorded its interest in plaintiffs'
mortgage after it was conveyed by Washington Mutual. In

March, 2010, Chase assigned its interest in the mortgage to
Bank of America.

Plaintiffs stopped making payments on their mortgage in
late 2009, and in early 2011, Bank of America initiated
foreclosure by advertisement proceedings. Plaintiffs filed
a complaint to stop the foreclosure, alleging a variety of
statutory and common law causes of action. Defendants
moved for summary disposition under MCR 2.116(C)(8) and
MCR 2.116(C)(10), and the trial court granted the motion and
dismissed plaintiffs' claims. Plaintiffs appealed.

**II. ISSUE PRESERVATION
AND STANDARD OF REVIEW**

For an issue to be preserved for appeal it must be raised,
addressed, and decided by the trial court. *Hines v. Volkswagen
of America, Inc.,* 265 Mich.App 432, 444; 695 NW2d 84
(2005) (citations omitted). Plaintiffs' argument on appeal is
difficult to decipher, but it appears that it is based on whether
plaintiffs had standing to foreclose under MCL 600.3204.
Plaintiffs did not make this argument below, and therefore
the trial court did not address or decide it. However, this
issue is one of law for which all relevant facts are available;
accordingly, we will review plaintiffs' argument. *Vushaj v.
Farm Bureau Gen Ins Co of Michigan,* 284 Mich.App 513,
521; 773 NW2d 758 (2009).

Appellate courts review the grant or denial of summary
disposition de novo. *Maiden v. Rozwood,* 461 Mich. 109, 119;
597 NW2d 817 (1999).

A motion under MCR 2.116(C)(8) tests the legal
sufficiency of the complaint. All well-pleaded factual
allegations are accepted as true and construed in a light
most favorable to the nonmovant. A motion under MCR
2.116(C)(8) may be granted only where the claims alleged
are so clearly unenforceable as a matter of law that no
factual development could possibly justify recovery. When
deciding a motion brought under this section, a court
considers only the pleadings.

**\*2** A motion under MCR 2.116(C)(10) tests the factual
sufficiency of the complaint. In evaluating a motion
for summary disposition brought under this subsection,
a trial court considers affidavits, pleadings, depositions,
admissions, and other evidence submitted by the parties, in
the light most favorable to the party opposing the motion.
Where the proffered evidence fails to establish a genuine

Sobh v. Bank Of America, NA, Not Reported in N.W.2d (2013)

issue regarding any material fact, the moving party is entitled to judgment as a matter of law. *[Id.* at 119–120 (citations and quotations omitted).]

### III. ANALYSIS

In Michigan, the prerequisites that a foreclosing party must satisfy in order for a foreclosure by advertisement to be valid are set forth in MCL 600.3204. Central to this case is whether defendants satisfied the requirements of MCL 600.3204(3). That statute provides:

> If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title shall exist prior to the date of sale ... evidencing the assignment of the mortgage to the party foreclosing the mortgage.

A chain of title is "[t]he ownership history of a piece of land...." Black's Law Dictionary (9th ed).

The Michigan Supreme Court's recent decision in *Kim v. JPMorgan Chase Bank, N.A.,* 493 Mich. 98; 825 NW2d 329 (2012), addressed the proper application of MCL 600.3204(3). *Kim,* which was decided after the trial court granted summary disposition, is controlling in this case. In *Kim,* as here, the plaintiffs had a Washington Mutual mortgage. *Id.* at 103. The *Kim* plaintiffs' mortgage was acquired by Chase on September 25, 2008, by a Purchase and Assumption Agreement—the exact same agreement by which Chase acquired plaintiffs' mortgage in this case. *Id.* Chase never recorded its interest in the *Kim* plaintiffs' mortgage, but foreclosed by advertisement nonetheless. *Id.* at 104. Similarly, in this case, there is no indication that once Chase acquired plaintiffs' mortgage it recorded an assignment of its interest. None of defendants' filings below assert that Chase recorded its interest in defendants' mortgage once it acquired it from Washington Mutual, and defendants' appellate brief suggests that Chase did not record its interest. Indeed, in both *Kim* and the instant case it appears that Chase did not record the mortgage interests it received from Washington Mutual. In fact, *Kim* and this case are factually identical up until the point at which, in the instant case, Chase assigned its interest in the mortgage to Bank of America, which eventually became the foreclosing entity.

In *Kim,* the Supreme Court held that because the Washington Mutual mortgage was acquired by Chase as part of a voluntary Purchase and Assumption Agreement, Chase did not acquire those mortgages by operation of law. *Id.* at 111. Further, the Court held, because Chase acquired Washington Mutual's mortgages voluntarily, and not by operation of law, those mortgages were subject to the requirements of MCL 600.3204(3), and because Chase never recorded its interest the plaintiffs' mortgage prior to foreclosing, the foreclosure was voidable. *Id.* at 113–115.

**\*3** The same result is warranted here. There is no indication in the lower court record that Chase, after acquiring plaintiffs' mortgage via the same Purchase and Assumption Agreement at issue in *Kim,* ever recorded its assignment before assigning the mortgage to Bank of America. Chase's failure to comply with MCL 600.3204(3) prior to assigning its interest to Bank of America accordingly resulted in a break in the chain of title because Chase never recorded its assignment from Washington Mutual before assigning it to Bank of America. Therefore, the plain requirement of MCL 600.3204(3) was not met here because "a record chain of title" did not "exist prior to the date of sale."

Defendants argue that MCL 3204(3)

> does not require that all interim assignments be recorded ... rather ... all that is required is that the party foreclosing the mortgage record the assignment to it prior to the date of sale. Nowhere does the current statute require the recording of any interim assignments that may have been made between the date the initial mortgage was given and the date the last assignment was recorded prior to sale.

Defendants' argument is meritless. First, defendants fail to cite a single source in their appellate brief to support their contention that under MCL 600.3204(3), interim assignments such as the one from Washington Mutual to Chase need not be recorded so long as the foreclosing entity recorded the assignment by which it acquired the mortgage. Second, the *Kim* Court squarely addressed this issue when it held that, under MCL 600.3204(3), "a mortgagee cannot validly foreclose a mortgage by advertisement *before the mortgage and all assignments of that mortgage* are duly recorded." *Kim* 493 Mich. at 106 (emphasis added). Accordingly, defendants

Sobh v. Bank Of America, NA, Not Reported in N.W.2d (2013)

are incorrect that MCL 600.3204(3) does not require that interim assignments be recorded-it does. The trial court erred when it concluded that Bank of America received a valid assignment from Chase: Chase's failure to comply with the statute resulted in a break in the chain of title, and consequently Bank of America did not have standing to foreclose on plaintiffs' property under MCL 600 .3204(3).

As in *Kim,* because defendants lacked standing to foreclose, defendants' foreclosure is voidable, but not void *ab initio. Kim,* 493 Mich. at 115. We therefore reverse the judgment of the trial court and remand. As in *Kim,* on remand:

> [T]o set aside the foreclosure sale, plaintiffs must show that they were

prejudiced by ... [the] failure to comply with MCL 600 .3204. To demonstrate such prejudice, they must show that they would have been in a better position to preserve their interest in the property absent [the] noncompliance with the statute. *[Kim,* 493 Mich. at 115–116.]

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiffs, as the prevailing party, may tax costs pursuant to MCR 7.219(A).

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "F"

Darcy v. CitiFinancial, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 3758805
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Sheila M. DARCY, Plaintiff,
v.
CITIFINANCIAL, INC. and
Citimortgage, Inc., Defendants.

No. 1:10–cv–848.   |   Aug. 25, 2011.

**Attorneys and Law Firms**

Kellie Andrea Maki, Legal Services of South Central
Michigan (Lansing), Lansing, MI, Lorray S.C. Brown,
Michigan Poverty Law Program, Ann Arbor, MI, for Plaintiff.

James W. Batchelor, Trott & Trott P.C. (Grand Rapids),
Grand Rapids, MI, Richard Welke, Trott & Trott P.C.
(Farmington Hills), Farmington Hills, MI, for Defendants.

**Opinion**

### OPINION

JANET T. NEFF, District Judge.

**\*1** Plaintiff, Sheila Darcy, is a homeowner seeking damages
and injunctive relief from her mortgage holder, CitiFinancial,
Inc., and its agent, CitiMortgage, Inc. (Defendants). This
matter is before this Court on Defendants' Motion for
Summary Judgment/Dismissal (Dkt 45). Plaintiff filed a
response to Defendants' motion (Dkt 50), and Defendants
filed a reply (Dkt 51). Having fully considered the written
briefs and accompanying exhibits, the Court finds that the
relevant facts and arguments are adequately presented in
these materials and that oral argument would not aid the
decisional process. *See* W.D. Mich. LCivR 7.2(d). For the
reasons that follow, the Court concludes that Defendants'
motion is properly denied.

### I. BACKGROUND

Plaintiff, who owns and resides at a home at 746 Princeton
Ave., Lansing, Michigan, (Dkt 28, Am. Compl., ¶¶ 5, 17,
18), was laid off from her job of approximately ten years

in the midst of the 2008 financial downturn (*id.*, ¶ 20). She
subsequently sought to prevent foreclosure via modification
of her home loan under HAMP, the Home Affordable
Modification Program, which was created pursuant to the
October 3, 2008, Emergency Economic Stabilization Act,
(EESA), 12 U.S.C. §§ 5201 *et seq.* (2008). The centerpiece of
EESA is the Troubled Asset Relief Program (TARP), through
which Congress delegated broad powers to the Secretary of
the Department of Treasury to mitigate the financial impact of
the foreclosure crisis and preserve homeownership. *Stagikas
v. Saxon Mortgage Servs., Inc.*, No. 10–40164–FDS, 2011
WL 2652445, at *1 (D.Mass. July 5,2011) (citing 12 U.S.C.
§§ 5201, 5211–5241). Under TARP, the Secretary is directed
to "implement a plan that seeks to maximize assistance for
homeowners" and "facilitate loan modifications to prevent
avoidable foreclosures." 12 U.S.C. § 5219(a); *see also
Stagikas, supra.*

In seeking a mortgage modification under HAMP, Plaintiff
submitted financial information and a hardship affidavit to
CitiMortgage (Am.Compl., ¶¶ 27, 31, 38). CitiMortgage
responded by offering Plaintiff a HAMP Trial Period Plan
(TPP), effective September 1, 2009, which reduced Plaintiff's
mortgage payment for the three-month trial period from
$595.01 to $324.89 per month (*id.*, ¶¶ 25, 28, 29). Plaintiff
executed the TPP agreement on August 17, 2009 (*id.*, ¶ 31;
Defs. Br., Ex. C).

Immediately under the heading, on the first page of the
TPP, is the definition of Effective Date, which states: "Trial
Period Plan Effective Date (Beginning of Trial Period):
9/1/09" (Defs. Br., Ex. C at 1). The first full sentence of
the TPP agreement states: "If I am in compliance with
this Trial Period Plan (the 'Plan') and my representations
in Section 1 continue to be true in all material respects,
then the Lender will provide me with a Home Affordable
Modification Agreement ('Modification Agreement'), as set
forth in Section 3, that would amend and supplement (1) the
Mortgage on the Property, and (2) the Note secured by the
Mortgage" (*id.*). The second paragraph of the TPP defines
Offer as "the offer described in this Plan" and concludes:
"I understand that after I sign and return two copies of this
Plan to the Lender, the Lender will send me a signed copy
of this Plan if I qualify for the Offer or will send me written
notice that I do not qualify for the Offer. This Plan will not
take effect unless and until both I and the Lender sign It and
Lender provides me with a copy of this Plan with the Lender's
signature" (*id.*).

Darcy v. CitiFinancial, Inc., Not Reported in F.Supp.2d (2011)

**\*2** Section 2 of the TPP sets forth the amount and due date of each monthly payment and defines the "Trial Period" as "commencing on the Trial Period Effective Date" and ending the earlier of: the first day of the month following the last required payment or on termination of the Plan (*id.* at 2). It states that "TIME IS OF THE ESSENCE under this Plan" and, in § 2(F), identifies three conditions under which the TPP would not result in a permanent modification: "[i]f prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct" (*id*).

Section 3 explains how the permanent loan modification will be calculated. It then provides: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date" (*id.* at 3).

Plaintiff alleges that she complied with the TPP requirements, including the required payments, which she continued to make until July 2010, eight months beyond the three-month TPP period, and that her representations in Section 1 continued to be true in all material respects (Am.Compl., ¶¶ 27–41, 52), but that Defendants did not comply with their obligations, in that they did not send her either a signed copy of the Plan, written notice that she did not qualify, or a mortgage modification under the HAMP program (*id.,* ¶¶ 30, 32, 35, 52). Defendants assert that Plaintiff received a notification letter and was informed that there were verification issues regarding her income in December 2009 (Defs. Br. at 2 and Ex. K; Defs. Reply at 8 and Ex. C). The verification issue appears to be related to a tuition grant (Am.Compl., ¶¶ 34–37). Plaintiff alleges that, after she was laid off, she enrolled in Lansing Community College to obtain the training required for a more stable occupation (*id.* ¶ 23). On August 27, 2009, she received a Pell Grant for tuition, which was credited to her credit union savings account (*id.,* ¶ 34), and which she explained to Defendants (*id.,* ¶¶ 37– 38). Plaintiff alleges that she received verbal communication that she no longer qualified for HAMP on December 2, 2009, when she attempted to make a monthly payment, and that Defendants accepted her payment and subsequent payments

until July 2010 (*id.,* ¶¶ 36, 39–41). Plaintiff received a notice of foreclosure around July 1, 2010 (*id.,* ¶ 56).

Plaintiff filed a complaint in a Michigan circuit court in July 2010, and Defendants removed it to this Court on August 25, 2010, claiming federal question jurisdiction pursuant to 28 U.S.C. § 1331 (Dkt 1). Defendants later filed a Confirmation of Jurisdictional Amount (Dkt 26), which establishes that this Court has diversity jurisdiction under 28 U.S.C. § 1332.

**\*3** Plaintiff filed an Amended Complaint on January 20, 2011, that claims breach of contract, breach of the duty of good faith and fair dealing, and, in the alternative, promissory estoppel (Dkt 28). On February 7, 2011, she filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction, seeking to enjoin a sheriff's sale scheduled for February 10, 2011 (Dkt 29). This Court granted a temporary restraining order (Dkt 32) and, after further briefing, granted Plaintiff's motion for preliminary injunction on March 1, 2011 (Dkt 39).

Defendants' Motion for Summary Judgment/Dismissal followed (Dkt 45). Defendants maintain that Plaintiff's claims fail as a matter of law under Federal Rule of Civil Procedure 12(b)(6) and 56(a). They argue that Plaintiff has no right of action under HAMP (Defs. Reply at 3–6), that the language of the TPP agreement defeats Plaintiff's breach of contract claim (Defs.Mot., ¶¶ 3, 7), that Defendants were under no covenant of good faith and fair dealing because they were not required "to undertake obligations they did not agree to contractually under HAMP" (*id.,* ¶ 8). Defendants also argue that Plaintiff's promissory estoppel claim fails because it is barred by the statute of frauds and any claimed reliance was unreasonable (*id.,* ¶ 9).

## II. MOTION STANDARD

When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept all well-pled allegations of the complaint as true and construe them in the light most favorable to Plaintiff. *See Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir.2008). As the Supreme Court stated in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a motion to dismiss will be denied only where the "[f]actual allegations [are] enough to raise a right for relief above the speculative level" on the assumption that all of the complaint's allegations are true. *Id.* at 555. "To survive a motion to dismiss, a complaint must

Darcy v. CitiFinancial, inc., Not Reported in F.Supp.2d (2011)

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal.* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

A motion for summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Because we are exercising diversity jurisdiction in this case, the substantive law of Michigan applies. *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.,* 274 F.3d 1085, 1092 (6th Cir.2001). In construing a contract document, this Court "must follow and apply Michigan law in accordance with the controlling decisions of the Supreme Court of Michigan." *Id.* The primary responsibility of a court construing a Michigan contract "is to ascertain and enforce the intent of the parties." *Id.* (citing *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (Mich.1994); *Sobczak v. Kotwicki,* 347 Mich. 242, 79 N.W.2d 471, 475 (Mich.1956)). The contract must be examined "as a whole, giving effect to all parts and language of a written agreement according to their 'ordinary and natural meaning.' " *Id.* (quoting *City of Wyandotte v. Consol. Rail Corp.,* 262 F.3d 581, 585 (6th Cir.2001)). If contract terms or clauses appear to conflict, the court must strive to harmonize them. *Id.* (citing *Fresard v. Mich. Millers Mut. Ins. Co.,* 414 Mich. 686, 327 N.W.2d 286, 289 (Mich.1982)). The court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447, 453 (Mich.2003). If the provisions of a contract cannot be read "in reasonable harmony, the language of the contract is ambiguous." *Id.* Interpretation of an ambiguous contract is a question of fact for a jury to decide. *Id.* at 453. "[I]f, after the jury has considered all conventional means of contract interpretation and all relevant extrinsic evidence, it is still

unable to determine what the parties intended, the jury should then construe the ambiguity against the drafter." *Id.* at 460.

# III. ANALYSIS

## A. Preemption and Breach of Contract

**\*4** Defendants seek to dismiss Plaintiff's breach of contract claim on the grounds that (1) there is no private right of action under HAMP, (2) the TPP is not a binding contract for loan modification, and (3) Defendants complied with the TPP in that they sent Plaintiff written notification that a modification would not be offered.

### 1. Private Right of Action/Preemption

Defendants argue that Plaintiff cannot bring an action because the EESA provides only a limited private right of action for challenges to actions by the Secretary of the Treasury, that HAMP vests compliance enforcement in Freddie Mac, and additional remedies should not be added by the courts (Defs. Reply at 4–6). Plaintiff's Amended Complaint does not, however seek enforcement of the HAMP statutes against Defendants but instead is based on state contract claims concerning the TPP document Plaintiff received from Defendants. Plaintiff's action is not similar, despite Defendants' contention, to the action that resulted in dismissal in *Hart v. Countrywide Home Loans, Inc.,* 735 F.Supp.2d 741 (E.D.Mich.2010). In *Hart,* the claim focused on the lender's alleged duties under the HAMP statutes, and the court held that the lending statutes did not impose a duty on the lenders to modify loans. *Id.* at 748. Here, Plaintiff is alleging that the TPP agreement is a contract and that Defendants breached duties contained within the contract itself.

Defendants do not argue that a claim for breach of the TPP contract under state law is expressly preempted by the statutes that established the HAMP program. Rather, without any acknowledgment that preemption is at issue, they suggest an implied preemption, arguing that Plaintiff's case is inexorably tied to interpretation of the HAMP guidelines (Defs. Reply at 3). This is insufficient grounds for preemption.

The Court of Appeals for the Seventh Circuit considered whether common-law state claims are preempted by the Home Owner's Loan Act, which regulates federal savings

associations, preempts state regulation of federal savings associations, and, like HAMP, provides no private right of action for enforcement of the statute. *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638, 642–44 (7th Cir.2007). Noting that "[i]t would be surprising for a federal regulation" to bar state actions for breach of contract or fraud, the court determined that the "assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." *Id.* at 643–44.

A recent federal district court decision applied the *In re Ocwen* decision to a TPP agreement and held that a state-law breach of contract claim was not preempted or otherwise generally precluded by HAMP. *Fletcher v. One West Bank, FSB*, No. 10 C 4682, 2011 WL 2648606, at *4 (N.D.Ill. June 30, 2011) (citing *In re Ocwen*, 491 F.3d at 643–44). The *Fletcher* court explained, "without some explicit direction from Congress that it intended programs such as HAMP to have such preemptive force, the Court will not preclude Fletcher from pursuing her basic state common law remedies" *Id.; see also Bosque v. Wells Fargo Bank, N.A.*, 762 F.Supp.2d 342, 351 (D.Mass.2011) (TPP's relationship to federal statute and regulations does not require dismissal of any state-law claims that arise under TPP). In accordance with the analysis in these cases, we conclude that Plaintiff's contract action is not preempted or otherwise precluded by HAMP.

### 2. Binding Contract

**\*5** Defendants also argue that Plaintiff cannot claim breach of contract because the TPP was not a binding contract as a matter of law. They characterize the TPP as step one of a two-step process and claim that it did not result in an executed contract (Defs. Mot., ¶ 7; Defs. Br. at 21). Plaintiff responds by referring to several cases in which a TPP is recognized as a contract (Pl. Br. at 16). In *Bosque, supra,* the court noted that the TPP agreement at issue in that case based on a form of agreement created by the government, cited language like that present in the TPP at issue here, and described it as a document with the appearance of a contract. 762 F.Supp.2d at 348.

The forms and process here were similar. CitiMortgage offered Plaintiff a TPP as step one in the HAMP program, and then sent the form agreement to Plaintiff for her signature (Am.Compl., ¶¶ 28–31). Plaintiff alleged that she accepted

the terms both by making the payments required by the TPP and by signing it and returning two copies to CitiMortgage (*id.*, ¶¶ 31, 33). Defendants argue that the procedure followed with Plaintiff differed from that in the *Bosque* case in that the lender in *Bosque* signed the plaintiffs' TPP's. Other courts, however, have recognized as contracts TPP agreements that were not signed by the lender. *See Belyea v. Litton Loan Servicing, LLP*, Civ. Action No. 10–10931–DJC, 2011 WL 2884964 (D.Mass. July 15, 2011). Defendants do not raise the statute of frauds against Plaintiff's contract claim. Moreover, Defendants acknowledge that the TPP was in effect for the three-month period and state in their pleadings that Plaintiff's TPP started in September 2009 ((Dkt 45, Defs. Mot., ¶ 5). This understanding is consistent with the definition of the TPP Effective Date as September 1, 2009 (Defs.Br., Ex. C). We conclude that the TPP is a contract between the parties, subject to the terms and conditions stated in the document that Plaintiff accepted by signing on August 17, 2009.

Many of Defendants' arguments for dismissal of Plaintiff's contract claims are based on the terms of the TPP agreement. Defendants argue that her claim fails under clear and unambiguous terms of the contract and because Defendants complied with the terms of the TPP and terminated it by sending notice to Plaintiff. Plaintiff, in turn, argues that the contract promises a loan modification if she complied with the payments and income verification requirements, that she complied with all the terms of the contract, and that Defendants failed to perform their duties. Some of Plaintiff's arguments for her claims stray to rights and duties under the HAMP statute rather than under the terms of the TPP agreement. Such arguments are not relevant to the viability of her Amended Complaint, which pleads state common-law claims, and will not be given weight in these considerations.

Plaintiff maintains that she complied with the terms of the TPP and that Defendants therefore had a contractual obligation to provide her with a Modification Agreement (Am. Compl., ¶¶ 31–38, 59–67; Pl. Br. at 4–17). Defendants claim that the language of the TPP on which she relies is taken out of context and that clear, unambiguous language in the TPP requires judgment in their favor (Defs. Reply at 6). Defendants point to language in § 2 of the TPP and argue that these terms and others in the TPP (Defs.Br., Ex. C) make it clear that they have no obligation to proceed to Step Two and can let the TPP expire without doing anything. The key sections on which Defendants rely provide in relevant part:

> **\*6** F. If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of

Darcy v. CitiFinancial, Inc., Not Reported in F.Supp.2d (2011)

this Plan and the Modification Agreement, (ii) I have not made the Trial Period payments required under Section 2 of this Plan, or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the loan documents will not be modified and this Plan will terminate.

G. I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed.

Defendant also calls attention to the portion of § 2 that provides that the TPP expires at the end of the three month trial period.

Plaintiff claims that the language of the TPP promised her a modification of her mortgage if she complied with the terms of the TPP. As noted above, the first full sentence of the TPP states:

> If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

Defendants argue that this sentence does not obligate them to provide a Modification Agreement because it is qualified by § 3, which is subject, in turn, to § 2. But § 3 can be read to condition Plaintiff's receipt of a Modification Agreement only on Plaintiff's compliance with the requirements that place duties on her in § 2. The only references to § 2 in § 3 are a mention of payment procedures in § 2D and a statement of Plaintiff's duties that provides:

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan

Documents as necessary to reflect this new payment amount and waive any late charges accrued to date.

It is clear in the TPP that "I" refers only to Plaintiff and not to Defendants, the "Lender." The requirements of § 2 that impose a duty on Plaintiff are those requiring timely payment of the TPP payment amounts.

While both parties try to isolate the terms that support their interpretation, when read as a whole, the TPP document is far from clear. The parties' attempts to support their positions with references to portions of the agreement highlight the fact that some of the terms conflict with others. While this Court is mindful that it should strive to harmonize the terms of the TPP, *Wonderland,* 274 F.3d at 1092, the Court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp,* 663 N.W.2d at 453. The terms of the TPP cannot be read "in reasonable harmony" and its language is, thus, ambiguous. *See id.*[1] Plaintiff's breach of contract claim hinges on ambiguities in the contract and precludes dismissal as a matter of law.

### 3. Written Notification

**\*7** The parties also contest whether summary judgment should be entered on Plaintiff's breach of contract claim based on Defendants' evidence that they sent written notice to Plaintiff that she did not qualify for a mortgage modification, as referenced in § 1 of the TPP. Plaintiff claims that she fulfilled all of the requirements for a loan modification, and that, although she was informed by telephone in December 2009 that she no longer qualified for a HAMP modification, she never received written notice (Am.Compl., ¶¶ 36–39). Defendants do not provide any evidence to counter Plaintiff's claim that she was in compliance with the TPP in that her financial representations were true and she made the required payments.

Defendants do, however, assert in their motion that they sent written notice that her request for a modification was denied, and they support this claim with a file copy of a 12/10/09 notice letter (Dkt 45, Defs. Mot., ¶¶ 5–6 and Ex. K). Defendants have also submitted an affidavit attesting that the file copy was a true and accurate copy of the correspondence sent, except that the copy sent would have been on letterhead (Dkt 51, Defs. Reply, Ex. C). Plaintiff's only evidence of

Darcy v. CitiFinancial, Inc., Not Reported in F.Supp.2d (2011)

nonreceipt is her affidavit, attesting that she did not see or receive the 12/10/09 letter (Am.Compl., Ex. A, ¶¶ 32–33). Defendants' evidence may well be sufficient to establish that Defendants provided the written notice referenced in § 1 of the TPP. In light of the ambiguities in the TPP as to the promises and responsibilities of the parties, however, this evidence is insufficient to support summary judgment for Defendants because it does not resolve all of the issues raised by Plaintiff's claim of breach of contract.

### B. Breach of Duty of Good Faith and Fair Dealing

While Michigan does not recognize an independent tort claim for breach of the implied covenant of good faith and fair dealing, every contract in which performance is left to a party's discretion is subject to an implied covenant of good faith. *McLiechey v. Bristol West Ins. Co.*, 408 F.Supp.2d 516, 522 (W.D.Mich.2006); *Lowe's Home Centers, Inc. v. LL & 127, LLC*, 147 Fed App'x 516, 523 (6th Cir.2005). "[W]here the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith." *Lowe's*, 147 Fed. App'x at 523–24.

Plaintiff alleges that Defendants breached their duty of good faith and fair dealing by inaction, lack of timely verification that she qualified under the TPP, and failure to timely provide her with a Modification Agreement (Am.Compl., ¶¶ 69–74). Defendants provide no evidence to support a claim that they acted in good faith or made any effort at all to verify the information Plaintiff submitted during the three-month TPP period. Defendants simply say that verification of her income "became problematical" in December 2009 (Defs. Br. at 18), which was after the three-month TPP period, and that they fulfilled any duty by sending written notice that Plaintiff was not qualified for modification.

**\*8** Plaintiff's claim of breach of the duty of good faith and fair dealing is dependent on the existence of contract duties, which is, in turn, dependent on resolution of ambiguities in the TPP contract. Defendants' motion is thus denied, and this claim is permitted to proceed in conjunction with Plaintiff's breach of contract claim.

### C. Promissory Estoppel

Defendants contend that Plaintiff cannot prevail on her third count, a promissory estoppel claim, pled in the alternative, because Plaintiff's claim of reliance is based on isolated language in the TPP and her claim of a promise is barred by the statute of frauds (Defs. Mot., ¶ 9). Defendants cite Michigan's statute of frauds, which provides that an action cannot be brought against certain financial institutions unless the contract or promise is in writing and signed. MICH. COMP. LAWS ANN. § 566.132(2)(b) and (3). Plaintiff counters that her claim is not subject to dismissal under the statute of frauds because it is based on a writing, the TPP, and that Defendants' signature was waived and Defendants are estopped by her performance of the terms (Pl. Br. at 20–21). Defendants, in reply, characterize Plaintiff's argument as "absurd" but do not cite any support for their contention that Plaintiff's allegations are insufficient under Michigan law to avoid dismissal under the statute of frauds (Defs. Reply at 9). The issue of Plaintiff's reliance is subject to analysis of the ambiguous TPP provision and is not ripe for dismissal. For these reasons, Defendants' motion is denied on the promissory estoppel claim.

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment/Dismissal (Dkt 45) is DENIED. An Order will be entered consistent with this Opinion.

---

Footnotes

1   Cases that have dismissed a breach of contract claim under a TPP agreement generally have not discussed the language of § 3 of the TPP, quoted above, or addressed whether conflicting language in the TPP created ambiguity. *Brown v. Bank of New York Mellon*, No. 1:10–cv–550, 2011 WL 206124, at \*3 (W.D.Mich. Jan.21, 2011), for example, cites only §§ 2F and 2G of the TPP, which provide that loan payments will not be modified if lender does not send the borrower a Modification Agreement. A recent case, *Thomas v. JPMorgan Chase & Co.*, No. 10 Civ. 8993(SAS), 2011 WL 3273477, at \*8 (S.D.N.Y. July 29, 2011), cites language similar to § 3 in the TPP preamble and acknowledges that it is "misleading." *Thomas* does not cite § 3 of the TPP agreement, however, and, on the basis of language in § 2, without any further discussion of conflicting terms, holds that the TPP is not a binding contract for mortgage modification. *Id.* Additionally, such cases are distinguishable based on the facts or the specific claims asserted.

Darcy v. CitiFinancial, Inc., Not Reported in F.Supp.2d (2011)

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "G"

2014 WL 765055
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Rebecca **WILLIAMS**, et. al., Plaintiff,

v.

**SAXON** MORTGAGE
SERVICES, INC., Defendants.

No. 13–10817.   |   Feb. 26, **2014**.

**Attorneys and Law Firms**

Joseph J. McDonnell, Durkin, McDonnell, Detroit, MI, for
Plaintiffs.

David G. Marowske, Potestivo Assoc., Rochester Hills, MI,
Jason R. Scherr, Bingham McCutchen LLP, Washington, DC,
for Defendant.

**Opinion**

### *ORDER ACCEPTING AND ADOPTING*
### *REPORT & RECOMMENDATION*

SEAN F. COX, District Judge.

**\*1**  This is a home loan modification case. Plaintiffs Rebecca
and Stephen **Williams**[1] ("Plaintiffs" or "Williamses"), on
behalf of a purported class, allege that Defendant **Saxon**
Mortgage Services, Inc. ("Defendant" or "**Saxon**") breached
the parties' contract ("TPP") by failing to offer them a
permanent home mortgage modification as agreed in the TPP.

Defendant filed its Motion to Dismiss Plaintiff's Complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6) on June
7, 2013. On June 11, 2013, this Court referred that
motion to Magistrate Judge Michael J. Hluchaniuk for Report
& Recommendation ("R & R") pursuant to 28 U.S.C. 636(b)
(1)(B). (Doc. # 7). The motion has been fully briefed by the
parties.

On January 13, **2014**, Magistrate Judge Hluchaniuk issued his
R & R (Doc. # 22), wherein he recommended that this Court
grant in part and deny in part Defendant's motion. Defendant
timely filed objections to the January 13, **2014** R & R (Doc. #

23) and Plaintiff responded to Defendant's objections. (Doc.
# 24).

Pursuant to Fed.R.Civ.P. 72(b), a party objecting to the
recommended disposition of a matter by a Magistrate Judge
must file objections to the R & R within fourteen (14) days
after being served with a copy of the R & R. "The district
judge must determine *de novo* any part of the magistrate
judge's disposition that has been properly objected to." FED.
R. CIV. P. 72(b)(3). "The district judge may accept, reject
or modify the recommended disposition; receive further
evidence; or return the matter to the magistrate judge with
instructions." FED. R. CIV. P. 72(b)(3).

### *Defendant's Objections*

Defendant objects to Magistrate Judge Hluchaniuk's finding
that Plaintiffs have stated a valid breach of contract claim
in several respects. Specifically, Defendant claims that
Magistrate Judge Hluchaniuk erred in concluding that 1) the
TPP obligates **Saxon** to modify the Williamses' loan; 2) the
Plaintiffs' claim is not a "back-door" attempt at creating a
private cause of action under HAMP; 3) **Saxon** is a proper
party to the TPP.

### **1) Magistrate Judge Hluchaniuk did not err in finding**
### **that the TPP obligated Saxon to modify the Williamses'**
### **loan.**

Defendant objects to Magistrate Judge Hluchaniuk's
conclusion that the TPP obligated it to modify the Williamses'
mortgage on three grounds. First, Defendant argues that
Magistrate Judge erred in not following *Polk v. Countrywide*
*Fin. Corp.,* 2012 WL 2952389 (E.D.Mich. July 19, 2012)
and *Pennington v. HSBC Bank USA,* 493 Fed.App.x 548
(6th Cir.2012). The Magistrate Judge distinguished both of
those cases on the basis that the TPP did not create a
binding contract because it was not signed and returned to
the plaintiff. Defendant claims that was error because "those
cases still analyzed the text of the TPP in determining the
scope of the agreement" and found that the TPP's language
would not require the lender to permanently modify the
plaintiff's loan. (Def.'s Obj. at 5).

**\*2**  The Court finds this objection without merit. As the
Magistrate Judge explained, Defendant's signature on the TPP
constituted an offer to modify Plaintiffs' loan if Plaintiffs
complied with the terms of the trial period and if all
of Plaintiff's representations about their financial situation
continued to be true at the end of the trial period. Plaintiffs

allege that all three of those events took place, yet Defendant failed to offer them a permanent modification of their mortgage. This objection is denied.

Next, Defendant argues that the Magistrate Judge incorrectly interpreted the TPP and, therefore, erroneously held that Plaintiffs stated a valid claim for breach of the TPP. The Court finds that this objection is also without merit. Defendant offers no authority for its interpretation of the TPP, whereas the Magistrate Judge cites two cases supporting his finding that the TPP required Defendant to send written notice to Plaintiffs if they did not qualify for permanent modification. (*See* R & R p. 32–33). Moreover, the Court agrees with the Magistrate Judge's well-reasoned analysis on the issue. This objection is denied.

### 2) Magistrate Judge Hluchaniuk did not err in finding that Plaintiff's claim is not a "back-door" attempt at a HAMP private cause of action.

Defendant objects to the Magistrate Judge's finding that "Plaintiffs breach of contract claim is not precluded as a 'back-door effort' to enforce HAMP" (R & R at 20) because the Plaintiffs' alleged injury and damages arise solely from HAMP guidelines. (Def.'s Obj. at 8–9).

In his January 13, 2014 R & R Magistrate Judge Hluchaniuk cites to cases decided by this and other courts that have all rejected Defendant's argument. (R & R at 20) (collecting cases). Defendant raised this particular issue in its opening brief, and the Magistrate Judge properly considered and rejected it. Plaintiff's claim is not merely an attempt at creating a private cause of action for HAMP violations.

Defendant also reiterates its argument that it is entitled to share the United States' sovereign immunity because it is a government contractor. Defendant argues that Magistrate Judge Hluchaniuk dismissed this argument as "novel" without evaluating the rationale on which it is based.

The Court finds Defendant's objection without merit and agrees with Judge Hluchaniuk's conclusion. Defendant assumes, without establishing, that Saxon is a "government contractor" that might be entitled to share in the government's immunity in the way Saxon proposes. Moreover, Defendant did not cite to any case law supporting its theory that mortgage servicers, obligated by Servicer Participation Agreements to administer HAMP guidelines, enjoy immunity from wrongdoing. Without more, this argument is not well taken. The Court denies Defendant's objection.

### 3) Magistrate Judge Hluchaniuk did not err in holding that Saxon is a party to the TPP.

Defendant next objects to Magistrate Judge Hluchaniuk's conclusion that Saxon is a party to the TPP contract and, thus, a proper party to this case. (Def.'s Obj. at 10). Defendant claims that, as shown on the face of the document, the TPP exists exclusively between the Williamses and the Lender, which is the Bank of New York Mellon. (Def.'s Obj. at 11).

*3  As Plaintiff points out, Magistrate Judge Hluchaniuk cites persuasive case law that unequivocally supports the proposition that "a TPP is a contract between a homeowner and a mortgage servicer." *Markle v. HSBC Mortg. Corp.*, 844 F.Supp.2d 172, 183 (D.Mass.2011). Additionally, Magistrate Judge Hluchaniuk's R & R indicates that a majority of courts agree with Plaintiff's position, having held that the TPP is a contract enforceable against a mortgage servicer like Saxon. (R & R p. 22) (collecting cases). This Court agrees with Magistrate Judge Hluchaniuk that *Gilchrist v. Saxon Mortg. Servs.*, 2013 WL 1091112 (Ohio Ct.App. Mar. 14, 2013) is not persuasive, considering that it is an Ohio state court case involving a motion for summary judgment.

Further, Magistrate Judge Hluchaniuk's conclusion also relies on his finding that Saxon's conduct (i.e. its numerous communications and representations to Plaintiffs) strongly indicates that it was a party to the contract and a proper party to this suit. (R & R at 22–23). Defendant does not challenge this reasoning. The Court denies Defendant's objection.

Therefore, the Court hereby ADOPTS the January 13, 2014 R & R. IT IS ORDERED that:

1) The Williamses are DISMISSED as parties to this action;

2) Plaintiffs' MCPA and FDCPA claims (Counts III and IV) are DISMISSED WITH PREJUDICE;

3) Defendant's Motion is DENIED in all other respects.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*
*DEFENDANT'S MOTION TO DISMISS (Dkt.6)*

MICHAEL HLUCHANIUK, United States Magistrate Judge.

## I. PROCEDURAL HISTORY

On February 28, 2013, plaintiffs Rebecca and Stephen Williams and Douglas Ellman, United States Bankruptcy Panel Trustee, filed this putative class action suit against defendant Saxon Mortgage Services, Inc. ("Saxon" or "defendant"), on behalf of themselves and similarly-situated Michigan homeowners "who have been wrongfully denied a permanent modification of their mortgages by" Saxon. (Dkt.1).[1] Plaintiffs assert four causes of action against Saxon: (1) breach of contract/breach of the duty of good faith and fair dealing; (2) promissory estoppel; (3) violations of the Michigan Consumer Practices Act ("MCPA"); and (4) violation of the Fair Debt Collection Practices Act ("FDCPA"). (Id.). Defendant filed a motion to dismiss in lieu of an answer on June 7, 2013. (Dkt.6). On July 10, 2013, plaintiffs filed a response to defendant's motion (Dkt.11, 12),[2] and defendant filed a reply brief in support of its motion on August 9, 2013. (Dkt.13). On August 23, 2013, plaintiffs filed a notice of supplemental authority in opposition to defendant's motion to dismiss. (Dkt.15). The parties filed their joint statement of resolved and unresolved issues on September 19, 2013. (Dkt.19). Defendant's motion to dismiss motion was referred to the undersigned on June 11, 2013. (Dkt.7). Pursuant to notice, a hearing was held on this matter on October 16, 2013. (Dkt.16). This motion is now ready for report and recommendation.

*4 For the reasons set forth below, the undersigned **RECOMMENDS** that defendant's motion to dismiss be **GRANTED in part** and **DENIED in part.**

## II. BACKGROUND

### A. The Home Affordable Modification Program

In February 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program (the "MHA"), an effort to stem the foreclosure process. As part of the MHA, the Home Affordable Modification Program ("HAMP") was created. HAMP is a federal program designed to assist homeowners in avoiding foreclosure by offering lenders incentives to offer borrowers modifications with more favorable terms. Pursuant to HAMP, the Secretary of the Treasury negotiates Servicer Participation Agreements (SPAs) with servicers, such as Saxon, which require servicers to identify eligible homeowners who are in default or will

likely soon default and to modify the terms of their loans. Saxon entered into a Servicer Participation Agreement with Fannie Mae in which Saxon agreed to apply the Treasury Department's HAMP criteria to all of the loans it services. (Dkt.6–3). The HAMP guidelines specify that a servicer follows three steps to determine whether a homeowner is eligible for a modification. First, the servicer determines whether the borrower meets certain threshold requirements. Second, the servicer applies various changes in order to lower the monthly mortgage payment as close as possible to 31 percent of the borrower's monthly income. Finally, applying a net present value test, the servicer determines whether it is more profitable for the lender to modify the loan or to go into foreclosure.

Before a borrower receives a permanent modification, a loan servicer and a borrower enter into a three-month trial period, during which the borrower makes lower monthly payments towards their mortgage. The terms of the trial period are governed by a form contract entitled "HAMP TPP" (the "TPP"). The TPP states that the Lender will send the borrower a permanent modification agreement if: (1) the borrower's representations of their financial state continue to be true; (2) the borrower complies with the terms of the temporary payment program; (3) the borrower provides all required documentation; and (4) the Lender determines that the borrower qualifies. As part of this process, the servicer offers the borrower a two-step TPP. The first step is a trial payment period, usually lasting three months, during which the borrower provides loan modification documentation to the lender and makes trial payments under the new loan repayment terms. The second step of the process is a permanent modification, which occurs if the borrower makes all of the payments in the modified amounts and complies with all of the requirements of the TPP.

### B. Plaintiffs' Complaint

According to plaintiffs' complaint, defendant Saxon was the servicer of plaintiffs' home loan made on December 6, 2004. (Dkt.1, ¶ 51). Plaintiffs began experiencing difficulty making their regular monthly mortgage payment in March 2008, and sought a HAMP modification of their mortgage with Saxon in May 2009. (Id. ¶¶ 52–53). In support of their application, plaintiffs sent Saxon a package containing all requested financial information and documents, including plaintiffs' Hardship Affidavit. (Id. ¶ 53). After receiving plaintiffs' financial documents, Saxon sent plaintiffs a loan modification package, including a proposed Trial Period Plan ("TPP") Contract for the August 1st through October 30,

2009 trial period. (Dkt. 1 ¶ 54; Dkt. 1–1, TPP). Plaintiffs assert they were prequalified for their TPP contract on the basis of verified financial information and that they "accepted Saxon's offer by executing the TPP Contract" and returning it to Saxon. (Id. ¶¶ 55–56). On August 28, 2009, Saxon countersigned the contract as "attorney-in-fact" for the lender, "The Bank of New York Mellon," and returned the TPP Contract to plaintiffs. (Id. ¶ 57). The TPP Contract provided: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan *if I qualify for the Offer* or will send me written notice that I do not qualify for the offer." (Id. ¶ 59; Dkt. 1–1, TPP ¶ 2 (emphasis added)). Plaintiffs assert they fully performed their obligations under the TPP and that they remained qualified for a permanent modification, but that Saxon failed to offer them a permanent loan modification and failed to provide written notice of their ineligibility prior to the expiration of the trial period. (Dkt.1, ¶¶ 61–62, 65). Saxon instead informed plaintiffs on May 6, 2010 that they were approved for a "Saxon Alternative Modification." (Id. ¶ 67). Plaintiffs called Saxon in July 2010 to inquire about the status of their modification and were told that they were not approved for a HAMP modification. (Id. ¶ 68). Plaintiffs continued to make modified payments and by August 2010, plaintiffs had made a total of $12,338.28 in modified payments, which Saxon placed in an unapplied funds account rather than applying the funds to pay the principal and interest on plaintiffs' mortgage. (Id. ¶ 69). Saxon subsequently sent plaintiffs a Saxon Alternative Loan Modification Agreement in October 2010. (Id. ¶¶ 67, 70). The terms of this modification agreement were markedly inferior to a HAMP modification and provided only a small reduction in plaintiffs' monthly payment, which was inadequate to remedy plaintiffs' financial hardship. (Id. ¶ 70).

**\*5** Plaintiffs allege that because the terms of the alternative agreement were not adequate, they reluctantly filed Chapter 7 bankruptcy on October 19, 2010. (Dkt.1, ¶ 71). The bankruptcy was discharged on January 20, 2011, exempting plaintiffs' mortgage, and the case was closed on March 28, 2011. (Id. ¶ 71). Saxon then began foreclosure proceedings against plaintiffs, with notice of foreclosure dated March 24, 2011. (Id. ¶ 72). [3] On September 21, 2011, the Williams plaintiffs filed an action against Saxon, similar to the instant case. After Saxon moved to dismiss for lack of standing, plaintiffs voluntarily dismissed the complaint (Dkt.6–10), and moved to re-open their Chapter 7 case and amend their schedules to include the dismissed claims against Saxon. (Dkt .1, ¶ 77). The bankruptcy court authorized the bankruptcy trustee, Mr. Ellman, to retain plaintiffs' attorney

as special counsel, and the Trustee is now part of the instant action against Saxon. (Id. ¶¶ 9, 78). Plaintiffs filed for Chapter 13 bankruptcy on May 15, 2011, in an attempt to forestall the foreclosure, and plaintiff's bankruptcy plan was confirmed on December 19, 2011. (Dkt.73). On February 28, 2013, plaintiffs filed the instant action against defendant Saxon, asserting claims for breach of contract/breach of the duty of good faith and fair dealing, promissory estoppel, violations of the MCPA, and violation of the FDCPA. (Dkt.1). Plaintiffs have subsequently conceded that their FDCPA claim should be dismissed. (Dkt. 18, Pg ID 419).

## III. ANALYSIS AND CONCLUSIONS

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby Cnty. Tenn.,* 220 F.3d 433, 446 (6th Cir.2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn., Dep't of Children's Servs.,* 510 F.3d 631, 634 (6th Cir.2007).

In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted). Dismissal is appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id .* at 570. The Supreme Court clarified the concept of "plausibility" in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009):

**\*6** To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.

The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Id.* at 678 (internal citations to *Twombly* omitted). A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir.2007) (emphasis in original, citing *Twombly*, 550 U.S. at 555). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 550 U.S. at 562).

In ruling on a motion to dismiss, the Court "may consider only matters properly part of the complaint or pleadings" in deciding the merits of the motion. *Armengau v. Cline*, 7 Fed. Appx. 336, 344 (6th Cir.2001) (citations omitted). The Sixth Circuit "takes a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Id.* Thus, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, (3) documents that are a matter of public record, and (4) letters that constitute decisions of a government agency. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *see also Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett–Packard Co.*, 258 F.Supp.2d 718, 721 (E.D.Mich.2003). "Otherwise a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir.1997).

## B. The Williams Plaintiffs' Standing to Proceed

Saxon argues that the Williams plaintiffs should be dismissed from this action because: (1) they lack standing to proceed in this action because the bankruptcy Trustee is the real

party in interest who has exclusive standing to bring claims on behalf of the estate; and (2) the Williams plaintiffs are judicially estopped from proceeding as a result of their failure to disclose their claims to the court presiding over their Chapter 13 bankruptcy. Plaintiffs respond that the Williamses can proceed as co-plaintiffs with the Trustee, and that they should not be judicially estopped from proceeding because their non-disclosure of the claim to the bankruptcy court was inadvertent and not inequitable to Saxon.

### 1. The Williams plaintiffs lack standing

*7 Saxon argues that the bankruptcy Trustee is the sole proper plaintiff in this matter and the claims of the Williams plaintiffs should be dismissed because those plaintiffs lack standing. Plaintiffs argue that the Williamses can continue as "co-plaintiffs" with the bankruptcy Trustee, but cite no authority for that proposition. Rather, the law is well-settled that when the bankruptcy estate is part of a Chapter 7 case, the bankruptcy trustee has the sole power to pursue pre-petition claims, and "[t]he debtor has *no standing* to pursue such [the estate's] causes of action." *See Bauer v. Commerce Union Bank*, 859 F.2d 438, 440–42 (6th Cir.1988) (emphasis added); *see also Currithers v. FedEx Ground Package Sys., Inc.*, 2012 WL 380146, at *7 (E.D.Mich. Feb.6, 2012) ("Assets of the bankruptcy estate are within the *sole* control of the trustee, the *only party* with standing to maintain actions related to such assets.") (emphasis added, citations omitted). This is because, when an individual files for bankruptcy, "[t]he Bankruptcy Code ... provides that the bankruptcy estate comprises 'all legal or equitable interests of the debtor in property as of the commencement of the case[.]" *Bauer*, 859 F.2d at 440–41. These property interests include all causes of action that can be brought by the debtor, such as those in this case. *Id.* at 441. Accordingly, the Williams plaintiffs have no standing to proceed as plaintiffs or co-plaintiffs in this action and should be dismissed. *See Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 905–06 (6th Cir.2012) (ordering that the district court could allow Auday to amend the complaint to *substitute*, not add, the Trustee as the plaintiff); *see also Auday v. Wetseal Retail, Inc.*, 2013 WL 2457717, at *9 (E.D.Tenn. June 6, 2013) (ordering that trustee be substituted into case, and denying plaintiffs' request to join the trustee as a party).[4]

### 2. Judicial Estoppel

Saxon also argues, in the alternative, that even if plaintiffs retained any claims against Saxon following their Chapter 7 bankruptcy, they would be judicially estopped from pursuing those claims here. Plaintiffs failed to identify any potential

Williams v. Saxon Mortg. Services, Inc., Slip Copy (2014)

claims against Saxon when they initially petitioned under Chapter 7 and, as of the date of their motion-over 20 months after filing their initial suit and 8 months after reopening their Chapter 7 bankruptcy-plaintiffs still have not informed the court overseeing their Chapter 13 bankruptcy or creditors about any potential or existing claims against Saxon. Plaintiffs argue in response that their non-inclusion of this potential claim in their Chapter 7 bankruptcy filing was a result of inadvertence and should be excused. Plaintiffs further argue that the two bankruptcy filings are pending before the same judge, and thus plaintiffs' notice to the Court in the Chapter 7 proceedings constitutes notice in the Chapter 13 proceedings.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citations omitted). The purpose of the doctrine of judicial estoppel is to "preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir.2002). The Supreme Court has identified three considerations that are typically relevant in determining whether judicial estoppel should apply:

> **\*8** (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*New Hampshire*, 532 U.S. at 750–51 (internal quotations and citations omitted). However, these elements are not "inflexible prerequisites or an exhaustive formula" for judicial estoppel, and additional considerations may inform applicability in certain factual contexts. *Id.* at 751.

In the bankruptcy context, the Sixth Circuit has stated that in order to support a finding of judicial estoppel, the court must find that (1) the plaintiff assumed a position that was contrary to the one that he asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) the plaintiff's omission did not result from mistake or inadvertence. *White v. Wyndham*

*Vacation Ownership, Inc.*, 617 F.3d 472, 478 (6th Cir.2010). As explained above, a debtor has an affirmative duty to disclose all of his assets to the bankruptcy court, *Browning*, 283 F.3d at 775 (citing 11 U.S.C. § 521(1)), and in the Sixth Circuit, it is well-established that a cause of action is an asset that must be scheduled under § 521. *See White*, 617 F.3d at 479 n. 5; *Lewis v. Weyerhaeuser Co.*, 141 Fed. Appx. 420, 424 (6th Cir.2005); *Eubanks v. CBSK Fin. Grp.*, 385 F.3d 894, 897 (6th Cir.2004). In addition, "the duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action." *Lewis*, 141 Fed. Appx. at 424 (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5thCir.1999)) (internal quotations omitted); *see also Kimberly v. Dollar General Corp.*, 520 Fed. Appx. 312, 315 (6th Cir.2013) (finding debtor had duty to disclose a potential claim arising from her employment termination, which occurred forty-one days after her final payment into her bankruptcy plan); *Bartlett v. Ohio Nat'l Fin. Servs., Inc.*., 2013 WL 394381, at *3 (S.D.Ohio Jan.31, 2013) (applying judicial estoppel for failure to disclose when plaintiff filed a civil suit one month after bankruptcy court discharged debt because plaintiff had received right to sue letter from EEOC 88 days earlier). While the doctrine of judicial estoppel might yield harsh results, *White*, 617 F.3d at 486–87 (Clay, J. dissenting), it has been consistently applied in the Sixth Circuit to bar a plaintiff from prosecuting a cause of action which he has omitted from his Chapter 13 bankruptcy petition. *See, e.g., id.* at 482.

**\*9** The undersigned first notes that Saxon's estoppel arguments do not apply to the bankruptcy Trustee, who may bring the instant claims for the benefit of plaintiffs' bankruptcy estate. *See Stephenson v. Malloy*, 700 F.3d 265, 272 (6th Cir.2012) (holding "that Al–Mansoob's failure to disclose his claims [on his bankruptcy filings] does not bar the trustee from pursuing them."). The Sixth Circuit has held that pursuing a cause of action not disclosed as an asset in a bankruptcy proceeding creates an inconsistency sufficient to support judicial estoppel as the debtor has already asserted the position that no such claims existed. *See Eubanks*, 385 F.3d at 898; *Browning*, 283 F.3d at 775. Thus, "[i]t is undisputed that, by omitting any reference of the [instant] claim in [their] Schedule B and Statement, in this instant case, [plaintiffs] 'assumed a position that was contrary to the one that [they] asserted under oath in the bankruptcy proceedings,' and that by confirming [their] plan, 'the bankruptcy court adopted the contrary position.' " *Payne v. Central Defense Servs., Inc.*, 2013 WL 3974575, at *6 (W.D.Tenn. Aug.2, 2013) (quoting *White*, 617 F.3d at 478); *see also Epps*, 2013 WL 4096001,

at \*4 ("Courts presume a debtor in bankruptcy has a motive to conceal assets.") (citing *Lewis,* 141 Fed. Appx. at 426 ("It is always in a Chapter 13 petitioner's interest to minimize income and assets.")).

Plaintiffs do not dispute that their Chapter 7 bankruptcy filing did not initially include the pending claims and that their Chapter 13 bankruptcy filing does not list the pending claims, but only argue that any error was due to their inadvertence. A debtor's omission may be deemed inadvertent in two circumstances: (1) where the debtor lacked knowledge of the undisclosed claims; and (2) where the debtor had no motive for concealment. *Browning,* 283 F.3d at 776. The courts also look at whether the evidence indicates an absence of bad faith. *See Epps,* 2013 WL 4096001. It is the plaintiff's burden to present evidence establishing the absence of bad faith. *Payne,* 2013 WL 3974575. Regarding inadvertence, "[t]he debtor need not know all the facts or even the legal basis for the cause of action rather, if the debtor has enough information ... to suggest that it may have a possible cause of action, then it is a 'known' cause of action such that it must be discharged." *In re Coastal Plains,* 179 F.3d at 210. Here, plaintiffs had knowledge of the factual basis of their claims before they petitioned the bankruptcy court because they argued that the failure to modify their loan caused their bankruptcy. (Dkt.1, ¶¶ 71–73, 77). Further, it can be presumed that plaintiffs had a motive to conceal their claim, "because if the claim became part of [their] bankruptcy estate, then the proceeds from it could go towards [their] creditors." *Payne,* 2013 WL 3874575, at \*6 (citing *Lewis,* 141 Fed. Appx. at 426 ("It is always in a Chapter 13 petitioner's interest to minimize income and assets.")). As the *Payne* court explained, "even if Payne had informed his bankruptcy attorney of his lawsuit, judicial estoppel would still apply to bar his claim." *Id.* at \*3 n. 2. The fact that plaintiffs reopened and amended their Chapter 7 filings does not preclude dismissal based on judicial estoppel. *See id.* at \*7; *see also Maxwell v. MGM Grand Detroit, LLC,* 2007 WL 2050795, at \*7 (E.D.Mich. July 16, 2007) (collecting cases). Simply put, an "after-the-fact effort to amend is insufficient to show a lack of bad faith." *Payne,* 2013 WL 3874575, at \*7 (citing *White,* 617 F.3d at 481 ("We will not consider favorably the fact that White updated her initial filings after the motion to dismiss was filed. To do so would encourage gamesmanship, since White only fixed her filings after the opposing party pointed out that those filings were inaccurate.")); *see also Maxwell,* 2007 WL 2050795 (applying judicial estoppel to dismiss plaintiffs' claims despite plaintiffs' petitions to reopen their bankruptcy cases and amend their schedules and financial statements).

Accordingly, the Williams plaintiffs should be dismissed as parties to this lawsuit and the bankruptcy Trustee, Ellman, should proceed as the only named plaintiff to this action.

## C. Count I—Breach of Contract/Breach of Duty of Good Faith and Fair Dealing

\*10 Plaintiffs allege that they entered into a written TPP Contract with Saxon, and that Saxon breached the contract by failing to offer permanent HAMP modifications or providing plaintiffs with a timely written notification denying them a HAMP modification. (Dkt.1, ¶ 106). Specifically, plaintiffs allege that Saxon breached the TPP Contract by, among other things: (1) failing to evaluate plaintiffs' demonstrated qualifications within the term of the TPP Contract; or (2) failing to offer plaintiffs a permanent modification within the period required by the TPP Contract; or (3) failing to provide plaintiffs a timely written notice of denial explaining why Saxon believed that plaintiffs did not qualify. (*Id.* ¶ 65).

The TPP at issue provides, in relevant part:

> If I am in compliance with this Trial Period Plan ("TPP") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3 ...

> \* \* \*

> I understand that after I sign and return two copies of this Plan to the Lender, *the Lender will send me a signed copy of this Plan if I qualify for the Offer* or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

(Dkt.1–1, Intro) (emphasis added).

> If prior to the Modification Effective Date, (I) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period Payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and

correct, the Loan Documents will not be modified and this Plan will terminate....

(*Id.* ¶ 2.F.)

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (I) I meet all the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan

(*Id.* ¶ 2.G.).

> .... If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, *the Lender will send me a Modification Agreement for my signature* which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date....

(*Id.* ¶ 3) (emphasis added).

**1. Plaintiffs' breach of contract claim is not precluded as a "back-door effort" to enforce HAMP**

Saxon argues that plaintiffs' breach of contract claim should be dismissed as a back door effort to enforce compliance with HAMP, which does not provide a private cause of action. Saxon argues that because the TPP is a part of HAMP, the TPP cannot form the basis of a state-law breach of contract claim. Saxon's argument is not convincing, and the courts in this district and elsewhere have rejected this contention. *See e.g.,* *Bolone v. Wells Fargo Home Mortg., Inc.,* 858 F.Supp.2d 825, 831 (E.D.Mich.2012) (holding that HAMP does not preempt plaintiff's state law breach of contract claim based on a TPP); *see also* *Brady v. Chase Home Fin., LLC,* 2012

WL 1900606, at *3 (W.D.Mich. May 24, 2012) (agreeing with those courts "that have found that the lack of private right of action under HAMP does not preclude[ ] a plaintiff from maintaining a breach of contract claim based on a TPP.") (citations omitted); *Helmus v. Chase Home Finance, LLC,* 890 F.Supp.2d 806, 812 (W.D.Mich.2012) (lack of private right of action under HAMP did not preclude borrowers from maintaining a breach of contract claim against mortgage loan servicer premised on a TPP, a HAMP-related document). In *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547 (7th Cir.2012), the Seventh Circuit considered and rejected this same argument, noting that "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law." *Id.* at 581; *see also* *Cave v. Saxon Mortg. Servs., Inc. (Cave II),* 2013 WL 1915660, at *4 n. 3 (E.D.Pa. May 9, 2013) ("it is inconsequential" to plaintiff's breach of the TPP contract claim "that HAMP affords no private right of action"). The undersigned agrees with those courts that have considered and rejected Saxon's argument and found that the lack of private right of action under HAMP does not preclude a plaintiff from maintaining a breach of contract claim based on a TPP. *See Bolone,* 2012 WL 882894, at *4; *Brady,* 2012 WL 1900606, at *3. [5]

**\*11** Saxon further argues that it is not a proper party for plaintiff's breach of contract claim because, it contends, the TPP provides that it is between "Borrower," "Stephen Williams and Rebecca R. Williams," and the "Lender," "The Bank of New York Mellon," and Saxon only signed the agreement as "attorney-in-fact" for the Lender. Plaintiffs here did not bring their claims against the Lender, only Saxon, alleging that they entered into a written TPP with Saxon. (Dkt.1, ¶¶ 28–34, 47, 50–60). Plaintiffs respond that Saxon should be estopped to deny that it is a party to the TPP based on its conduct (i.e., its communications with plaintiffs in entering the TPP), and based on Saxon entering the SPA with Fannie Mae, where it agreed to be the party to the TPPs. Plaintiffs assert that the federal program directed servicers to sign TPPs, and any other reading of the TPPs would render them void. Case law supports plaintiffs' argument, providing that "[a] TPP is a contract between a homeowner and a mortgage servicer." *See Markle,* 844 F.Supp.2d at 183 ("A party to the contract, the homeowner has standing to seek enforcement of contractual promises made by the servicer, so long as enforcement is compatible with the objectives of HAMP."); *see also* *Cave v. Saxon Mortg. Servs., Inc. (Cave I),* 2012 WL 1957588, at 7 (E.D.Pa. May 30, 2012) ("[W]e conclude that the TPP is an enforceable contract. Under

its plain terms, the TPP obligated Saxon [the servicer] to provide Plaintiffs with a permanent modification if Plaintiffs qualified, or send Plaintiffs a written denial if they did not qualify."); *see also Nash v. Green Tree Servicing, LLC,* 943 F.Supp.2d 640, 646 (E.D.Va.2013) (plaintiff alleged a legally enforceable obligation of the defendant servicer to plaintiff by stating that the servicer sent plaintiff the TPP application, stating "Let us know if you accept this offer.").[6] Further, under HAMP, the mortgage servicer is the party that conducts the loan modification with the borrower, and determines borrower eligibility for a modification, not the Lender. (Dkt. 6–2, SD 09–01). Here, it is undisputed that Saxon sent the TPP to plaintiffs, stating "If you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure," and asking plaintiffs to "[p]lease let us know no later than August 1, 2009 that you accept the Trial Period Plan." (Dkt. 6–4, Pg ID 144). It is also undisputed that Saxon, not the Lender, signed the Servicer Participation Agreement ("SPA") with Fannie Mae authorizing it to offer loan modifications to borrowers (Dkt. 6–3, Pg ID 141), and the plaintiffs submitted their Hardship Affidavit to Saxon "[i]n order to qualify for Saxon Mortgage Services, Inc.'s ("Servicer") offer to enter into an agreement to modify [plaintiffs'] loan under the federal government's Home Affordable Modification Program (the 'Agreement')."). (Dkt. 6–16, Pg ID 293). Accordingly, the undersigned concludes that plaintiff has sufficiently alleged that Saxon is a proper party to plaintiffs' breach of contract claim. *See Markle,* 844 F.Supp.2d at 183.

### 2. Plaintiffs have sufficiently pleaded an offer to support their breach of contract claim

**\*12** For plaintiffs to state a breach of contract claim under Michigan law, they must establish the essential elements of a valid contract: (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Yates v. U.S. Bank Nat'l Ass'n,* 912 F.Supp.2d 478, 486 (E.D.Mich.2012) (citing *Hess v. Cannon Twp.,* 265 Mich.App. 582, 592, 696 N.W.2d 742 (2005)). Then, plaintiffs must show: (1) the terms of the contract, (2) a breach of one or more of those terms by defendant, and (3) injury to plaintiffs caused by defendant's breach. *Id.* (citation omitted).

Plaintiffs allege that they entered into a written TPP Contract with Saxon and that Saxon breached the contract by failing to offer plaintiffs a permanent HAMP modification or by failing to provide plaintiffs with a timely written notification denying them a HAMP modification. (Dkt.1, ¶ 106). Saxon argues that it did not have a contractual obligation to provide plaintiffs a permanent HAMP modification because it was entitled to review plaintiffs' submissions and either approve or deny the requested permanent loan modification after receiving that information, *citing Polk v. Countrywide Fin. Corp.,* 2012 WL 2952389 (E.D.Mich. July 19, 2012), and *Pennington v. HSBC Bank USA,* 493 Fed. Appx. 548 (6th Cir.2012), *cert. denied,* ─── U.S. ───, 133 S.Ct. 1272, 185 L.Ed.2d 185 (2013). Defendants argue that plaintiffs fail to allege that they satisfied the eligibility and underwriting criteria required for permanent modification, but only suppose that they were qualified because they received a TPP and made the reduced payments required. Rather, Saxon argues, plaintiffs must allege that they satisfied the HAMP eligibility and underwriting criteria that constitute express preconditions to permanent modification under the program. Saxon further argues that it did not have a contractual obligation to provide plaintiffs with a written denial letter. Plaintiffs respond that the TPP is an unambiguous offer to modify their mortgage. Plaintiffs argue that they adequately alleged their acceptance of Saxon's offer by signing the TPP and by their performance under the TPP in making the required payments. Further, the TPP was countersigned by Saxon, which plaintiffs argue demonstrates that Saxon found plaintiffs qualified for a permanent modification.

The undersigned agrees with plaintiffs that they have sufficiently alleged that the TPP here is an enforceable contract whose plain terms obligate Saxon to provide plaintiffs with a permanent loan modification if plaintiffs qualified, or to send plaintiffs a written denial if they did not qualify. Plaintiffs allege that they were prequalified for a loan modification on the basis of verified financial information (Dkt.1, ¶ 55), and that they performed all of their obligations under the TPP Contract, including making all payments due on time and providing additional copies of previously supplied documents that were requested by Saxon. (*Id.* ¶ 61). Plaintiffs further allege that they remained qualified for a permanent modification throughout the term of the TPP by, among other things, complying with the TPP Contract and all applicable HAMP rules and guidelines, and that all representations they made in support of their HAMP application remained true and correct. (*Id.* ¶ 62). Plaintiffs state that Saxon countersigned and returned the TPP because it determined plaintiffs qualified for a loan modification. (*Id.* ¶¶ 59–60, 64).

**\*13**  It is significant in this case that the TPP was countersigned by Saxon and returned to plaintiffs, because that indicates, per the express language in the TPP, that Saxon determined that plaintiffs qualified for the offer of a loan modification. (Dkt. 1–1 ("I understand that after I sign and return the two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan *if I qualify for the Offer* .... " ) (emphasis added).[7]  As the court recognized in *Brady v. Chase Home Fin., LLC,* 2012 WL 1900606 (W.D.Mich. May 24, 2012), "because the TPP warns the recipient that it 'will not take effect unless and until both [the borrowers] and the Lender sign it and the Lender provides [the borrower] with a copy of this Plan with the Lender's signature,' no offer is extended until the lender provides the borrower a copy with the lender's signature. By providing an executed copy to the borrower, the lender extends an offer and must provide a modification if the borrower complies with her obligations. Conversely, no offer exists if the lender fails to provide the borrower a signed copy." *Id.* at \*7 (alternations in original); *cf. Goss v. ABN AMRO Mortg. Grp.,* —— Fed. Appx. ———, 2013 WL 6698041, at \*5 (6th Cir. Dec.20, 2013) (holding the TPP was not a binding contract because it was not signed by CMI, and "[b]y its plain terms, the TPP made clear that it is not binding until signed by CMI," distinguishing *Wigod* ). In other words, the lender's signature "is a further manifestation of assent required by the Lender for there to be a valid offer." *Rummel v. Vantium Capital,* Inc., 2012 WL 2564846, at \*7 (E.D.Mich. July 2, 2012) (citing *Wigod,* 673 F.3d at 561 (observing that "when Wells Fargo executed the TPP, its terms included a unilateral offer to modify Wigod's loan conditional on her compliance with the stated terms of the bargain.")); *see also Cave II,* 2013 WL 1915660, at \*5 ("Under the terms of the TPP, Saxon would only return an executed TPP to the borrower if the borrower was, in fact, qualified .").

The facts of this case are very similar to those in *Wigod,* where the court found plaintiffs stated a valid breach of contract claim sufficient to survive defendant's motion to dismiss. As the *Wigod* court explained:

> Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo.... Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine whether Wigod qualified. If she did not, it could have and should have denied her a modification on that basis. Instead, Wells Fargo countersigned on June 4, 2009 and mailed a copy to Wigod

with a letter congratulating her on her approval for a trial modification. In doing so, Wells Fargo communicated to Wigod that she qualified for HAMP and would receive a permanent "Loan Modification Agreement" after the trial period, provided she was "in compliance with this Loan Trial Period and [her] representations ... continue[d] to be true in all material respects."

**\*14**  *Wigod,* 673 F.3d at 562. The *Wigod* court also rejected the same proposition Saxon makes here, that the servicer did not have a contractual obligation to provide the plaintiff a permanent HAMP modification, but was entitled to review plaintiff's submission and either approve or deny the requested permanent modification. The Seventh Circuit explained that such a position would make the existence of any obligation conditional solely on action of the servicer, and conflicted with other provisions of the TPP, including the servicer's promise to send the borrower a Modification Agreement if the borrower complied with the obligations under the TPP and the borrower's representations continued to be true. *Wigod,* 673 F.3d at 563. Wells Fargo's interpretation was suspect because it allowed servicers to avoid their obligations to borrowers merely by choosing not to send a signed Modification Agreement, even though the borrowers made both accurate representations and the required payments. *Id.* ("Under this reading, a borrower who did all the TPP required of her would be entitled to a permanent modification only when the bank exercised its unbridled discretion to put a Modification Agreement in the mail. In short, Wells Fargo's interpretation of the qualifying language in section 2 turns an otherwise straightforward offer into an illusion."); *see also Corvello v. Wells Fargo Bank, N.A.,* 728 F.3d 878, 883 (9th Cir.2013) ( "The more natural and fair interpretation of the TPP is that the servicer must send a signed Modification Agreement offering to modify the loan once borrowers meet their end of the bargain.").[8]

The undersigned finds the Seventh Circuit's analysis both reasonable and persuasive. Plaintiffs here have sufficiently alleged a valid offer to provide a permanent modification agreement if they fulfilled their obligations. *See Brady,* 2012 WL 1900606, at \*7 (agreeing with *Wigod* that "[b]y providing an executed copy to the borrower, the lender extends an offer and must provide a modification if the borrower complies with her obligations.... Michigan law is consistent with Illinois law on this point."); *see also Corvello,* 728 F.3d at 884 ("Where, as here, borrowers allege, and we must assume, that they have fulfilled all of their obligations under the TPP, and the loan servicer has failed to offer a permanent

2:14-cv-11186-LJM-MJH   Doc # 19   Filed 07/02/14   Pg 92 of 108   Pg ID 704

Williams v. Saxon Mortg. Services, Inc., Slip Copy (2014)

modification, the borrowers have valid claims for breach of the TPP agreement."); *Cave I,* 2012 WL 1957588 ("it is sufficient for a plaintiff to allege generally that all conditions precedent [for a permanent modification] were satisfied").

Saxon's reliance on *Pennington v. HSBC Bank USA, N.A.,* 493 Fed. Appx. 548 (5th Cir.2012), and *Polk v. Countrywide Fin. Corp.,* 2012 WL 2952389 (E.D.Mich. July 19, 2012), is misplaced because those cases are factually distinguishable. In *Pennington,* the court found that plaintiff's allegations in her complaint that she would not have fallen behind in her mortgage payments absent entering the loan modification process and the bank's demand that she quit making her regular monthly payments demonstrated her financial disqualification for a HAMP modification, because she cannot meet the financial-hardship requirement. *Pennington,* 492 Fed. Appx. at 553 ("Because financial eligibility is a condition for the TPP, Smith is not entitled to any benefits the TPP might provide."). That is not true in the instant case. More importantly, both the *Pennington* and *Polk* courts found it significant that the TPPs in those cases were not signed by the bank and returned to the borrower. *Pennington,* 493 Fed. Appx. at 554–55; *Polk,* 2012 WL 29523889, at *4. The *Pennington* court held that because the plaintiff did not allege that they received a signed copy of the TPP, the TPP never ripened into an offer and thus the plaintiff's breach of contract claim failed. *Id.* at 554–55 ("Provisions [in contracts] expressly requiring the agreement to be executed before it binds the parties are considered particularly significant."); *see also Polk,* 2012 WL 2952389, at *4 ("Defendant denied Plaintiff's request [for modification], Compl. ¶¶ 26–28, and it is undisputed that Defendant did not return an executed copy of the Trial Period Plan to Plaintiff" and therefore "Plaintiff's allegations fail to establish a breach of an enforceable contract"). Conversely, the TPP at issue here was signed and returned to plaintiffs, indicating that the parties intended to be bound by the agreement. *See Goss,* 2013 WL 6698041, at *5 ("By its plain terms, the TPP made clear that it is not binding until signed by CMI").

*15  Plaintiffs also allege, in the alternative, that Saxon breached the TPP because it did not send plaintiffs a timely written denial, but instead led plaintiffs along in a trial modification for more than a year before advising them orally that they were denied a permanent modification. (Dkt.1, ¶¶ 64–66). Saxon argues in response that it had no obligation to send a written denial. The TPP provides that "the Lender will send me a signed copy of this Plan if I qualify for the Offer *or will send me written notice that I do not qualify for*

*this Offer."* (Dkt.1–1). Moreover, this notification obligation is also set out in the applicable Treasury Directive:

> If the servicer determines that the borrower does not meet the underwriting and eligibility standards of the HAMP after the borrower has submitted a signed Trial Period Plan to the servicer, the servicer should promptly communicate that determination to the borrower in writing, and consider the borrower for another foreclosure prevention alternative.

(Dkt. 6–2, Pg ID 105, SD 09–01). Plaintiffs alleged that Saxon failed to offer them a permanent modification within the period required by the TPP Contract or provide them a timely written notice of denial explaining why Saxon believed that plaintiffs did not qualify, but that Saxon instead strung plaintiffs along in a trial modification for more than a year without any guidance about their mortgage. (Dkt.1, ¶¶ 64–66). Thus, plaintiffs have sufficiently alleged a claim for breach of contract based on Saxon's failure to send them a timely written denial. *See Corvello,* 728 F.3d at 884–85 ("Wells Fargo's own failure to fulfill the notification obligation does not deprive plaintiffs of the benefits of their argument."); *Cave I,* 2012 WL 1957588, at *7 (complaint alleges that Saxon did not provide a written denial as to why plaintiffs did not qualify for permanent modification and thus adequately alleges that Saxon breached the TPP by not sending a written denial if plaintiffs did not qualify for permanent modification).

### 3. Plaintiffs have adequately alleged consideration sufficient to support their breach of contract claim

Saxon argues that plaintiffs fail to allege adequate consideration to support a breach of contract claim, and that their partial payments of amounts due under plaintiffs' original note are insufficient because that was a preexisting duty under the mortgage. " 'Courts generally do not inquire into the adequacy of consideration to support a contract,' and even a 'cent or a peppercorn, in legal estimation,' would suffice." *Federal Deposit Ins. Corp. v. Fedorov,* 2010 WL 2944569, at *6 (E.D.Mich. July 22, 2010) (quoting *General Motors Corp. v. Dep't of Treasury,* 466 Mich. 231, 239, 644 N.W.2d 734 (2002)). The undersigned suggests that plaintiffs have adequately plead consideration to survive defendant's motion to dismiss. Plaintiffs allege

that in addition to making trial period payments, the TPP Contract required plaintiffs to (1) provide extensive financial information that was not required under their original mortgages; (2) make representations in a hardship affidavit concerning their personal circumstances; (3) make payments into newly established escrow accounts; and (4) undergo credit counseling if Saxon so requested. (Dkt.1, ¶¶ 63, 101). Here, plaintiffs' allegations are sufficient to show that their promise was supported by consideration. *See Wigod,* 673 F.3d at 564 (finding consideration in the plaintiff's agreement to "open new escrow accounts, to undergo credit counseling (if asked), and to provide and vouch for the truth of her financial information"); *Cave I,* 2012 WL 1957588, at *6 ("[T]he promise to undergo credit counseling upon request of Saxon constitutes consideration for Saxon's promise to provide Plaintiffs with a permanent loan modification or a timely denial."); *Fletcher v. One West Bank, FSB,* 798 F.Supp.2d 925, 931–32 (N.D.Ill.2011) (rejecting defendant's argument that lower monthly payments were a windfall to plaintiff, because plaintiff "suffered some detriment" by incurring fees and likely having to pay a higher total amount in the long run).

**4. Damages**
*16  Saxon also argues that plaintiffs inadequately allege damages because their alleged damages arise solely from their failure to make their mortgage payments and could have been avoided by plaintiffs paying the amounts due under their existing mortgage contracts. Plaintiffs respond that they have pleaded sufficient damages, in the form of accrued fees and charges and damage to their credit reports. (Dkt.1, ¶¶ 69–71, 109). Specifically, plaintiffs' alleged damages include "payment of increased interest, longer payoff times, higher principle balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit due to improper negative reporting to credit bureaus, additional income tax liability, inappropriate fees and charges including broker price opinion fees, inspection fees, attorney's fees, 'process management' fees, and late fees, costs and expenses incurred to prevent or fight foreclosure[.]" (*Id.* ¶ 109). Plaintiffs allege that if a class member accepted a non-HAMP modification on terms that are less favorable than those of a HAMP-compliant modification, their injury is measured by the difference between the modification they accepted and the modification they were entitled to. (*Id.* ¶ 110). Or, if the class member had not been tendered a permanent modification, their injury is measured by the difference between the current circumstances and the terms of the modification they were entitled to. (*Id.*). The undersigned suggests that plaintiffs'

allegations sufficiently allege damages to support their breach of contract claim. *See Wigod,* 673 F.3d at 575 (rejecting trial court's conclusion that the plaintiff had not shown any pecuniary loss and pointing to the plaintiff's allegations that she "incurred costs and fees, lost other opportunities to save her home [and] suffered a negative impact to her credit."); *see also Fletcher,* 798 F.Supp.2d at 932–33; *Cave I,* at *8; *Cave II,* 2013 WL 1915660, at *8 ("If Saxon had provided Plaintiffs with permanent modifications, it is reasonable to infer that they would not have incurred, *inter alia,* increased principal, interest, and longer loan payoff times that accrued after the end of their trial periods, and may have sought other remedies to address their unaffordable mortgage payments.").

**5. Breach of the implied covenant of good faith and fair dealing**
Saxon argues that the TPP is not an enforceable contract and thus there can be no breach of implied covenant of good faith and fair dealing claim because "Michigan does not ... recognize a claim for breach of an implied covenant of good faith and fair dealing separate from an action on the underlying contract." *Burton v. William Beaumont Hosp.,* 373 F.Supp.2d 707, 718 (E.D.Mich.2005). Plaintiffs respond that they have alleged a series of defendant's actions and omissions that undermined its ability to perform under the TPP and meet plaintiff's performance expectation, and that Saxon's unjustified failure to timely provide a permanent modification or a written denial deprived them of the expected fruits of the TPP and made it impossible for plaintiffs to know what was required of them at the end of the trial period.

*17  "Michigan common law recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts." *Burton,* 373 F.Supp.2d at 718; *Hammond v. United of Oakland, Inc.,* 193 Mich.App. 146, 151–52, 483 N.W.2d 652 (1992) ("It has been said that the covenant of good faith and fair dealing is an implied promise contained in every contract 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' ") (citation omitted). While Michigan does not recognize a common law cause of action for breach of the implied covenant of good faith and fair dealing, *Mernatti v. Nationstar Mortg., LLC,* 2013 WL 5587821, at *7 (E.D.Mich. Oct.10, 2013) (citing *Fodale v. Waste Mgmt. of Michigan, Inc.,* 271 Mich.App. 11, 35, 718 N.W.2d 827 (2006)), every contract in which performance is left to a party's discretion is subject to an implied covenant of good faith. *Lowe's Home Ctrs., Inc. v. LL & 127, LLC,* 147

Fed. Appx. 516, 523 (6th Cir.2005); *Darcy v. CitiFinancial, Inc.,* 2011 WL 3758805, at *7–8 (W.D.Mich. Aug.25, 2011). "[W]here the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith." Lowe's, 147 Fed. Appx. at 523–24 (citing *General Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 334 n. 23 (3d Cir.2001) (distinguishing breach of contract based on bad faith in performance from independent tort action for breach of implied covenant of good faith under Michigan contract law))..

Plaintiffs allege that Saxon routinely and regularly acts in bad faith and breached its duties under the TPP for its own economic benefit by, among other things, failing to perform loan servicing functions consistent with its responsibilities to plaintiffs, failing to properly train and supervise its agents and employees implementing its modification programs, using unfair means to keep plaintiffs in trial periods of indeterminate lengths, making inaccurate calculations and determinations of eligibility for permanent modifications, making misleading offers that do not meet contractual obligations, failing to follow through on written and implied promises, and failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers. (Dkt.1, ¶ 99). The undersigned suggests that plaintiffs have adequately alleged that Saxon breached its duties under the TPP in bad faith and Saxon's motion to dismiss plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should be denied and this claim should be permitted to proceed in conjunction with plaintiffs' breach of contract claim. *See Gallagher v. BAC Home Loans Servicing, L.P.,* 2012 WL 1952349, at *13 (W.D.Mich. May 30, 2012) (denying motion to dismiss claim for breach of duty of good faith and fair dealing regarding performance of loan forbearance agreement); *Darcy,* 2011 WL 3758805, at *7–8 (denying motion to dismiss breach of duty of good faith and fair dealing claim, because that claim "is dependent on the existence of contract duties, which is, in turn, dependent on resolution of ambiguities in the TPP contract" and "this claim is permitted to proceed in conjunction with Plaintiff's breach of contract claim.").

**\*18** Accordingly, plaintiffs have plausibly alleged that the TPP was an enforceable contract, that Saxon breached the TPP, and that plaintiffs were damaged by that breach. Therefore, Saxon's motion to dismiss plaintiff's breach of contract claim (Count I) should be denied.

**D. Promissory Estoppel**

Plaintiffs assert a claim for promissory estoppel in the alternative to their breach of contract claim. Plaintiffs alleged that the TPP promised that Saxon would modify plaintiffs' loan. Specifically, Saxon promised a determination no later than the Modification Effective Date, as specified in § 2 of the TPP, which reasonably induced plaintiffs to make modified payments. (Dkt. 1 ¶¶ 48–50, 63–68). Saxon argues, as it did with regard to plaintiffs' breach of contract claim, that the TPP does not include any promise to permanently modify the loan or provide a written denial, and that plaintiffs could not have reasonably relied on a promise that was never made.

The elements of promissory estoppel are:

> (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided.

*Novak v. Nationwide Mut. Ins. Co.,* 235 Mich.App. 675, 599 N.W.2d 546, 552 (1999). The promise must be "actual, clear and definite." *State Bank of Standish v. Curry,* 442 Mich. 76, 500 N.W.2d 104, 107 (1993). Reliance is reasonable only if it is induced by an actual promise. *Id.*

Plaintiffs have adequately alleged their claim of promissory estoppel. Plaintiffs allege that Saxon made an unambiguous promise of a permanent loan modification under HAMP if all trial period plan payments as set forth in the TPP Contract were timely made and required documentation was submitted. (Dkt.1, ¶ 114). They also allege that they relied on Saxon's representations by making monthly TPP payments and that their reliance was reasonable and justified. (*Id.* ¶¶ 115–17, 500 N.W.2d 104).[9] Plaintiffs further allege that their reliance was to their detriment because those who complied with the TPP contracts but were denied a permanent modification have been required to pay increased interest, higher principal balances, higher service fees, and extended payoff time periods, and they have been deterred from seeking other remedies to address their default and/or unaffordable mortgage payments, have incurred damage to their credit, costs and expenses to prevent or fight foreclosure and other damages, and have been subject to additional income tax

liability. (*Id.* ¶¶ 118, 500 N.W.2d 104). Therefore, defendant's motion to dismiss plaintiffs' promissory estoppel claim should be denied.

### E. MCPA Claim

Plaintiffs allege that Saxon violated the MCPA by engaging in conduct that constitutes "unfair, unconscionable, or deceptive methods, acts or practices."

**\*19** (Dkt.1, ¶¶ 125–27). Saxon argues that plaintiffs' claim must fail because it is well settled that the MCPA "does not apply to residential mortgage transactions." *Brown v. Steel Capital Steel, LLC*, 2013 WL 765310, at \*4 (E.D.Mich. Feb.28, 2013). Saxon asserts that the complaint alleges that Saxon engaged in the servicing of mortgage loans (Dkt.1, ¶¶ 8, 10), and Saxon is a "licensed mortgage servicer" under the Mortgage Brokers, Lenders, and Servicers Licensing Act ("MBLSLA"), MCL § 445.1651 *et seq.*, which specifically authorizes licensed servicers to "engage in mortgage loan transactions." *See Morris v. HomEq Servicing Corp.*, 2010 WL 537745, at \*5 (Mich.Ct.App. Feb.16, 2010) ("Likewise, because defendant is a mortgage loan servicer that is specifically authorized under the Mortgage Brokers, Lenders, and Servicers Licensing Act ... to engage in mortgage loan transactions, subject to the supervisory authority and control of the Commissioner of the Office of Financial and Insurance Services ... we find that defendant is exempt from the provisions of the MCPA.").

Plaintiffs respond that to establish the exemption, Saxon "must show that it was specifically authorized to engage in the type of general transaction that is the gravamen of the complaint." *Gordon v. Home Loan Ctr., LLC*, 2011 WL 1261179, at \*12 (E.D.Mich. Mar.31, 2011). Plaintiffs contend that Saxon has failed to make the required showing here because it is not licensed to make deceptive and misleading statements, to provide TPPs, and then fail to follow the requirements of those contracts, to deprive plaintiffs of information or take advantage of plaintiffs by charging them more than $5,000 in fees. However, the undersigned suggests that plaintiffs misconstrue the nature of the exemption. As the court explained in *Gordon v. Home Loan Center*, "[w]hen analyzing a claim of exemption, 'the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is "specifically authorized." Rather it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.' " *Gordon*, 2011 WL 1261179 at \*12 (quoting *Smith v. Global Life Ins. Co.*, 460 Mich. 446, 597 N.W.2d 28, 38 (1999)).

"Thus, to prove an entitlement to this exemption, a defendant must show that it was specifically authorized to engage in the type of general transaction that is the gravamen of the complaint." *Id.* As stated above, federal and state courts that apply Michigan law have repeatedly held that mortgage loan transactions are a type of "general transaction" that is exempt from the MCPA. *Id.* (collecting cases); *see also Brown v. Bank of New York Mellon*, 2011 WL 206124, at \*7 (W.D.Mich. Jan.21, 2011) (dismissing MCPA claims against defendants Bank of New York and Saxon because the complaint alleged that they were engaged in mortgage loan origination and servicing of mortgage loans, involving activities specifically authorized by the laws under this defendants were regulated). "Courts have consistently held that defendants [such as Saxon] who are licensed under the MBLSLA fall within this exemption." *Gordon*, 2011 WL 1261179, at \*12 (collecting cases). Saxon has provided-and plaintiffs have not rebutted-that Saxon was licensed as a First Mortgage Registrant under the MBLSLA and a Secondary Mortgage Registrant under the Secondary Mortgage Loan Act. (Dkt.6). Therefore, the undersigned suggests that Saxon is exempt from the MCPA and plaintiffs' MCPA claim should be dismissed for failure to state a claim.

### F. FDCPA Claim

**\*20** Saxon asserts that plaintiffs' FDCPA claim fails as a matter of law because Saxon is not a debt collector under the statute. *See Mohlman v. Long Beach Mortg.*, 2013 WL 490112, at \*4 (E.D.Mich. Feb.8, 2013) ("mortgage servicing companies are not debt collectors"). Plaintiffs do not oppose the motion to dismiss their FDCPA claim, and the undersigned agrees that this claim should be dismissed.

### IV. RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant's motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**. The Williams plaintiffs should be dismissed as parties to this action, and plaintiffs' MCPA and FDCPA claims (Count III and IV) should be dismissed with prejudice for failure to state a claim.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140,

106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir.1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## Footnotes

1   The Williamses' interests are technically being pursued by their Trustee in Bankruptcy because they filed for Chapter 7 protection after this case was filed.

1   Plaintiffs had filed an action against Saxon nearly identical to the instant action on September 12, 2011. Saxon moved to dismiss that case, in part for lack of standing because it argued that the claims belong to plaintiffs' Chapter 7 bankruptcy estate. Plaintiffs subsequently voluntarily dismissed that complaint without prejudice. (Dkt.6–10). Plaintiffs then moved to reopen their Chapter 7 case and amended their schedules to include the dismissed claims against Saxon. (Dkt.1, ¶ 77). The bankruptcy Trustee is now a party to this case.

2   On September 4, 2013, plaintiffs filed a corrected response brief (in 14–point font, as required by E.D. Mich. L.R. 5.1(a)(3), as amended on July 1, 2013). (Dkt.18).

3   Plaintiffs allege that they were advised by letter dated April 21, 2011 that the servicing of their mortgage was being transferred from Saxon to Ocwen Financial Corporation ("Ocwen"), effective May 16, 2011. (Dkt.1, ¶ 75). Plaintiffs applied to Ocwen for an in-house loan modification, which Ocwen subsequently denied, claiming that plaintiffs were not qualified for a modification because they have a "conventional loan." (*Id.* ¶ 76). Plaintiffs have not asserted any claims against Ocwen in this case.

4   Saxon argues, and the undersigned agrees, that plaintiffs did not retain any claims against Saxon following their Chapter 7 bankruptcy, when they filed for Chapter 13 bankruptcy. In any event, although the Sixth Circuit has not expressly addressed the issue, some district courts within the Sixth Circuit Court of Appeals, and all other Circuit Courts of Appeal to consider the issue, have held that a *Chapter 13 debtor* may bring claims in their own names on behalf of the estate. *See e.g.*, *Epps v. United States*, 2013 WL 4096001, at *3 (W.D.Tenn. Mar.27, 2013) (collecting cases supporting holding that Chapter 13 debtor retains standing to pursue prepetition claims); *Boddie v. PNC Bank, NA*, 2013 WL 443773, at *4 (S.D.Ohio Feb.5, 2013) (Chapter 13 debtor/plaintiff has standing to bring suit on behalf of the estate). However, as explained below, plaintiffs' initial failure to disclose this claim in their Chapter 13 bankruptcy filing and continuing failure to disclose this claim in their Chapter 13 bankruptcy filing, which includes some different creditors, would judicially estop the Williamses, but not the Trustee, from proceeding here.

5   Saxon also argues that the Trustee seeks to hold Saxon liable for damages flowing from plaintiffs' failure to qualify for government benefits administered by Saxon, which amounts to suing a government contractor for following directives issued by the United States. Saxon argues it is entitled to immunity because a "private contractor [which] is compelled by a contract to perform an obligation for the United States" may "share the sovereign immunity of the United States." *Carley v. Wheeled Coach*, 991 F.2d 1117, 1120 (3d Cir.1993). However, as plaintiffs point out, Saxon fails to provide any authority to support this novel argument, and the undersigned has found none. Rather, the TPP is a private contract between the borrower and servicer. *See Markle v. HSBC Mortg. Corp. (USA)*, 844 F.Supp.2d 172, 183 (D.Mass.2011) ("A TPP is a contract between a homeowner and a mortgage servicer."). Therefore, this argument fails and should be denied.

6   The one case Saxon relies on in support of its argument, *Gilchrist v. Saxon Mortg. Servs.*, 2013 WL 1091112 (Ohio Ct.App. Mar. 14, 2013), is a state law case not controlling on this Court and is distinguishable as that case was decided expressly on Ohio state law, not federal law, and specifically on R.C. 1337.092(A), which governs contracts entered into in a representative capacity under Ohio law.

7   Saxon argues that the HAMP guidelines allowed servicers to offer trial plans before verifying the borrower's eligibility, and thus plaintiffs' arguments that they were prequalified for a modification fail. However, while the Treasury Directive does provide that "[s]ervicers may use recent verbal financial information to prepare and offer a Trial Period Plan," and "[s]ervicers are not required

to verify financial information prior to the effective date of the trial period," (Dkt. 6–2, Pg ID 107), that Directive also provides that "[u]pon receipt of the Trial Period Plan from the borrower, the servicer must confirm that the borrower meets the underwriting and eligibility criteria. *Once the servicer makes this determination and has received good funds for the first month's trial payment, the servicer should sign and immediately return an executed copy* of the Trial Period Plan to the borrower." (Dkt. 6–2, pg ID 105 (emphasis added)). Thus, Saxon's signature on and return of an executed copy of the TPP to plaintiffs here indicated that Saxon "confirm[ed] that [plaintiffs met] the underwriting and eligibility criteria" for a loan modification *Id.*

8    Similarly, the court in *Cave II* concluded that "Saxon's theory that the TPP permitted it to determine whether Plaintiffs qualified under HAMP guidelines 'after the trial period began ... conflicts with the plain terms of the TPP.' " *Id.,* 2013 WL 1915660, at *6 n. 5 (citing *Wigod* ). The court explained that, unlike the instant TPP:

    [t]he *Cave I* TPP stated in Section 2.G. that "the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify." Similarly, Section 3 of the *Cave I* TPP stated that "[i]f ... the Lender determines that I qualify, the Lender will send me a Modification Agreement." The *Cave I* TPP thus permitted the servicer to determine, even after it signed and returned the TPP to the borrower, whether the plaintiffs qualified for permanent modification. The instant TPP does not contain similar language, and, thus does not similarly indicate that Saxon had yet to qualify Plaintiffs for permanent modifications at the time it signed and returned Plaintiffs' TPPs.

    *Id.* (internal citations omitted).

9    The undersigned suggests that Saxon's signature on and return of the TPP to plaintiffs rendered plaintiffs' reliance on Saxon's promises reasonable. *See Rummell,* 2012 WL 2564846, at *9 (citing *Wigod* for the holding that the bank's signature on and return of the TPP to plaintiff made the borrower's reliance reasonable); *Wigod,* 673 F.3d at 566 (finding that the complaint adequately alleged reliance based on defendant's promise to provide permanent modifications).

---

    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "H"

Mielke v. Bank of America Home Loans Servicing LP, Not Reported in F.Supp.2d (2011)

2011 WL 1464848
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Frank V. **MIELKE**, Plaintiff,
v.
**BANK** OF **AMERICA** HOME LOANS
SERVICING LP, Successor in Interest to
Countrywide Home Loans, Inc., Defendant.

No. 2:10–cv–11576.  |  April 18, **2011**.

**Attorneys and Law Firms**

Andrew L. Campbell, Flint, MI, for Plaintiff.

Christine E. Ficks, Bodman, Detroit, MI, Melissa M.
Benton, Brian C. Summerfield, Bodman PLC, Troy, MI, for
Defendant.

**Opinion**

*ORDER DENYING DEFENDANT'S
MOTION TO DISMISS*

PAUL D. BORMAN, District Judge.

**\*1** This matter comes before the Court on Defendant Bank
of America Home Loan Servicing LP's [1] ("Defendant")
motion to dismiss Plaintiff Frank V. Mielke's ("Plaintiff")
claim that it violated the Michigan Collection Practices Act
("MCPA"). [2] (Dkt. No. 7.) Plaintiff has filed a response (Dkt.
No. 8) and Defendant has filed a reply. (Dkt. No. 10.) For the
following reasons, Defendant's motion to dismiss is DENIED.

**I. Background**
On October 27, 2003, Plaintiff obtained an adjustable rate
loan (the "Loan") from non-party Full Spectrum Lending,
Inc. ("Full Spectrum") for a principal amount of $110,500.
(Def.'s Br. in Supp. of its Mot. to Dismiss 1; Ex. 1.) The
Plaintiff granted a mortgage (the "Mortgage") on his property
located at 4159 Skinner Lake Road, Lapeer Michigan (the
"Property") to non-party Mortgage Electronic Registration
Systems, Inc. ("MERS") as security for the Loan. (*Id.*)
Defendant, f/k/a Countrywide Home Loans Servicing LP, is
the servicer of the Loan. [3] (*Id.*)

Between 2006 and 2008 Plaintiff struggled to make his
mortgage payments. (*Id.* (quoting Compl. ¶ 7).) On May 2,
2008, Defendant voluntarily lowered Plaintiff's interest rate
to 7.625%. (Def.'s Br. 2; Ex. 4—notice dated May 2, 2008.)
In the May 2 notice, Defendant informed Plaintiff that his
account was due for $2,522.02 and that he owed monthly
payments of $786.60. (Ex. 4.)

On May 23, 2008, Defendant sent Plaintiff another notice
indicating that his rate reduction had been completed. (*Id.*;
Ex. 4—notice dated May 23, 2008.) This modification
lowered Plaintiff's interest rate to 7.625%, modified the
principal balance of his mortgage to $105,971.47, and
increased Plaintiff's monthly payment to $928.29 a month.
(Ex. 4.) The cover letter also stated "[o]ur records indicate
your account is due for 0." (*Id.*) Finally, the May 23 notice
warned "[t]his Letter does not stop, waive or postpone the
collection actions, or credit reporting actions we have taken
or contemplate taking against you and the property" and
"[i]n the event that you do not or cannot fulfill ALL of the
terms and conditions of this letter no later than June 15 [,]
2008 we will continue our collections actions without giving
you additional notices or response periods." (*Id.*) Plaintiff
accepted Defendant's offer to modify the Loan on June 12,
2008. (Def.'s Br. 3; Ex. 4.)

On November 3, 2008, Defendant sent Plaintiff a letter
informing him that the modification was processed on July
21, 2008. (Pl.'s Resp. Ex. 9.) The letter also stated that there
was an overage of $669.60 which was included in Plaintiff's
new principal balance, and informed Plaintiff that "we have
applied $669.60 to a principal reduction on your account. This
change will be reflected on your next billing statement." (*Id.*)

On December 9, 2008, Defendant offered to modify the
Loan a second time. (Def.'s Br. 3; Ex. 5.) This letter offered
to reduce Plaintiff's interest rate to 4.125% fixed for five
years, [4] lowered the monthly payments to $598.08, and
stated his anticipated principal balance at the time his first
payment would become due under the modification was
$111,411.37. (Ex. 5.) The December offer further stated that
"[a]ccepting the enclosed modification also resolves your past
due amount of $1,091.91 as of December 7, 2008." (*Id.*)
The notice also contained the same disclaimer that the May
modification did about not altering Defendant's right to
initiate collection actions. (Def.'s Br. 3.) Plaintiff accepted
this offer on December 22, 2008. (Ex. 5.)

**\*2** On January 2, 2009, Defendant sent Plaintiff a Notice of Intent to Accelerate that he received on January 13. (Def.'s Br. 3; Compl. Ex. G.) The notice informed Plaintiff that his Loan was in serious default and that if he did not pay his outstanding balance of $2,033 .72 by February 1, 2009, Defendant would accelerate and make due the full amount remaining on the Loan. (*Id.*) Defendant calculated Plaintiff's total amount due by adding $1,830.56 in Monthly Charges from December, Late Charges from December of $39.54, Total Late Charges of $158.16, and Uncollected Costs of $60.00. (Compl.Ex.G.) It then reduced that amount by a Partial Payment Balance of $54.54. (*Id.*) Plaintiff claims that the monthly amount contained in the notice was inconsistent with both modifications. (Pl.'s Resp. 1 .)

Plaintiff claims that on March 2, 2009 he mailed his Loan payment for that month and it was returned on March 23. (*Id.* at 2.) Similarly on August 3, 2009, he mailed a check for his August payment. This was returned on or about August 22, indicating it was less than the amount owed. (*Id.*) "Since September 2009, Plaintiff has paid the amounts due as indicated on each statement with the most recent statement being $968 for principal, interest, and escrow payments." (*Id.*)

Plaintiff alleges that the letters Defendant sent offering to modify the Loan were communications to collect a debt and contained false, deceptive, and misleading representations in violation of the MCPA, Mich. Comp. Laws § 445.251 *et seq.* (Compl.¶¶ 68–74.) In addition to arguing that Defendant sent confusing, inaccurate, misleading, untrue statements in connection with collecting a debt in violation of § 252(a), (e), and (f)(ii), Plaintiff also claims that "Defendants have also violated § 252(q) because they have failed to implement procedures designed to prevent the above acts." (*Id.* ¶ 73.) Defendant has moved to dismiss Plaintiff's claims because it contends that the letters it sent Plaintiff were not communications to collect a debt, and even if they were, they were not misleading. (Def.'s Br. 11.)

## II. Standard of Review

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege facts which, if true, would entitle it to relief. This requires more than a mere formulaic recitation of the elements of a cause action, and conclusory statements alone will be insufficient. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (internal citations omitted); *see also Ass'n of Cleveland*

*Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir.2008). The claims set forth must be plausible, rather than simply conceivable. *See Twombly,* 550 U.S. at 570. When evaluating a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in its favor. *See DirecTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007).

## III. Discussion

**\*3** The MCPA, Mich. Comp. Laws § 445.251 *et seq.,* was enacted "to regulate the collection practices of certain persons." (Def.'s Br. 8.) Section 252(a) generally prohibits "regulated persons" from "[c]ommunicating with a debtor in a misleading or deceptive manner." Regulated entities are defined as "a person whose collection activities are confined and are directly related to the operation of a business other than that of a collection agency." § 251(g).[5] The MCPA forbids such entities from "[m]aking an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt or concealing or not revealing the purpose of a communication when it is made in connection with collecting a debt." § 252(e). Finally, section 251(f)(ii) is violated if the defendant misrepresents the legal rights of the creditor or the debtor in a communication to the debtor. This section does not require that the communication be in connection with the collection of a debt. *See* § 252(f).[6]

In addition to claiming that the letters Defendant sent were misleading or inaccurate, Plaintiff also contends that every invoice he received and every phone call conversation with Defendant's representatives also contained misrepresentations regarding late charges or the balance on his principal because they were based off of errors contained in the letters. (Pl.'s Resp. 4.) Plaintiff argues that "[i]f the terms of the modification were unclear, made in error, referenced a wrong balance amount, wrong past due amount, etc. then by logical conclusion, each phone call and letter stating or demanding that inaccurate amount would also be inaccurate." (*Id.*) Defendant argues that "plaintiff's allegations fail to state a claim for a violation for MCPA as the communications at issue were not in connection with collecting a debt, inaccurate, untrue, misleading or deceptive." (Def.'s Br. 11.)

### A. Were Defendant's Letters Communications in Connection with Collecting a Debt?

Mielke v. Bank of America Home Loans Servicing LP, Not Reported in F.Supp.2d (2011)

The term "communication in connection with collecting a debt" is not defined in the MCPA or the case law interpreting it. The term has been interpreted by courts analyzing the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, an analogous federal statute. (Def.'s Br. 9.) "Because the Michigan provision closely mirrors the federal exclusion, interpretations of the federal statute provide highly persuasive, although not binding, authority." *Dana v. Am. Youth Found.*, 257 Mich.App. 208, 215, 668 N.W.2d 174 (2003). Many courts have acknowledged the similarities between the FDCPA and the MCPA. *See, e.g., McKeown v. Mary Jane M. Elliot P. C.*, No. 07–12016, 2007 WL 4326825, at *9 (E.D.Mich. Dec.10, 2007) ("The parties did not identify any legal authority distinguishing the standard applicable to the Michigan causes of action from the federal statute."); *Lovelace v. Stephens & Michaels Assocs.*, No. 07–10956, 2007 WL 3333019, at *2 (E.D.Mich. Nov.9, 2007) (finding that plaintiff's MCPA claims "simply duplicate his claims under the FDCPA and need not be addressed separately").

**\*4** The FDCPA prohibits entities from making false, deceptive, or misleading representations in connection with the collection of debts. *See* 15 U.S.C. § 1692e. Courts have held that letters simply informing the plaintiff of the current status of his account that do not make any demand for payment are not communications in connection with the collection of a debt under the FDCPA. *See, e.g .., McCready v. Jacobsen*, No. 06–2443, 2007 WL 1224616, at *1 (7th Cir. Apr.25, 2007) (citing *Bailey v. Sec. Nat'l Serv. Corp.*, 154 F.3d 384, 388–89 (7th Cir.1998)); *Mabbitt v. Midwestern Audit Serv., Inc.* No. 07–11550, 2008 WL 723507, at *4 (E.D.Mich. Mar.17, 2008) (Edmunds, J.) (citing *McCready* ). Whether a communication was made in connection with debt collection "is a question of objective fact, to be proven like any other fact." *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 386 (7th Cir.2010) (quoting *Ruth v. Triumph P'ships*, 577 F.3d 790, 798 (7th Cir.2009)).

Defendant claims that under the Seventh Circuit's decision in *Bailey*, its letters should not be considered communications in connection with collecting a debt. (Def.'s Br. 9.) In *Bailey*, the defendant loan servicers sent the plaintiffs a letter that listed the next four payments the plaintiff owed and stated:

> We wish to work with you on the resolution of your delinquency and will allow you to continue to make the payments remaining under this agreement. However, sending less than the forbearance payment amount

> and late payment of your monthly installment may render this agreement null and void requiring immediate payment in full of all sums due under the terms of your Note.

154 F.3d at 386. The plaintiffs sued the defendants because the letter did not contain any of the FDCPA's required notices. *Id.* The district court granted the defendants' motion for summary judgment because it concluded that the defendants "were not demanding payment on a defaulted loan." *Id.* at 385. The Seventh Circuit affirmed. *Id.* The Seventh Circuit held that the letter could not reasonably be considered sent "in connection with the collection of any debt" as the FDCPA requires. *Id.* at 388. The court found that the letters did not make any demand for payment, but rather merely informed the plaintiffs about the current status of their account and warned them that failure to make timely payments could result in acceleration. *Id.* at 388–89. The court stated "[a] warning that something bad might happen if payment is not kept current is not a dun, nor does it seek to collect any debt, but rather the opposite because it tries to prevent the circumstances wherein payments are missed and a real dun must be mailed." *Id.* at 389. The court also found that all of the information about the plaintiffs' account status was prospective, and added the letter "doesn't even imply that anything owed under the Baileys' forbearance agreement is overdue." *Id.*

**\*5** Defendants argue that their communications with Plaintiff never demanded payment of a debt, and "merely informed plaintiff of the current status of his loan and offered to modify the terms of the Loan." (Def.'s Br. 10.) Thus, it claims that under *Bailey* the letters are not communications made in connection with the collection of a debt. *See* 154 F.3d at 389.

Plaintiff makes several arguments in support of his contention that the letters should be considered communications in connection with debt collection. First, although Plaintiff agrees that the FDCPA and the MCPA are similar and analogous and that the term "communication to collect a debt" is not explicitly defined in the statute, he argues the term's meaning can be derived from combining the terms "debt" and "communication" which are defined in sections 251(a) and (c) respectively. (Pl.'s Br. 6–7.) The MCPA defines the terms "claim" or "debt" to mean "an obligation or alleged obligation for the payment of money or thing of value arising out of an expressed or implied agreement or contract for a purchase made primarily for personal, family, or

household purposes." § 445.251(a). "Communicate" means "the conveying of information regarding a debt directly or indirectly to a person through any medium." § 251(c).

Plaintiff does not fully develop this argument—instead he goes almost immediately into distinguishing *Bailey*—but in any event, it is unpersuasive. Defendant's letters were clearly communications and clearly involved Plaintiff's debt. Plaintiff's "synthesized definition" fails to shed light onto whether the letters were made "in connection" with debt collection, or what constitutes debt collection. As a result, the Court finds that the definitions contained in § 251 of the MCPA offer little guidance for determining whether Defendant's communications were made in connection with debt collection.

Alternatively, Plaintiff contends that even if the Court adopts *Bailey*, Defendant's communications should still be considered related to debt collection. (Pl.'s Br. 7.) Plaintiff emphasizes the fact that in *Bailey*, the letter only addressed future payments that were going to become due and did not even imply that anything is due or past-due. *See* 154 F.3d at 389. In fact, the Seventh Circuit explicitly distinguished the communication in *Bailey* from the prototypical dunning letter Chief Judge Posner drafted in *Bartlett v. Heibl*, 128 F.3d 497, 501 (7th Cir.1997) to serve as a model for debt collectors, which demanded an overdue credit card balance. *Bailey*, 154 F.3d at 389. Plaintiff argues that *Bailey* stands for the proposition that a communication to collect a debt is one that either demands a payment, or implies that something is owed. (Pl.'s Br. 7.)

Additionally, Plaintiff directs the Court to *Gburek*, a recent Seventh Circuit decision on this issue. In *Gburek*, the defendant loan servicing company sent the plaintiff a letter offering to discuss ways she could avoid losing her home to foreclosure and asking for current financial information when the plaintiff fell behind on her mortgage payments. *Id.* at 381. Days later, the plaintiff received another letter from Titanium Solutions on behalf of the defendant again asking for her information. The defendant's letter stated:

   *6 We recently sent you a letter requesting that you contact our office to review your financial situation and discuss foreclosure alternatives. To date, we have not received a response to our request.

   Again, we would like to emphasize that it is not too late to save your home. Options may be available to help preserve your homeownership. To determine options that best fit your financial situation, you must complete and return the enclosed form and provide the requested documentation to [Litton's Loss Mitigation Department] within 14 business days.

   * * *

   Litton will not delay ongoing legal action on your home until your financial information has been received and processed.

*Id.* at 382. The bottom of the letter also read "LITTON LOAN SERVICING LP IS A DEBT COLLECTOR. THIS LETTER IS AN ATTEMPT TO COLLECT YOUR DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." *Id.*

The district court granted the defendant's motion to dismiss the plaintiff's FDCPA claims, holding that the defendant's conduct did not fall within the ambit of the FDCPA because the letter did not contain a demand for payment. *Id.* at 381. The Seventh Circuit reversed. *Id.* at 382. In holding that the defendant's letter was a communication in connection with the collection of a debt, the Seventh Circuit analyzed its prior decision in *Bailey* and a number of other cases and set forth several general rules for future courts construing FDCPA claims.

First, the *Gburek* court stated "[n]either this circuit nor any other has established a bright-line rule for determining whether a communication from a debt collector was made in connection with the collection of any debt." *Id.* at 384. Next, it held that its decision in *Bailey* did not establish a categorical rule that a communication cannot fall within the purview of the FDCPA unless it makes an explicit demand for payment. *Id.* 384–85 ("The absence of a demand for payment was just one of several factors that influenced the outcome in *Bailey.*"). The court stated that the fact that the letter in *Bailey* only mentioned prospective payments, and that the plaintiff had not missed any payments on the new forbearance agreement, and so nothing was past due, were additional factors that influenced that decision. *Id.* at 384.

*Gburek* enumerated several factors courts should consider when analyzing whether the FDCPA applies to a communication. Along with the absence of a demand for payment, the court stated the nature of the parties' relationship, the purpose, and the context of the communication are also important considerations. *Id.* at 385. Finally, the court also stated that "a communication made

Mielke v. Bank of America Home Loans Servicing LP, Not Reported in F.Supp.2d (2011)

specifically to induce the debtor to settle her debt will be sufficient to trigger the protections of the FDCPA." *Id.* (citing *Horkey v. J.V.D.B. & Assocs.*, 333 F.3d 769, 774 (7th Cir.2003)). Applying these principles to the defendant's letter, the *Gburek* court held that it constituted a communication in connection with the collection of a debt because "it was an offer to discuss Gburek's repayment options." *Id.* at 386. Although the letter stated that the defendant was a debt collector and that the letter was an attempt to collect a debt, the court did not rely on that language. In a footnote, the court stated "[t]he letter bore a disclaimer identifying it as an attempt to collect a debt, but this does not automatically trigger the protections of the FDCPA, just as the absence of such language does not have dispositive significance." *Id.* at 386 n. 3.

 **\*7** The Court finds that Defendant's letters in the instant case were communications in connection with a collection of a debt. Although neither *Bailey* or *Gburek* are binding on this Court, other district courts in the Eastern District of Michigan have relied on them when analyzing FDCPA claims. *See, e.g., South v. Midwestern Audit Servs., Inc.*, No. 09–15740, 2010 WL 5089862, at \*7 (E.D.Mich. Dec. 8, 2010).

Applying the Seventh Circuit's reasoning in those cases to Defendant's letters demonstrates that they would be considered communications made in connection with debt collection under the FDCPA, and therefore are under the MCPA as well.

In the May 2, 2008 notice, Defendant informed Plaintiff that his account was due for $2,522.02 and that he owed monthly payments of $786.60. (Def.'s Br. Ex. 3.) Although not an explicit demand for payment, telling a debtor that a certain amount is due on their account is an implicit demand for payment. Even if it is not a demand of any kind, *Gburek* states that the absence of a demand is only one factor. 614 F.3d at 385. Furthermore, this letter is distinguishable from the one at issue in *Bailey* because it states that there is an amount due on Plaintiff's account. *See* 154 F.3d at 389. As a result, the Court holds that the May 2, 2008 notice is a communication relating to the collection of a debt.

Next, the letter Defendant sent on May 23, 2008 was also made in connection with debt collection. Although no demand for payment is made (the notice states that Plaintiff does not owe any money), the letter asked Plaintiff to "please consider the enclosed loan modification." (Ex. 4.) Although this does not ask Plaintiff to settle a debt, it does "offer to

discuss [Plaintiff's] repayment options, which qualifies as a communication in connection with an attempt to collect a debt." *See Gburek*, 614 F.3d at 386. While the May 23 letter may not have been made in connection with an attempt to collect a debt because it does not have some of the additional indicia that supported the *Gburek* court's conclusion, such as the fact that the defendant in that case was offering alternatives to foreclosure. *Id.* Accordingly, the Court holds that at this stage the question of fact remains regarding this letter.

The December 9, 2008 notice is clearly a communication in connection with the collection of a debt. It states "[a]ccepting the enclosed modification also resolves your past due amount of $1,091.91." (Ex. 5.) This letter, therefore, is both an implicit demand for past due payments on Plaintiff's account and "a communication made specifically to induce the debtor to settle [his] debt." *See Gburek*, 614 F.3d at 385.

Finally, the Notice of Intent to Accelerate, which Defendant sent on January 2, 2009, was also made in connection with the collection of a debt. The notice frankly informed Plaintiff that his account was "in serious default," tallied the total amount due at $2,033.72, and stated "[i]f the default is not cured on or before February 1, 2009, the mortgage payments will be accelerated." (Compl.Ex.G.)

### B. Were the Letters Not Misleading or Confusing as a Matter of Law?

 **\*8** Defendant argues that even if the Court construes the letters as actionable under the MCPA, the Court should still dismiss Plaintiff's claims because the communications are not misleading. (Def.'s Br. 11.) Defendant points out that there is nothing inherently deceptive about offering to modify the Loan in December 2008 with a first payment due date of February 1, 2009 and then issuing a Notice of Intent to Accelerate in January 2009 because the modification did not limit or change Defendant's right to accelerate any time the Loan was in default. (*Id.*)

It is not clear whether this was confusing because the modification purported to absolve Plaintiff's outstanding balance if he accepted it, and said that the new payment rate would become effective February 1, 2009. (Ex. 5.) Then in early January, Defendant informed Plaintiff that he owed over $2,000. (Compl.Ex. G.) Plaintiff also alleges that the May 28, 2008 letter was misleading because it told Plaintiff his account was due for "0" but also added $1,342.96 to his principal as a result of the proposed modification. (*Id.* ¶¶

Mielke v. Bank of America Home Loans Servicing LP, Not Reported in F.Supp.2d (2011)

10–13.) Additionally, Plaintiff claims that Defendant failed to properly apply an overage of $669.90 to his account that Defendant notified him about in November 2008. (*Id.* ¶ 19; Pl.'s Resp. Ex. 9.) These are just some examples of Plaintiff's many allegations. Because Plaintiff has alleged sufficient facts to support his claims under the MCPA, the Court should not dismiss his Complaint.

### C. Failure to Implement Procedures under § 445.252(q)

Plaintiff also claims that Defendant violated MCPA section 445.252(q) by claiming it "failed to implement procedures designed to prevent the above acts." (Compl.¶ 73.) Defendant argues that Plaintiff has not made any specific allegations as to how it violated § 252(q), and therefore the Court should dismiss this claim. (Def.'s Br. 12–13.) Defendant argues that Plaintiff must allege "more than the bare assertion of legal conclusions." (*Id.* at 13 (quoting *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993)).)

The Court declines to dismiss Plaintiff's § 252(q) claim. While Plaintiff has not alleged specifically what procedures Defendant should have had in place, or how those procedures

in place broke down, he has done more than offer bare legal assertions. Without discovery it would be very difficult for Plaintiff to be able to have the knowledge of Defendant's operations necessary to make such detailed claims. Throughout his Complaint, however, Plaintiff claims various communications he received from Defendant were misleading. Those factual allegations provide enough substance to Plaintiff's claim under § 252(q).

### IV. Conclusion

Because the majority, if not all, of Defendant's letters to Plaintiff constitute communications made in connection with the collection of a debt, and because Plaintiff has sufficiently alleged that they were misleading, deceptive, untrue, or confusing, Plaintiff has stated claims upon which relief can be granted under the MCPA § 252(a), (e), and (f)(ii). Accordingly, the Court DENIES Defendant's motion to dismiss.

**\*9 SO ORDERED.**

Footnotes

1    There is some confusion over Defendant's name. Defendant claims that Plaintiff erroneously named it Bank of American Home Loans Servicing LP when in reality its proper name is BAC Home Loans Servicing, LP. (Def.'s Mot. to Dismiss 2.) The case caption also describes Defendant as the successor in interest to Countrywide Home Loans, Inc. Defendant contends that Countrywide is still an existing entity. (*Id.* at 2 n. 1.)

2    Plaintiff's original Complaint contained two other counts, but on August 2, 2010, the Court entered a stipulated order dismissing Counts I and III of Plaintiff's Complaint. (Dkt. No. 9.) As a result, Plaintiff's MCPA claim is all that remains before the Court.

3    A loan servicer is the entity that receives periodic payments from the borrower in accordance with the loan's terms, including amounts for escrow accounts, and making the payments of principal and interest, as well as other payments as may be required. (Def.'s Br. 1 n. 2 (quoting 12 U.S.C. § 2605).)

4    After five years, Plaintiff's interest rate would be the higher of 7.625% or the thencurrent market rate for a 30–year fixed Fannie Mae loan. (Ex. 5.) This rate would become fixed for the remainder of the Loan. (*Id.*)

5    Defendant does not contest that it falls under this definition.

6    Although sections 252(a) and (f)(ii) do not contain an explicit requirement that the communications be made in connection with the collection of a debt, other courts have analyzed claims made pursuant to these statutes under the FDCPA. *See, e.g., Saltzman v. I.C. Sys., Inc.*, No. 09–10096, 2009 WL 3190359 (E.D.Mich. Sept.30, 2009). Furthermore, because the Court finds that the letters are communications relating to debt collection this issue is not decisive.

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "I"

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE MOTT,

          Plaintiff,

v.

                             Case No. 1:12cv462

BANK OF AMERICA, N.A. and
FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

                             Hon. Robert J. Jonker

          Defendants.

_____/

# ORDER

    This is another in a growing number of cases challenging a foreclosure by advertisement of a residential mortgage.  Plaintiff filed a 13-count verified complaint in state court asserting state and federal law claims.  Defendants timely removed on the basis of both federal question and diversity of citizenship. The matter is now before the Court on Defendants' Motion to Dismiss (docket # 9) all claims.  The Motion is fully briefed (docket # # 10, 24 and 26).  After reviewing the briefing and all other matters of record, the Court denies the Motion to Dismiss.  The denial is without prejudice to the ability of Defendants to raise their defenses on a Motion for Summary Judgment after the parties have the opportunity to develop the record fully.

    The fundamental dispute between the parties is whether the foreclosure process in this case was lawful on the verified facts articulated by plaintiff.  The proper parties to test that issue are here:  namely, the servicer and investor or presumed investor of the mortgage, and the mortgagor herself.  The mortgagor plaintiff has pleaded--actually sworn--facts sufficient to put defendants on reasonable notice of the factual and legal bases for her claims.  Those claims may or may not ultimately survive a Rule 56 motion, but the best time to address them all is after each side has a full opportunity to develop the record.  Even defendants' motion papers

tacitly recognize the need for material outside the four corners of plaintiff's complaint to resolve the merits because at least one of defendants' 29 exhibits includes a transactional document (the original promissory note) that was not part of plaintiff's original filing.  Moreover, the briefing of the parties is replete with factual assertions or assumptions that both should have the opportunity to test and support in plenary discovery.  Under these circumstances, denial of a motion to dismiss is appropriate.  See Fed. R. Civ. P. 12(d).

Moreover, in this case, as in many similar cases, there are eminently practical reasons to deny a Rule 12 motion without prejudice and permit the parties to develop the relevant facts. For one thing, the law continues to develop rapidly in this area.  The meaning and significance of the Michigan Supreme Court decision in *Residential Funding Co., LLC v. Saurman*, 807 N.W.2d 412 (2011), for example, continues to unfold, and the specific factual context of each foreclosure can be germane to careful application of the decision.  Similarly, only a few weeks after defendants filed their motion in this case, the United States Court of Appeals for the Sixth Circuit expressly recognized the possibility--at least in some factual contexts--of an FDPCA claim against mortgage servicers and their attorneys.  *See Wallace v. Washington Mutual Bank*, _____ F.3d _____, Case No. 10-3694 (June 26, 2012).  Once again, a more robust factual record will assist the Court in properly applying *Wallace*.  In addition, there continue to be external developments that all parties and the Court should have a full opportunity to consider.  In particular, the Attorney General of the United States has recently announced settlements with large, national mortgage servicers, including defendant Bank of America, and these settlements have been embodied in recently approved federal consent decrees.  It behooves the parties and this Court to take full account of such settlements before proceeding to final adjudication of the claims in this case.

Accordingly, **IT IS ORDERED** that Defendant's Motion to Dismiss (docket # 9) is

-2-

**DENIED**, without prejudice to defendants' ability to raise its defenses in a Rule 56 motion after

plenary discovery.

_____/s/Robert J. Jonker_____
ROBERT J. JONKER
UNITED STATES DISTRICT JUDGE

Dated:  August 22, 2012