134

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

*Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se*

BARBARA A. ELLIS,

   PRO SE Plaintiff,

                                                   No. 2:14-cv-11186
                                                   Honorable Laurie J. Michelson
                                                   Mag. Judge Michael J. Hluchaniuk

v.

CHASE HOME FINANCE, LLC,
JPMORGAN CHASE BANK, N.A.,
DEUTSCHE BANK NATIONAL
TRUST COMPANY, as Trustee, and
UNKNOWN TRUST, the currently
unknown asset backed security at issue,

   Defendants.

*Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se*

BARBARA ELLIS
**Pro Se**
8293 South Huron River Drive
South Rockwood, MI 48179
Telephone:  (734)672-0574
4barbls@gmail.com

Joseph H. Hickey (P41664)
Christyn M. Scott (P67485)
Kyle R. Dufrane (P58809)
Thomas H. Trapnell (P74345)
*Attorneys for Defendants*
DYKEMA GOSSETT PLLC
400 Renaissance Center
Detroit, MI 48243
(313)568-6529
cscott@dykema.com
kdufrane@dykema.com
ttrapnell@dykema.com

*Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se*

## COMBINED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION, MOTION TO STAY EVICTION AND CONVEYANCE/TRANSFER

Now comes the Pro Se Plaintiff, Barbara A. Ellis ("Ms. Ellis"), and moves this Honorable Court to enter a temporary restraining order or preliminary injunction granting Ms. Ellis the relief sought in this motion, staying the eviction of Plaintiff and/or further conveyance or transfer of her home until a hearing on the merits of her Motion under Fed. R. Civ. P. Rule 60(b)(6), Rule 60(d)(1)/Rule60(d)(3) or an independent action under FCRA and/or FDCPA or transfer to the appropriate Federal Agency to whom which formal complaints were made.  In support of this motion, Ms. Ellis alleges and states as follows:

## I.   MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

1.   As more fully set out in the Fed. R. Civ. P Rule 60(b)(6) and Rule 60(d)(1) or Rule 60(d)(3) Motion before this Court,  Motion attached hereto and incorporated by reference, Defendants have encumbered and continue to encumber the property at 8293 South Huron River Drive, South Rockwood, Michigan 48179, (the property) which is the subject of the Motion, have failed to provide consideration as they did not concur and refused to conference upon being notified of the pending motion.  According to LR 7.1 of the US District Court Eastern District of Michigan, the movant must ascertain whether the contemplated motion

will be opposed.  Ms. Ellis did so.

The Defendants have attempted to interfere and are attempting to interfere with Ms. Ellis' rightful possession and ownership of the premises at 8293 South Huron River Drive, South Rockwood, Michigan and have otherwise taken adverse action against Ms. Ellis.

2.     Unless Defendants are temporarily and permanently enjoined from the acts set forth above, irreparable injury and possibly death will be occasioned to Ms. Ellis due to the nature and severity of Defendants' acts.

3.     The interest of Ms. Ellis in her property, in her health and in the public interest of making her availability to FINRA, the FBI and HUD for investigation of wire tapping, phone tapping, obstruction of justice and ongoing fraud on the court system by Federal agencies outweighs the interests, if any, of Defendants.

4.     Ms. Ellis, the Pro Se Plaintiff, has a likelihood of success on the merits of her motion having preserved her claims of error and is entitled to equitable relief;

5.     Issuance of injunctive relief against the Defendants will maintain the *status quo* between the parties; namely, if Defendants rightfully have an interest in the property, it remains secured by the property while this action is pending.

WHEREFORE, Ms. Ellis moves this Court for the issuance of a Temporary

3

Restraining Order or, in the alternative, Preliminary Injunction, enjoining the

Defendants, Chase Home Finance, LLC, JP Morgan Chase Bank,, N.A., and

Deutsche Bank National, their employees, agents, successors, or assigns, from

making any effort to evict the Plaintiff, and/or further conveyance or transfer of her

home, and for such other and additional relief as the Court deems just and

equitable, including a Preliminary Injunction at the earliest possible opportunity.

## II.    MOTION TO STAY CONVEYANCE OR TRANSFER

6.    Mr. Simmons restates and realleges Paragraphs 1 through 5 above as if set

forth in full herein.

7.    This Defendants retained ReMax Masters on June 13, 2016 to pursue sale

pursuant to the issue of Mandate of the 6th Circuit Appellate Court on June 7, 2016.

See attached notice from Remax.

8.    As set forth above, any further conveyance or transfer of her home should be

stayed as, in the State of Michigan, no judgment is final if fraud on the Court

occurred and Ellis has concrete proof and concrete harm.

WHEREFORE, Ms. Ellis Simmons prays this Honorable Court stay eviction

of Plaintiff and/or further conveyance or transfer of her home until such time as all

the matters in the Motion and complaints to FINRA, the Federal Bureau of

4

Investigation and the U.S. Housing and Urban Development Agency may be heard, transferred and decided.

## III.   MOTION TO ALLOW FEDERAL CLAIMS

9.   Ms. Ellis restates and realleges the preceding Paragraphs 1 through 8 as if set forth in full herein.

10.   Mr. Ellis, now Pro Se, previously appeared by Counsel and was granted a Temporary Restraining Order by State of Michigan in the Monroe County Circuit Court so that appropriate pleadings might be filed.

11.   The attached Motion appears to be the proper pleading to be filed in this matter.  Whereas Federal Agencies, FINRA, FBI and HUD will have to determine and coordinate their investigation activities.

WHEREFORE, Ms. Ellis prays this Honorable Court grant leave in file the instant Motion *instanter.*

Respectfully submitted:

*Barbara Ellis*

Date:  June 20, 2016

By:  Barbara A. Ellis
PRO SE Appellant
8293 South Huron River Drive
Rockwood, MI 48179

5



June 13, 2016

### THIS IS AN IMPORTANT NOTICE
### REGARDING YOUR OCCUPANCY OF THE PROPERTY

Please be advised that JPMorgan Chase Bank, National Association ("Chase"), in its capacity as mortgage loan servicer and on behalf of the owner, completed a foreclosure proceeding or a deed in lieu transaction on the property located at **8293 HURON RIVER DR, SOUTH ROCKWOOD, MI 48179** (the "Property") and has retained **PAUL ENDRES** to assist with respect to the Property. For your information, the new owner intends to sell the Property.

### THIS IS NOT A NOTICE TO VACATE OR AN EVICTION NOTICE
### BY THIS NOTICE YOU ARE NOT BEING EVICTED FROM THE PROPERTY

### NOTICE TO TENANTS

If you are a tenant or subtenant (if applicable) who rented the Property prior to the date the new owner acquired title to the Property, you may have the legal right to continue renting the Property under applicable law. If the new owner acquired title to the Property prior to January 1, 2015 and you also occupied the Property prior to that date, you may have the legal right to continue renting the Property under the federal Protecting Tenants at Foreclosure Act of 2009, as amended by the Mortgage Reform and Anti-Predatory Lending Act (part of the Dodd-Frank Wall Street Reform and Consumer Protection Act), which was in effect from May 20, 2009 through December 31, 2014. In addition, if you are a tenant or a subtenant of the Property and any other federal, state or local law grants you the right to continue renting the Property, then you may continue renting the Property in accordance with, and to the extent permitted by, that law.

### IMPORTANT NOTICE FOR SERVICEMEMBERS AND THEIR DEPENDENTS

If you or any occupant of your home are or recently were on active duty or active service, you may be eligible for benefits and protections under the federal Servicemembers Civil Relief Act (SCRA). This includes, among other things, protection from eviction. You also may be eligible for benefits and protections under state law or Chase policy. SCRA and state military benefits and protections also may be available if you are the dependent of an eligible service member.

Eligible service may include:

- Active duty with the Army, Navy, Air Force, Marine Corps, or Coast Guard, or

**RE/MAX** Properties, Inc

7931 Allen Road
Allen Park, Michigan 48101
Office: (313) 381-2000
Fax: (313) 381-2185

Non-CA, non-FHA KYRL [4/2015]                    -1-

⌂ Each Office Independently Owned and Operated

# UNITED STATES DISTRICT COURT
# IN THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se*

BARBARA A. ELLIS,

    PRO SE Plaintiff,

v.

CHASE HOME FINANCE, LLC,
JPMORGAN CHASE BANK, N.A.,
DEUTSCHE BANK NATIONAL
TRUST COMPANY, as Trustee, and
UNKNOWN TRUST, the currently
unknown asset backed security at issue,

    Defendants.

No. 2:14-cv-11186
Honorable Laurie J. Michelson
Mag. Judge Michael J. Hluchaniuk

*Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se*

BARBARA ELLIS
***Pro Se***
8293 South Huron River Drive
South Rockwood, MI 48179
Telephone:  (734)672-0574
4barbls@gmail.com

Joseph H. Hickey (P41664)
Christyn M. Scott (P67485)
Kyle R. Dufrane (P58809)
Thomas H. Trapnell (P74345)
*Attorneys for Defendants*
DYKEMA GOSSETT PLLC
400 Renaissance Center
Detroit, MI 48243
(313)568-6529
cscott@dykema.com
kdufrane@dykema.com
ttrapnell@dykema.com

*Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se*

## ***Pro Se*** PLAINTIFF'S MOTION TO SET ASIDE JUDGMENT UNDER FRCP RULE Rule 60(b)(6) &60(d)(1)/(3)  **Not Time Barred Per SCOTUS**

Pro Se Plaintiff Barbara A. Ellis ("Plaintiff" or "Ellis") pursuant to Fed. R. Civ. P. 60(b)(6) and/or Fed. R. Civ. P. 60(d)(3) moves to set aside final judgment of this case, void the Sheriff's Sale of 8293 South Huron River Drive, South Rockwood, Michigan and seeks award of actual damages for intentional violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, by Defendants JP Morgan Chase Bank, N.A. ("Chase"), successor by merger to Chase Home Finance, LLC, and Deutsche Bank National Trust Company, solely and exclusively in its capacity as Trustee for Washington Mutual Mortgage Pass-Through Certificates, Series 2004-AR ("Trustee"), improperly named as "Deutsche Bank National Trust Company, as Trustee" and attorneys, Dykema Gossett PLLC of record:  Joseph H. Hickey ("Hickey"), Christyn M. Scott ("Scott"), Kyle R. Dufrane ("Dufrane") and Thomas H. Trapnell ("Trapnell") *et. al.* ("Defendants") pursuant to the Supreme Court of the U.S.A. ruling that an independent and secondary civil suit for "fraud on the court", must first be submitted to this court under Fed. R. Civ. P. Rule 60 (d)(1).

In accordance with LR 7.1, Pro Se Plaintiff sought Defendants concurrence in the relief requested herein, on June 5, 2016, by asking for a phone conference via emails to Scott, Dufrane and Trapnell and then, on June 6, 2016, and by leaving

1

telephone message for Dufrane when there was no response.  A phone conference was not granted and concurrence was denied via email on June 7, 2016 by Scott, head counsel and attorney for the Trustee.

Under Fed. R. Civ. P.  Rule 60 (d)(3), the Defendants are allowed no response to this motion and the Defendants failure to concur under LR 7.1 is moot.

Because, in accordance with 6th Circuit Local Rule (2004) Fed. R. App. P. Rule 27 (a)(3)(A) – Any party can respond to a motion as long as it relates to the contents of the motion LFRAP 27(a)(2).  The Plaintiff's Rule 41 motion for an En Banc rehearing was based on the court not filing photographic evidence and the newly discovered Defendant's intentional violation of the FCRA.

FRAP Rule 27 specifically addresses this in the Advisory Committee on Rules—1967:

> *Subdivisions (a) and (b).* Many motions seek relief of a sort which is ordinarily unopposed or which is granted as of course. The provision of subdivision (a) which permits any party to file a response in opposition to a motion within 7 days after its service upon him assumes that the motion is one of substance which ought not be acted upon without affording affected parties an opportunity to reply. A motion to dismiss or otherwise determine an appeal is clearly such a motion. Motions authorized by Rules 8, 9, 18 and 41 are likewise motions of substance; but in the nature of the relief sought, to afford an adversary an automatic delay of at least 7 days is undesirable, thus such motions may be acted upon after notice which is reasonable under the circumstances.

2

Secondly, the Rule 41 motion to stay the mandate pending a Writ of Certiorari to the U.S. Supreme Court specifically stated the Plaintiff had preserved the claim of error by opting out of the class action on March 21, 2016 – not so in the prior motion as investigation required correspondence via U.S Postal Service.

Thus the Trustee had not one but two Rule 41 motions in which to submit an affirmative defense of their lack of civil liability and is procedurally barred from consideration as Rule 60 motions allow no response. The Supreme Court ruled that a Plaintiff may not pursue an independent action of fraud on the court *infra*.

15 US Code § 1639a (g) – Duty of servicers of residential mortgages in rules of construction states that the No Liability (b)  and Safe Harbor protections (g) provisions do not apply to any person, including a trustee, issuer, and loan originator where State or Federal Laws are broken.

It was foreseeable that the Plaintiff would opt out to pursue actual damages for illegally accessing her credit report under the Federal FCRA Law which proved fraud on the 6th Circuit Court of Appeals, the US District Court for the Western District of Texas and this Court. Thus all Defendants are equally liable for any damages from the FCRA violation as well as fraud that has vitiated this action from the beginning to the end as well as the court system.

3

Finally, this action IS NOT TIME BARRED.  As will be cited in the brief, the U.S. Supreme Court ruled that no independent actions for fraud on the court may be taken by a litigant when that matter may be addressed under a court rule in the original proceeding.

WHEREFORE, the Pro Se Plaintiff respectfully requests that the Court grant the Motion, set aside the judgment, void the Sheriff's Sale, award actual and punitive damages and grant such other relief in favor of the Pro Se Plaintiff, and against the Defendants *et. al.,* as the Court deems appropriate.

Respectfully submitted:

Date:  June 20, 2016          By:  Barbara A. Ellis
                                   PRO SE Appellant
                                   8293 South Huron River Drive
                                   Rockwood, MI 48179

4

# UNITED STATES DISTRICT COURT
# IN THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se

BARBARA A. ELLIS,

    PRO SE Plaintiff,

v.

CHASE HOME FINANCE, LLC,
JPMORGAN CHASE BANK, N.A.,
DEUTSCHE BANK NATIONAL
TRUST COMPANY, as Trustee, and
UNKNOWN TRUST, the currently
unknown asset backed security at issue,

    Defendants.

No. 2:14-cv-11186
Honorable Laurie J. Michelson
Mag. Judge Michael J. Hluchaniuk

Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se

BARBARA ELLIS
**Pro Se**
8293 South Huron River Drive
South Rockwood, MI 48179
Telephone: (734)672-0574
4barbls@gmail.com

Joseph H. Hickey (P41664)
Christyn M. Scott (P67485)
Kyle R. Dufrane (P58809)
Thomas H. Trapnell (P74345)
*Attorneys for Defendants*
DYKEMA GOSSETT PLLC
400 Renaissance Center
Detroit, MI 48243
(313)568-6529
cscott@dykema.com
kdufrane@dykema.com
ttrapnell@dykema.com

Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se Pro Se

## BRIEF IN SUPPORT OF *Pro Se* PLAINTIFF'S MOTION TO SET ASIDE
## JUDGMENT UNDER FRCP RULE 60(b)(6) &60(d)(1)/(3)
## <u>Not Time Barred Per SCOTUS</u>

**This is an unprecedented case**, so this Plaintiff **begs the forbearance of this Court** in presenting this Fed. R. Rule 60(b)(6) & 60(d)(1) &(3) Motion citing *Morgan v. Scott* (USD Delaware, March 19, 2015):

> **The court must accept all factual allegations in a complaint as true and take them in the light most favorable to a Pro Se plaintiff.** See *Phillips v. County of Allegheny,* 515 F.3d 224, 229 (3d Cir. 2008); *Erickson v. Pardus,* 551 U.S. 89, 93 (2007).

Pro Se Plaintiff Barbara A. Ellis' ("Plaintiff" or "Ellis") states that all events and facts set forth in this Motion and all other filings **made by Ellis *once Ellis became a Pro Se litigant*** are true upon pain of criminal prosecution for perjury.

## A FORESEEABLE SECOND POINT OF ACTION

Ellis is not seeking to retry a case that ended with an adverse judgment. The Defendants intentionally violated the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDCPA") creating a foreseeable and undeniable second point of action. The Defendants are guilty and required to pay damages. Those intentional violations are inextricably entwined with their fraud on the court and are the entry point for invoking this Rule 60(d)(3) motion for fraud on the court system. Ellis has meritorious claims for the award of actual damages. See Exhibit C – Damages that arise out of fraud on the court as well as actual damages and statutory awards for violating the FCRA and FDCPA. Ellis, a Pro Se Plaintiff cites the following regarding this Pro Se Motion:

1

If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982).

Deeming Ellis' damages simply statutory would be OVERT prejudice against a disabled Pro Se Plaintiff (See Exhibit A – Ellis is Sick and Disabled) since the FCRA recognizes such information is a major tool in perpetrating crime. The tolled FDCPA claim arises as an intentionally false offer of help to a desperate homeowner in light of the Defendant's impermissible access of Ellis' credit report that was not a mass mailing accident. The Defendants attempted to get Ellis to participate in yet another false program to save her home when it was impossible without voiding the foreclosure in yet another bad faith attempt to deny a sick Ellis health care, the ability to run her business and the ability to recover the ADA compliant home she build specific to her disabilities.

## ELLIS' DISABILITY CONCEALED FROM THIS COURT

Furthermore, **the one prevailing and indisputable material fact** about Pro Se Plaintiff, Barbara Ellis, that has been kept from this Court, and is grounds for granting the relief prayed for, is that **Ellis was and continues to be afflicted with a disabling illness that may easily result in death. Add her history of disabling health concerns and Ellis' probability of death goes even higher if this**

2

**judgment stands.**  The fact that Ellis is seriously ill has shown up repeatedly in the official record, the US Bankruptcy Court and even in requests for extensions of time to file in the 6th Circuit Court.  Thus the judgment Ellis seeks to set aside is a **Manifest Injustice** that may yet result in **Ellis' death creating a Miscarriage of Justice** resulting in wrongful death claims.  This Court should grant Pro Se Plaintiff's Motion to invoke Rule Fed. R. Civ. P. 60(d)(1) because material facts warrant the use of Rule 60(d)(3) by U.S. Supreme Court direction, and social justice demands it.  Not only is disability a civil rights issue, it directly impacts the governments bottom line.

## BACKGROUND

This never was the "garden variety foreclosure lawsuit" the Defendants reasserted to the 6th Circuit Court (Case # 15-1059, Document 21, p 1).  Neither did Ellis ever state "in writing" that she *wanted* to sell her home.  As a Registered Representative (see Exhibit B – Registered Rep.)  Ellis knew that any award from a court would reopen her Pro Se Chapter 7 Bankruptcy so the only reason to sue would be to recover the home.  Hence the intentional omission of Ellis' bankruptcy. In fact, Ellis has been getting harsh treatment from what is now the largest bank in the world.  And Ellis, as a Pro Se Plaintiff, is not required to cite laws or case law and proceeds with her motion in regard to her disabilities.  Ellis cannot possibly,

3

even on a good health day, address all the statutes that are applicable and would not insult this Court in trying.

## ELLIS NEVER WANTED TO SELL

Ellis never intended to sell the property at 8293 South Huron River Drive. Having injured both knees, one in 1996 during a required college physical education class and the other in 2007 stopping her mother from falling.   Since Ellis' first knee injury occurred shortly after a full remodel of her last home (8102 S Huron River Drive),  Ellis suffered greatly due to the lack of accessibility.   As Ellis  had cared for her father who had terminal brain cancer, the family plan did not include Ellis' mother moving in or Ellis ever being a primary caregiver.

Ellis paid an extra $950 to the architects at the custom modular company to revise an existing floor plan for the site and to make the home handicap accessible with 36 inch doors, wide hallways, handicap bathrooms, etc.  That is, Ellis was planning far ahead *for herself* in the belief she would be the last child called upon to care for her mother.  And she was.

## ELLIS IS THE CAREGIVER OF LAST CHOICE

When Ellis' mother experienced a small stroke in February 2006, Ellis' sister and brother-in-law in Baltimore, Maryland offered Ellis' mother the opportunity to live with them.  Ellis' mother opted to stay close to the family farm, and as planned, initially moved in with Ellis' eldest sister and brother-in-law who had built next

4

door. But, the stroke left Ellis' mother with impulse control issues that meant she could no longer live alone and required 24 hour supervision. And it became glaringly apparent that the planned living situation was untenable for all parties. Ellis was called upon to care for her mother as the sister in Baltimore had just become pregnant after several years of trying. Hence, Ellis became the child of last resort to care for a mother who, having been CFO of the family business for over 25 years was deemed "difficult" by every rehabilitation facility she stayed in. Ellis' mother was not going to stand for being in a nursing home, her children didn't want her in one, and, until Carbon Monoxide poisoning from September 2010 to January 2, 2011 affected her severely, Ellis' mother was doing extremely well with Ellis. As stated in the 6th Circuit Appeal #15-1059, Document 44, 8293 South Huron River Drive was in no imminent danger of foreclosure. That is, Ellis having been a registered representative for a Fortune 500 not-for-profit, fraternal organization might have been a payment late due to delay in converting her mother's less liquid assets to cash being ill herself. But, if Ellis "skipped" payments, it was done under express direction and agreement with Chase. That is, Ellis resigned from her company to care for her mother and to address her own health problems while sitting out a one year non-compete agreement. Ellis' intent was to return to a financial services sector job. And, Ellis had a two year FINRA "grace" period in which to find another job without repeating her Series 7 (Broker) licensing exam.

5

## THE CHASE LOAN MODIFICATION PROCESS BEGINS

Ellis' mother was not long out of a trip to rehab when Ellis' skin started peeling off in January 2010 (See Exhibit A – Ellis is Sick). So there was a lot going on when **the Defendant's solicited Ellis** by mail with a loan modification offer. That is, Ellis was simply too busy to pursue one having a new health issue to deal with. So when it arrived, Ellis completed the forms and events transpired as described in 6th Circuit Case No. 15-1059, Doc 26, "Correction of the Record."

So, when on June 18, 2010, the Defendants received *written* notification from Ellis protesting their forced placed insurance, they investigated Ellis as large companies often do. Ellis was not an average registered representative so they accurately concluded that Ellis would, as she discussed with them, be obligated to report the issues with escrow accounts and force placed insurance errors to the authorities. In one phone conversation where Chase was reluctant to either cancel or refund the forced placement, Ellis stated that they had violated their fiduciary duty. And pointed out that, as power of attorney for her mother, Ellis was a fiduciary and aware of the rules regarding escrow accounts. Was Ellis unwise in her candor? Possibly, but again Ellis was distracted, very sick, caring for a disabled mother and totally aware that Chase's escrow increase completely wiped out any savings from the potential loan modification and it *still* wasn't finalized.

### ELLIS REALIZES SHE'S BEEN "HAD"

6

When, exactly, did Ellis discover their "mistake" on her force placed insurance was actually misconduct Chase expanded for profit? After the Sheriff's Sale Ellis worked so hard to prevent while trying to salvage what she could from a horrible situation. On or about October 10, 2013, Ellis received a notice for *Saccoccio v.* JP Morgan *Chase* Bank NA, 13-cv-21107, U.S. District Court, Southern District of Florida (Miami) seeking class action protection from Ellis for force placed insurance and escrow account misconduct. And as Ellis had refused to pay the additional cost of insurance in writing and was fully reimbursed for the overcharge by Chase in September 2010, Ellis was not a class member. The only reason to include Ellis was to eliminate any claim of error for the foreclosure. And that's when Ellis stopped trying to help the SECOND set of short sale buyers buy the property and started looking for an attorney.

## **FACTUAL BACKGROUND**

**A. THE ACCOUNT**

On August 1, 2013, on the steps of the Monroe County Courthouse, Chase conducted a Sheriff's Sale of Ellis' home. The successful bidder and purchaser of the home was JP Morgan Chase Bank. Chase's bid amount was $155,000. Those purchase proceeds were applied to Ellis' account at Chase. Application of the sale proceeds extinguished the debt Ellis owed to Chase and ended their debtor-creditor relationship with respect to the mortgage. Since the foreclosure, Chase has correctly

7

reported to credit reporting agencies that the account (starts with #156067322...) has a zero balance.

Any other debts Ellis had with Chase were discharged September 2011 through the Bankruptcy Court of the Eastern District of Michigan. Ellis alleged that Chase had illegally foreclosed and attempted to keep her home. Ellis contacted an attorney and retained Gantz Associate on February 11, 2014. Ellis had no other debtor-creditor relationship with Chase but did file a civil lawsuit in this Court against Chase contesting the foreclosure alleging fraud, misconduct, civil conspiracy and issues with foreclosure by advertisement. Notwithstanding the fact that there has been no debtor-creditor relationship between Ellis and Chase since August 1, 2013, Chase has accessed Ellis' Experian credit file of Ellis on at least these occasions:

> February 21, 2014
>
> September 12, 2014
>
> September 26, 2014

## B. THE CONSUMER, THE USER AND THE DATA REPOSITORIES

Ellis is a consumer as that term is defined by the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq* ("FCRA") at §1681a(c). Experian Information Solutions, Inc. (hereinafter referred to as "Experian") is corporation organized under the laws of the State of Ohio with its principal place of business in Allen, Texas. Experian is a "consumer reporting agency" as that term is defined in 15 U.S.C. §1681a(f). In

8

connection therewith, Experian acts as a data repository, assembling and storing information on consumers for the purpose of furnishing consumer reports to third parties.  Chase is a subscriber and user of consumer reports issued by Experian.

Chase also furnishes data about its experiences with consumers with whom it transacts business to Experian.

Chase is a furnisher of information as contemplated by the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about its transactions or experiences with any consumer.

## C. ACCESSING THE CONSUMER'S CREDIT INFORMATION

On or about February 21, 2014 Chase accessed the contents of Plaintiff's credit file from Experian.  In connection therewith, Chase made a general or specific certification to Experian that Chase sought the information because it had a legitimate business need for the information in connection with a business transaction initiated by Plaintiff or to review an account to determine whether Plaintiff continued to meet the terms of said account.

On or about September 12, 2014 Chase accessed the contents of Plaintiff's credit file from Experian. In connection therewith, Chase made a general or specific certification to Experian that Chase sought the information because it had a legitimate business need for the information in connection with a business

9

transaction initiated by Plaintiff or to review an account to determine whether Plaintiff continued to meet the terms of said account.

On or about September 26, 2014 Chase accessed the contents of Plaintiff's credit file from Experian. In connection therewith, Chase made a general or specific certification to Experian that Chase sought the information because it had a legitimate business need for the information in connection with a business transaction initiated by Plaintiff or to review an account to determine whether Plaintiff continued to meet the terms of said account.

## FAIR CREDIT REPORTING ACT – IMPERMISSIBLE ACCESS

Plaintiff hereby re-alleges and incorporates herein by this reference the allegations set forth above.  Chase is a "person" as that term is defined in 15 U.S.C. §1681a (b). The Fair Credit Reporting Act establishes very specific rules placing limitations upon an entity (or "person") seeking to obtain a consumer's credit history or the content of a consumer's credit file, as follows:

> **(f) Certain use or obtaining of information prohibited.** - A person shall not use or obtain a consumer report for any purpose unless -
> **(1)** the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
> **(2)** the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification. *See* 15 U.S.C. §1681b(f).

10

After Ellis' Chapter 7 Bankruptcy discharge on September 26, 2011 and Chase sold Ellis' home to Chase Bank and applied the proceeds to satisfy Ellis' loan, Chase had actual knowledge that it no longer had a permissible purpose to obtain Plaintiff's credit information from Experian.

When requesting Plaintiff's credit information from Experian on each of the occasions referenced herein, Chase had actual knowledge that it did not have a permissible purpose to obtain such credit information concerning Plaintiff. For Chase to repeatedly and impermissibly access the credit files of a consumer who is known by Chase to no longer have accounts constitutes willful non-compliance with the Fair Credit Reporting Act; this is especially true when Chase has before settled a class action case involving this exact same conduct. (The *Sleezer v. Chase* settlement included zero-balance closed accounts).

For Chase to impermissibly access the credit of files of Ellis a consumer who is known by Chase to no longer have accounts on those specific dates indicates a civil conspiracy to perform fraud on this Court by the Defendants. Dates listed in the *Duncan v. Chase* class action were life events, Chase accessed Ellis' consumer reports for use against Ellis in the lawsuit she filed in this US District Court.

On February 21, 2014, Chase, with no lawsuit yet filed, impermissibly accessed Ellis' credit report a full 7 days before Gantz sought the TRO to keep Ellis

11

in her home.  No billings for contact with opposing counsel were made and the earliest contact between counsels was notice of the TRO placed on 02/28/2014. Refer to the 6th Circuit Court of Appeals Case No, 15-1059, Document 41, Pp 20-22, Gantz Associates Invoice dated May 15, 2014.  The billing entries show that no one at Gantz Associates had contacted Chase or their attorneys to alert them of the pending lawsuit.  The fifth billing entry from the top of page 20 clearly shows that Ellis and Gantz had a 1.2 hour phone conversation about Ellis' case.  The accounts receivable transactions of page 22 show a $500 payment made on February 21, 2014.  And that by May 15, 2014, Ellis had paid Gantz Associates a sum total of $5,000 as a retainer.  The corresponding email dated February 21, 2014 to Adam Gantz with the subject of Retainer Check.(Exhibit E - Check) shows that Ellis had a new checking account with check number 1003 and it contained a check authorization number.  Ellis was not billed for any contact with Chase and Ellis did not contact Chase, so a civil conspiracy to perform fraud on the court existed as Chase knew *when* to access Ellis' credit report.  Access of Ellis' credit report on the same day as Ellis had emailed information about a new checking account the day after a lengthy phone conversation cannot be attributed to chance.  If the court will bear with the Plaintiff.  The statistical probability that Ellis' email occurred on the same day that Chase accessed her credit report is fairly easy to calculate by simple probability.  An event will happen is 1/n, so on one the same day it is 1 in 365.  The

12

probability that two events that are totally independent will happen(IE not related) is calculated by multiplying the two probabilities, that is 1/n x 1/n.  That is, the probability that two completely unrelated events will happen on the same day is (1/365) x (1/365) which equals 1 in 133,225, which is 0.00075 of one percent.  If the court wishes Ellis to calculate the probability of the phone call,  as a totally unrelated event, to multiply against that 0.00075 of a percent probability,  Ellis will use Bayes theorem.  But an estimate of the range suffices.  That is, even if the statistical probability that Chase accessed Ellis credit report independently were excellent, say 1 out of 2.  The net effect on the overall probabilities would be (1 / 2 ) x (1/ 133, 225).  Which erases all  doubt that the actions in that 2 day period could be unrelated to 1/266450  whereas 1/10 yields a probability of 1/1,332, 2250. Simple statistical certainty that Chase "somehow knew" to check Ellis' credit report stays above 99 percent however you calculate the third event because it's so unlikely to begin with.

So, how would Chase "know" to check Ellis' credit report on that particular day?

 **Phone Tap and Internet Hacking**– the events that unfolded support that Ellis was hacked and phone tapped.  Easy to do, hard to prove, even harder to prosecute.

**Someone at Gantz Associates** was working against Ellis for the Defendants.  Again meets the criteria of civil conspiracy with more facts supporting below.

**Both.**  And the most likely choice.

13

Ellis contends that the Defendants used any means necessary. Having already broken multiple laws, the logical act would be to enlist at least one of Ellis' attorneys. Consider the record of events in light of a conspiracy to defraud the court rather than simple legal malpractice even given the prejudicial track record the Defendants presented to this Court in Doc 4-1 as an exhibit for their motion to dismiss.

At this point, Ellis must temporarily depart from the analysis to beg this court to remember that Ellis is a PRO SE litigant and as such, she is not required to state laws or cases as much as how she was wronged by the Defendants. Ellis has proven Chase is guilty of much more than violating the FCRA, where Ellis is concerned.

> A "court errs if the court dismisses a pro se litigant without instruction of how pleadings are deficient and how to repair pleadings." B. Platsky v CIA, 953.F.2d 25, 26, 28 (2nd Cir. 1991).

And that this Court certainly has better discernment as to which statutes best serve the public interest than Ellis. And, given that Ellis has just shown damages of at least $5,000 and incontrovertible proof of guilt in breaking the FCRA and conspiracy to defraud the court system there are many from which to choose. Ellis must only pursue the civil rights aspect as Ellis is sick and can no longer afford the time the court system takes to render decisions. It will likely kill or at least endanger Ellis. Consider that Ellis had no financial incentive to pursue this lawsuit

14

in the first place, as her Chapter 7 bankruptcy for medical reasons would be reopened to pay creditors. Hence Ellis had to have more important reasons to pursue this action through every possible action that could be taken. That is, Ellis does not want to keep her house, Ellis needs to keep her house.

As there are grounds for multiple separate actions, an award of actual damages will still render Manifest Injustice since Ellis has lost her ADA compliant home, her means of income and it puts her life in imminent danger as the Defendants have cost her precious time and medical attention from the initial loan modification onward.

From that lack of medical care, Ellis' health is worse now than it was in 2010 and it was completely avoidable given proper medical intervention. Forcing Ellis to risk her life moving and giving up the source of income prevents Ellis from buying even over the counter medications for pallative care is a Manifest Injustice. As the Defendants were successful in their conspiracy, the likely result will be Ellis' death and a Miscarriage of Justice.

And, even if Ellis was well enough to leave her home to seek the services of legal aid at the Legal Services of South Central Michigan that serves Monroe County, the provider of Pro Bono legal services there is Dykema Gossett, counsel for the Defendants. As the statutory claim requires at least a hearing, a new action would require yet another attorney who will certainly pursue every possible avenue.

15

Ellis is sick, Pro Se, and relies on this Court to promote the good of the general public, while Ellis has no choice but pursue the civil rights aspect of denying a person with disabilities that which they need to merely survive, much less thrive. So Ellis will finish the FCRA analysis and introduce a FDCPA claim.

On September 5, 2014, Gantz finally contacted Ellis regarding this lawsuit and wanted to know on what terms Ellis would accept "cash for keys." Knowing that arranging a similar living situation specific to her health and disabilities would be difficult, Ellis quoted a necessarily high number. As first, any cash settlement would go to Ellis' creditors as the US Bankruptcy Court would reopen her file and then Ellis would have to locate housing. That is, Ellis was desperate to keep her home and the Defendants knew this. So Gantz attempted to negotiate terms better than the $5,000 cash for keys. Ellis can plainly state that Chase does not negotiate as negotiation requires more than one offer to actually be a negotiation.

On or around September 6, 2014 to September 12, 2014, Gantz was, in theory, negotiating for a potential settlement with Chase. After Ellis refused the one and only offer of $5,000 within that time frame. On September 12, 2014, Chase, with no settlement from Ellis, impermissibly accessed Ellis' credit report.

On or about September 23, 2014, Chase, knowing that Ellis desperately needed to keep her home mailed a letter directly to Ellis from their Glendale, CO offices that made a false offer of mortgage assistance. See 6th Circuit Court of

16

Appeals Case No, 15-1059, **Document 41, Pp 27-28**. And Chase, refusing to

actually negotiate a settlement with Ellis' attorney did intentionally violate the:

**Fair Debt Collection Practices Act**

Communication in connection with debt collection 15 U.S. Code § 1692c(a)(2)

Ellis is allegedly a "consumer" as that term is defined in 15 U.S.C. §1692(3).

Chase is a "creditor" as that term is defined in 15 U.S.C. §1692a(4)

The mortgage is allegedly "debt" as that term is defined in 15 U.S.C. §1692a(5)

Chase is a "debt collector" a that term is defined 15 U.S.C. §1692a(6)

The Fair Debt Collections Practice Act establishes very specific rules placing

limitations upon a debt collector regarding communications with a consumer:

> (a)Communication with the consumer generally
> Without the prior consent of the consumer given directly to the debt collector or the
> express permission of a court of competent jurisdiction, a debt collector may not
> communicate with a consumer in connection with the collection of any debt—
> …..
>
> (2)if the debt collector knows the consumer is represented by an attorney with
> respect to such debt and has knowledge of, or can readily ascertain, such attorney's
> name and address, unless the attorney fails to respond within a reasonable period of
> time to a communication from the debt collector or unless the attorney consents to
> direct communication with the consumer; or
> (c) **Ceasing communication** If a consumer notifies a debt collector in writing that
> the consumer refuses to pay a debt or that the consumer wishes the debt collector to
> cease further communication with the consumer, the debt collector shall not
> communicate further with the consumer with respect to such debt, except—
> (1) to advise the consumer that the debt collector's further efforts are being
> terminated;
> (2) to notify the consumer that the debt collector or creditor may invoke specified
> remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.
If such notice from the consumer is made by mail, notification shall be complete upon receipt.

Although the statute of limitations is one year from the incident, Ellis cites:

> "Equitable tolling may be applied if, despite all due diligence, **a plaintiff is unable to obtain vital information bearing on the existence of his claim.**" *Santa Maria v. Pacific Bell,* 202 F.3d 1170, 1178 (9th Cir. 2000).

That is, the true intent of the letter did not become clear to Ellis until it was viewed in context of the newly discovered impermissible access of Ellis' credit report. That is the *mens rea,* presence of fraud on the Court and bad faith for which Ellis motioned the 6th Circuit Court to sanction both the Defendants and Counsel. See 6th Circuit Court of Appeals Case No, 15-1059, Document 25-1, p 2. No. 1-4.

On or before September 26, 2014, as soon as Ellis received the letter from Chase, she called Gantz Associates and read it to Josh Joseph over the phone. Josh told Ellis not to worry about the letter and that he would tell Gantz. Ellis filed the letter with the rest of her paperwork and forgot about it.

On September 26, 2014, Chase, impermissibly accessed Ellis' credit report either to understand why Ellis had an offer of mortgage assistance as Ellis read the letter over the phone or to confirm their course of action in their conspiracy to either defraud this Court or trick Ellis out of her lawsuit

## STANDING

18

Ellis opted out of the *Duncan v. Chase* Class Action on March 21, 2016 via priority mail with tracking.  See Exhibit D- Ellis Opted Out preserving her claim of error on the FCRA for 2 years, the tolled FDCPA for 1 year, the conspiracy of fraud on the court for six years and actual fraud on the court is not subject to a statute of limitations under Fed. R. Civ. P. Rule 60(b)(6) and 60(d)(1) &(3)  There is no time bar for these rules.

As a direct and proximate result of Chase's willful conduct as outlined above, Ellis is entitled to actual damages, plus punitive damages and reasonable attorney fees together with the costs of this action as provided by 15 U.S.C. §1681n & 15 U.S.C. §1692k.  Ellis has lost at least $5,000 in attorney fees so the actual and punitive damages must arise from this Court's determination as to which course of action best serves public interests.  Again Ellis is a Pro Se litigant.

The U.S. Supreme Court ruled decades ago that separate actions are to be only pursued if no rule from the first action is available for relief.  And the 6th Circuit has seconded as every petition for a second action must be considered in light of *Daoud v. De L'eau* , 455 Mich. 181; 565 NW2d 639 (1997), clearly:

> Indeed, one can paraphrase the last sentences of the opinions of Justice BOYLE, 444 Mich. at 179, 507 N.W.2d 194, and of Justice RILEY, 44. Mich. at 183, 507 N.W.2d 194, in this manner:  Where statutes and court rules provide effective means for dealing with a judgment fraudulently obtained through perjury, it is neither sound law nor sound policy to permit a separate cause of action for fraud.

19

And, Rule 60(b)(6) ANY OTHER REASON THAT JUSTIFIES RELIEF does just that, as to the FCRA Rules of Construction, they state an action may be taken but nowhere does it dictate it be a separate action. So it is sound law and sound policy to make this Motion under Court rules. Consider a new action. It will add many additional Defendants to be named and possibly stripped off in the fraud and conspiracy analysis. Meanwhile, Ellis is sick and struggling to just get this Motion filed. Ellis cites *Picking v. Pennsylvania Railway,* 151 F.2d. 240, Third Circuit Court of Appeals:

> The plaintiff's civil rights pleading was 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe Plaintiff's Pleadings without regard to technicalities.

The fraud on the court combined with Ellis' illness prevented any Court from seeing that Chase moved Ellis from a loan modification that was complete into applying for a HAMP modification she would never get because Chase had already reduced the principal by $110,000. While Ellis is grateful for a reduction, in January 2011, Ellis mother was still alive and Ells was exiting Chase's bankruptcy process. But for Chase's total misrepresentation of their version of the HAMP program, Ellis lost EVERYTHING for want of ONE ~$3,500 house payment that would have been made by her sisters if necessary. (See Exhibit E – Check for the correspondence.) Unaware that that Chase had no qualms about making not one but two disabled

20

women who needed their ADA compliant home homeless.  For standing, Ellis cites
*Elsheick v. Select Portfolio Servicing,* No. 13-2100 (6th Cir. 2014):

> Not only did Elsheik establish Article II standing in this case, he also
> established standing under Michigan Law which requires only that a litigant
> identify a "legal cause of action." Lansing Schs. Educ. Ass'n v. Lansing Bd.
> Of Educ.(792 N.W.2d 686, 699 (Mich 2010).

Elsheik lost because he failed to request his case be moved to a judicial
foreclosure and didn't state the particular harm he would experience from losing it.

Not the case here as Ellis requests that if this Court is unable to use this path
to void her foreclosure then Ellis requests that it be moved to a judicial foreclosure,
if the award for Chase's guilt isn't sufficient to save Ellis' ADA compliant home.

And since the FCRA and FDCPA were violated and are inextricably
intertwined with fraud on the Courts.  While this is a "rules" motion, since the
standard the Sixth Circuit has announced for independent actions requires conduct:

**1. On the part of an officer of the court;** Under the proven conspiracy of fraud
proven, trace through the actions and events in 6th Circuit Court of Appeals Case No,
15-1059, Document 26, Pp 3-28, Correction of the Record.  Buonodono gave
Trapnell control of the Case Statement, Ellis had to ask and received a rough draft
after the fact.  Ellis could not have altered this course of events even had Ellis been

21

well enough to represent herself (she wasn't).  Neither was Ellis able to find or fund a new attorney (she tried) and legal aid and pro bono for Ellis' county was provided by opposing counsel.  Despite specific requests for a bill, Gantz never gave her another billing invoice that would demonstrate what transpired from May 15, 2014.  Three days before Buonodono filed the Case Statement on May 18 2014 and quit.

Gantz would not appeal until Ellis sent him, as her attorney, a copy of her HUD complaint alleging disabilities and obstruction of justice.  After filing appeal without any billing for Ellis to work off, Gantz dropped Ellis into the middle of the appeal, sick, unprepared and with little ability to defend her ADA home.

**2. That is directed to the judicial machinery itself;**  Ellis preserved her FCRA claim statistically proved the impermissible access of her credit report was intentional and that a conspiracy had to exist in this case from start to finish.  Ellis cites her 6th Circuit case No. 15-1059 in it's entirety.  While in the 6th Circuit disparaging Ellis, the Defendants defrauded the US District Court of the Western District of Texas by misrepresenting Ellis as a class member to seeking class action protection against her for proof of their conspiracy and fraud.

**3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth;**  Read all of the above, and again, read both cases in light of the omitted fact that Ellis is very ill, her mother was disabled, there was a bankruptcy for illness and every lawyer claims that a highly ethical registered

22

representative is just not paying her bills.  And this court judged without any of those material facts.

**4. That is a positive averment or is concealment when one is under a duty to disclose**; Failure to accommodate is a violation of Ellis civil rights and requires disclosure.  So too did the Defendants answers to the Motion to Sanction.. See below for an analysis of how Michigan Law supports this position.

**5. That deceives the court.**   After every possible act to save herself, Ellis is here writing this motion.  What is more heinous than denying any person their day in court?  Using the civil court system to legally kill someone.  Ellis cites:

> *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) This standard recognizes that fraud upon the court, unlike perjury, need not be based on affirmative misstatements, but may be based on non-disclosures, and need not be based on proof of subjective knowledge of falsity, but may be founded on a showing of willful blindness or reckless disregard for the truth.

Having constructed that the Defendants did break the law, then perjure themselves to the 6th District regarding sanctions, the actual fraud that worked it's way through this Court was that opposing counsel took the statement of the case to Judge Michelson into THEIR OWN hands and was silent about Ellis' illness (denying her accommodation in the 6th Circuit and risking her life), her bankruptcy, damage to her current prospective job opportunities and reputation.  Given that the material facts do not and never have pointed to a "garden variety" lawsuit.

23

Defendant's then pointed to Ellis' attorney misdeeds IN YET ANOTHER COURT as proof that Ellis was trying to "foment" a lawsuit, when upon review of material facts, Defendants displayed reckless disregard for Ellis' debilitating illness.

Having established the Defendants are *de facto* guilty under the FCRA and have met the 6th Circuit's 5 elements of a separate action that may be taken under Rule 60(d)(1) nevertheless, *Daoud v. De L'eau* is the standard for using a Rule 60 parameter instead of a separate action.  And Michigan Law applies.

Relief using Rule 60(b)(6) is justified in that here it is the most effective way to award of damages for the court, the plaintiff and society in general.  It is efficient and effective.  And Michigan Law bars this US District court from a summary judgment of Ellis Motion to invoke Rule 60(d)(1):

> *Maiden v Rozwood*, 461 Mich. 109, 118; 597 N.W.2d 817 (1999). A motion under
> MCR 2.116(C)(8) tests the legal sufficiency of a complaint by the pleadings alone.
> *Maiden*, 461 Mich at 119-120. "A motion under MCR 2.116(C)(8) may be granted
> only where the claims alleged are so clearly unenforceable as a matter of law that no
> factual development could possibly justify recovery." *Maiden*, 461 Mich at 119
> (citation and internal quotation marks omitted).

Not so here.  As the Defendants are guilty.  See Exhibit F – Disability for this Pro Se Plaintiff's DISABLITY ARGUMENT.  As Ellis still has no idea how to consistently qualify as "disabled," to any Court, Ellis' legal theory is to extend an existing civil rights precedent to qualifying persons with

24

disabilities, especially younger workers that may have a disability "span"

where a permanent ruling is bad for all.

Thus the Pro Se Plaintiff begs this court to provide relief under Rule 60(b)(6)

or Rule 60(d)(3) whichever this Court deems the expeditious rule for providing

appropriate relief to a disabled Plaintiff.

WHEREFORE, the Pro Se Plaintiff respectfully requests that the Court grant

the Motion, set aside the judgment, void the Sheriff's Sale, award actual damages

and grant such other relief in favor of the Pro Se Plaintiff, and against the

Defendants *et. al.*, as the Court deems appropriate. ADD NEGLIGENT!!!

Respectfully submitted:

Date: June 20, 2016          By:    Barbara A. Ellis
                                    PRO SE Appellant
                                    8293 South Huron River Drive
                                    Rockwood, MI 48179

25

# EXHIBIT A

## ELLIS IS SICK AND DISABLED

(See ELLIS IS SICK AND DISABLED PICTURE EXHIBITS for proof of these facts.)

Ellis, is, indeed currently sick and fighting a chronic infection and possibly meningitis. More importantly to this Court, Ellis has been disabled, by most every legal definition, since at least January 2010. That is, Ellis, according to 42 U.S. Code § Definition of Disability has been solidly fighting disabilities since she was born. That is, as picture clearly show, Ellis has NOT had six months where she wasn't either fighting an infection or a large shedding necrotic wound.

Ellis furthermore submits that perhaps, given that the ADA merely uses skin (and underlying condition to evaluate disability) that this Court consider that the military has had a high incidence of Pilonidal Sinus Diseases as the trauma from riding in some of their transport vehicles cause the issue. Fact is, the US Military ranks the infection at 10 percent and the SCAR by surface area. Given that the vast majority of pain from this chronic wound has been the scar bed (or as the pictures show) all the detritus in it feeling like your flesh is being sheared off, may be the most valid input within the regular court system. Particularly since there are approximately 8 million cases in the USA today, half of which have no idea (similar to Ellis) that they suffer from a chronic infection. See "The Gluteus Maximus Muscle" p 2, "Pathology."

1

That is, rather than try and track every sinus that breaks through the skin as they heal and break through again right next to the scar, that the military evaluation is under 38 CFR 4.118 – Schedule of ratings would rate Ellis at 10 percent for the chronic infections and 30 percent for a full depth scar that yaks up 80 square inches of her body. And the benefit of that is that while Ellis was trying to get some relief using laser scar therapy at Absolute Skin and Body in Novi, Michigan in the gap that the attached pictures show – the disability need not be permanent.

Unfortunately, in Ellis' case, laser therapy was excruciating, it did improve the surface of the scar but failed to vaporize the mass of hair underneath.

It is far simpler to assess what happened regarding Ellis' health after the fact. But in January of 2010, Ellis had no idea why a little spot that started peeling ended up as large as an 8×10 piece of paper (see 6th Circ. Case No. 15-1059, Doc 26, p 46, para 3).

Ellis is an atypical case of Chronic Pilonidal Sinus Syndrome. In that the only "factor" in Ellis' case is that it initiated from trauma and then anemia from another health issue. That is, after Ellis had completely remodeled her home at 8102 South Huron River Drive and moved in, Ellis came down the brand new oak staircase in stocking feet. The last step was freshly varnished and slippery, both feet went out from Ellis' body and she landed on her tail bone – HARD.

2

As worrisome as that situation might seem, Ellis was actually much busier dealing with the fact that her mother exited a trip to rehabilitation with pressure sores.  Ellis only knew to start taking digital pictures of her own necrotic tissue because she did so to monitor her mother's progress.  And since healing pressure sores requires turning the patient every two hours, keeping the wound clean and dry, Ellis was busy when Chase solicited her for a loan modification.

Since Ellis had been through at least 6 loan modification applications and countless phone calls with Chase representatives,  this is not the first time Chase was informed of the problem, it's being used for the size

And at this point, JP Morgan Chase does not inform Ellis that she can't possibly get the HAMP modification for which they are taking her information. And Ellis COULD HAVE brought the loan current for ~$3,500 to $4,500 post bankruptcy depending upon which conflicting statement the Court cares to use. (See Exhibit E – "Check" for the conflicting correspondence and offer of a HAMP modification)  Why, because as stated, Ellis had two sisters to call IF she had know she needed to bring the mortgage current.  Chase would like this Court to believe that Ellis was between a rock an a hard place when in actuality Chase intentionally defrauded over disability by letting Ellis believe she could get a HAMP modification.  Bear in mind at this point, nothing has substantially changed in

3

FINANCES regarding Ellis' income since Chase solicited the loan modification last year. Instead of informing Ellis as to the real status of her mortgage, Chase ultimately decided to foreclose the home in spite of the fact that TWO DISABLED WOMEN were living there with sufficient income to pay the mortgage.

As for Ellis' other health concerns, as mentioned in 6th Circuit Case # 15-1059, Doc 44-1, Ellis suffers from anaphylactic shock regarding Mosquito and possibly other bug bites. While this sounds rare, at least it WAS rare when it first happened to Ellis, the medical community has actually named it Skeeter Syndrome. Basically, it's a severe reaction to mosquito saliva See attached "Take a Bite Out of Mosquito Stings, "Skeeter Syndrome – Mosquito Bite Allergy "and Ellis' last prescriptions for her Epi-Pen and Medrol dose pack. Albeit her prescriptions are expired as are most people's who no longer have health care and are forced to gamble that their Epi-Pen is going to work if they need it. As there is already of plethora of photos in this Exhibit, Ellis points this Court to the DropBox link she's supplied. Ellis will upload the photo of Ellis about 12 hours before she went to emergency. Before and after pictures show Ellis at the James Leering Estate near Miami with a perfectly flat stomach (having worked all year to fit in her wedding gown) and then, similar to the inflammation Ellis is currently experiencing, Ellis clearly shows a large welt on her upper left thigh and she is

4

clearly "puffy"."

And finally for brevity with this Court, as Ellis' Gluteus Maximus muscle is devastated and she already has injured BOTH knees, again as referenced in the 6th Circuit filings – weak glutes injure knees. Refer to the attached "Gluteal Knee Connection." Ellis has been fighting various forms of disability all of her life and it's not that Ellis wants her house as much as NEEDS her house to keep going.

That the Defendants had schemes to profit off of persons with disabilities is becoming abundantly clear. Ellis leaves this Court to review the real record, not the one the Defendant's forced onto this Court to avoid their liability.

5

# Dynamic Chiropractic

THE CHIROPRACTIC NEWS SOURCE

## The Gluteal-Knee Connection

By William E. Morgan, DC and Amin Javid, DC

The underlying causes of knee pain and dysfunction are rarely isolated to the knee. The knee is a relatively stable joint with limited intrinsic ability to adapt to aberrant motion. Usually when there is a problem with the knee, it originates in the foot / ankle complex or the hip region. The foot and the hip have the ability to adapt and accommodate to changes in gait, terrain and directional forces much better than the knee.

In our last article, we shared how the gluteal muscles contribute to hip extension and the transference of motion and power to the leg through the knee in a sagittal (flexion / extension motion) plane. In this installment, let's discuss how the gluteus maximus (GM) muscle also affects the transverse (internal and external rotational) planes of motion of the lower extremities.

Keep in mind that although we are emphasizing the gluteal muscles and knee, it is our intent to convey the overall interconnectedness of the body. The lower extremity is an aggregate of many structures that work together to produce locomotion.

**Anatomy and Function of the Gluteus Maximus**



**Figure 1:** Schematic of the gluteus maximus. The

medial-to-lateral and obliquely superior-to-inferior orientation of the gluteus maximus results in this muscle extending and externally rotating the hip. The gluteus maximus muscle originates medially from the posterior ilium along the gluteal line and the posterior third of the iliac crest, the sacrum, the sacrotuberous ligament and the coccyx. **(Figure 1)** One quarter of it inserts into the gluteal tuberosity of the femur, and the remaining three quarters into the iliotibial band (which inserts into the anterior portion of the lateral condyle of the tibia at Gerdy's tubercle).

The action / function of the GM is to extend and externally rotate the hip. The GM also assists in maintaining the knee in extension due to its connection to the anterior portion of the tibia via the iliotibial band.

**Weak Gluteus Maximus Muscles and Genu Valgus**

Since the primary function of the GM is to externally rotate and extend the knee, a weak or inhibited GM can result in internal rotation of the femur, placing the knee into genu valgus. **(Figure 2)** This genu valgus position greatly increases the likelihood of an anterior cruciate ligament (ACL) injury.

When athletes fatigue, their gait degrades. If you watch an endurance runner at the beginning of a long race, their gait usually will look better than at the end of the race. This concept can also be applied to other sports and activities. As the muscles fatigue, both the gait and general athletic performance degrade.[1-4]



**Figure 2:** Gluteus maximus weakness creates a cascade of events that increases the likelihood of injury. GM weakness causes a contralateral pelvic lowering, ipsilateral internal rotation of the femur, which results in a valgus position of the knee and compensatory hyperpronation. In regard to the GM, as the athlete fatigues, the knee is more likely to internally rotate. This shift creates the appearance of genu valgus and increases the likelihood of injury, particularly ACL injury. Fatigued athletes are more likely to injure their knees than fresh athletes. [5]

Multiple elements contribute to the degradation of athletic form resulting from fatigue. Not only does local muscle fatigue contribute to increased risk of injury, but also metabolic fatigue, aerobic fatigue, and fatigue of the central and peripheral nervous systems. [6]

Fatigue has been cited in contributing to or causing a lag in neuromuscular activation, [7] reduced coordination, [8] diminished balance [9] and impeded muscle force. [10-11] Studies have also shown increased electromyography (EMG) activity of the quadriceps and hamstrings as the GM fatigues. [12] As a result, optimal performance patterns are substituted with suboptimal motion patterns that are more likely to contribute to injury.

Conditioning for strength and endurance is important to athletes, but so is managing rest and play time. Weekend-long tournaments, in which athletes play one game after another, will yield high rates of ACL injuries as fatigue takes its toll. Coaches must rotate players in and out of games to ensure athletic fatigue does not contribute to injury.



**Figure 3:** The Q angle (quadriceps angle) is the angle formed by the intersection of two lines: the line from the middle of the patella to the anterior superior iliac spine (ASIS) and a line from the tibial tubercle through the middle of the tubercle. **Special Considerations: The Female Athlete**

Women are much more prone to knee injuries than men. In fact, depending on the research, women athletes are two to nine times more likely to have an ACL rupture than their male counterparts.[13] The real questions are why and what we do about it.

There has been much written about this subject, and there are several theories, but no one reason has been able to fully explain this phenomenon. Some of the possible causes include the wider Q angle (between the pelvis and the femur) found in women due to the fact that they have a wider pelvis. **(Figure 3)** Other factors unique to women are increased laxity of ligaments, slower reflex time, weaker hamstrings (in relationship to

the quadriceps), hormonal effects of estrogen on the strength of the ACL, smaller ACL and intercondylar notch, and poor landing technique when leaping.

**Determining If a Patient Has GM Weakness and/or Inhibition**

One factor that can be easily identified and managed is GM weakness. Identifying gluteal weakness requires developing a keen eye for internal knee rotation and the appearance of a valgus migration during functional motion. Manual muscle testing may be used to grade more overt weakness, but gait analysis and observation of the patient moving through more functional motor patterns are better methods for identifying more subtle gluteal weakness patterns.

Observing a patient perform single-leg squats can reveal the subtle signs of a weak GM. **(Figure 4)** The weight-bearing leg should remain stable and straight as the patient descends. If the knee migrates medially into a valgus position, this is an indication of GM weakness. A variation of this test is to observe the patient descending stairs, again observing for medial migration of the knee.



**Figure 4:** Testing for gluteus maximus weakness. Clinical testing of the GM can be done by having the patient perform a one-leg squat or hop or by watching the patient descend stairs. The knee should track down straight in alignment with the tibia and femur (left image). If the knee migrates medially (right image), it indicates a motion pattern fault and likely a weak gluteus maximus. A more rigorous evaluation intended for athletes may include squat jumping (repeated jumping and landing into a deep squat). If the knees approximate, it is indicative of weak GM. Some doctors will even analyze the patient while performing single-leg hops or box jumping.

The use of video recording with **performance-analysis software** can aid the doctor in analyzing these motion patterns. If the athlete lands or jumps with **valgus migration of the knees**, the athlete should be coached in motion patterns that avoid genu valgus and **internal hip rotation**. They should also be instructed in a specific program of GM strengthening.

The advent of coaching, sports **performance and analysis software**, and mobile device applications has made it easy to record video of functional motions such as running, descending stairs, jumping and squatting. Using frame-by-frame playback **to look for medial migration of the knee** allows a clear view into a patient's motion patterns.

Many of these video applications come with **line-drawing-analysis tools**. This technology allows for video to be taken on the sports field or other locations and sent to doctors for analysis.

ion. Frequently, we look to activate and strengthen the gluteal muscles to reduce unhealthy motion patterns and stresses from the knee.

### Management Tactics

Determining appropriate management of a patient with GM weakness is dependent upon how far along the patient is in their rehabilitation. **An athlete with no overt injury wishing to increase athletic power will start at a higher level of training than a patient recovering from injury.** Nonetheless, when considering an athlete, we need to prepare for the **higher rate of knee injury that accompanies fatigue and weakness** by conditioning the GM for endurance and strength.

For athletes who are intent on **improving performance versus rehabilitating from a state of infirmity**, we like to include **weighted squats with elastic-band tubing around the distal thigh**, just above the knee. This provides a gentle stimulus and tactile cue that helps them to activate their GM during this motion. Other exercises that may enhance GM activation include hip thrusters from a supine bridge, lunges, kettlebell swings and squats, and box jumping.

A less intense method of exercise would use exercise tubing around the legs, just above the knees, and exercising in a partial squat with the GM activated by **abduction and mild external rotation**. Additionally,

"monster" walks, side walking, partial squats, and hip thrusts will stimulate and strengthen the GM. Patients unable to tolerate these exercises may begin with side-lying "clams" and progress through the track.

In addition to conditioning the GM with the intent to increase strength and endurance, aberrant motion patterns should be corrected with technical motion training. This would involve training patients how to properly squat, how to activate the GM while descending stairs, and how to perform other activities of daily living. For athletes, this would include coaching in running, jumping and agility components of their particular sport. A strong GM plays a protective role in the knee and will increase power in both athletes and the general population.

*Resources*

- McLean SG, Felin RE, Suedekum N, et al. Impact of fatigue on gender-based high-risk landing strategies. *Med Sci Sports Exerc*, 2007;39:502-514.
- Gabbett TJ. Incidence of injury in amateur rugby league sevens. *Br J Sports Med*, 2002;36:23-26.
- Rahnama N, Reilly T, Lees A. Injury risk associated with playing actions during competitive soccer. *Br J Sports Med*, 2002;36:354–359.
- Murtaugh K. Injury patterns among female field hockey players. *Med Sci Sports Exerc*, 2001;33:201-207.
- Ortiz A, Olson SL, et al. Fatigue effects on knee joint stability during two jump tasks in women. *J Strength Cond Res*, Apr 2010;24(4):1019-1027.
- Kent-Braun JA. Central and peripheral contributions to muscle fatigue in humans during sustained maximal effort. *Eur J Appl Physiol Occup Physiol*, 1999;80:57-63.
- Chappell JD, Herman DC, Knight BS, et al. Effect of fatigue on knee kinetics and kinematics in stop-jump tasks. *Am J Sports Med*, 2005;33:1022-1029.
- Coventry E, O'Connor KM, Hart BA, et al. The effect of lower extremity fatigue on shock attenuation during single-leg landing. *Clin Biomech*, 2006;21:1090-1097.
- Greig M, Wlker-Johnson C. The influence of soccer-specific fatigue on functional stability. *Phys Ther in Sport*, 2007;8:185-190.
- Rodacki AL, Fowler NE, Bennett SJ. Vertical jump coordination: fatigue effects. *Med Sci Sports Exerc*, 2002;34:105-116.
- Ronglan L, Raastad T, Borgesen A. Neuromuscular fatigue and recovery in elite female handball

players. *Scand J Med Sci Sports*, 2005;16:267-273.

- Orishimo KF, Kremenic IJ. Effect of fatigue on single-leg hop landing biomechanics. *J Appl Biomech*. 2006;22:245-254.

- Prodromos CC, Han Y, Rogowski J, et al. A meta-analysis of the incidence of anterior cruciate ligament tears as a function of gender, sport, and a knee injury-reduction regimen. *Arthroscopy*. 2007;23(12):1320-1325.

---

*Editor's note:* This article is a continuation of the discussion of the knee that began in the June 15 issue with "The Amazing Four-Bar Mechanism," and part of an ongoing series on chiropractic management of lower extremity conditions.

---

**Dr. William Morgan,** is credentialed at Bethesda's Walter Reed National Military Medical Center. He serves as a chiropractic consultant to various U.S. government executive health clinics in Washington, D.C., and is the team chiropractor for the U.S. Naval Academy's football team. He can be contacted through his website. www.drmorgan.info. His online courses are available through http://healthpatheducation.com/morgan.

**Dr. Amin Javid** attended the University of California, San Diego, and then earned his doctorate in chiropractic medicine. He currently works with leading figures in health care and biomechanical research, and is a medical illustrator for various physicians and organizations worldwide. Contact him through his website or directly via email at amin@medsketch.com.

Page printed from:

http://www.dynamicchiropractic.com/mpacms/dc/article.php?id=57095&no_paginate=true&p_friendly=true&no_b=true


American Academy of
**Allergy Asthma & Immunology**

# TAKE A BITE OUT OF MOSQUITO STINGS

*This article has been reviewed by Thanai Pongdee, MD, FAAAAI*



While mosquitoes can carry blood-borne diseases like malaria, West Nile encephalitis and dengue fever, it is the aggravating bite that gives them their notoriety.

Only female mosquitoes bite. Heat, light, sweat, body odor, lactic acid and carbon dioxide attract the female mosquito to skin. She inserts the tip of her mouth into a tiny blood vessel, injects her saliva into your bloodstream and then sucks your blood.

Contact must last at least six seconds in order for a reaction to occur. Chemicals in mosquito saliva prevent blood from clotting and evoke a response that causes localized redness, swelling and itching.

A mosquito bite can cause a variety of reactions. People who have never been bitten before (primarily young children) may not react at all. Thereafter, most of us develop a tiny, itchy red bump that appears hours to days after they have been bitten and may last a few days.

However, some people have more serious reactions like blistering lesions or larger hives accompanied by fever and joint swelling. At its worst, a mosquito bite can cause anaphylaxis (an-a-fi-LAK-sis), a potentially life-threatening condition characterized by throat swelling, generalized hives, faintness or wheezing. This reaction is rarely caused by mosquitoes and is more commonly associated with other stinging insects. If you have experienced anaphylaxis, consider consulting an allergy/immunology specialist, who can help determine the cause. Carry autoinjectable epinephrine if you have been diagnosed with stinging insect anaphylaxis.

**Treatment Tips**

If you develop anaphylactic symptoms, seek emergency medical treatment.

If your reaction is localized, try these treatments to relieve symptoms:

˘   Elevate the affected area and apply ice to reduce swelling and pain.

- Apply over-the-counter lotion to the affected area.
- Clean blisters with soap and water without breaking them.
- If itching persists, try topical steroids or oral antihistamines.
- Consult a physician if the swelling progresses or the area appears infected.

**Avoiding Mosquitoes**

These pests may seem impossible to avoid, but there are steps you can take to reduce your chance of a mosquito bite.

Stay indoors as much as possible from dusk to dawn µ peak mosquito time.

During the day, avoid standing near calm, shaded, humid areas and avoid pools of standing water. These are popular places for mosquitoes to hang out.

What you wear can attract mosquitoes. Avoid bright clothing and heavy perfumes. Wear clothing that covers most of your skin to minimize the chance for mosquitoes to bite.

Use insect repellents containing DEET. Read the label of your repellent carefully. DEET will often be listed under the active ingredients as N, N-diethyl-meta-toluamide. Products with 6 to 25% DEET should provide two to six hours of protection. Repellents can cause side effects, including eye irritation, dry skin, rash and possible allergic reaction. Before applying to your entire body, test the repellent on a small area of your skin. Use the lowest concentration that is effective for you and reapply as needed.

**Find out more about stinging insect allergies.**

555 East Wells Street Suite 1100, Milwaukee, WI 53202-3823  |  (414) 272-6071  |

Medical content developed and reviewed by the leading experts in allergy, asthma and immunology.

© 2016 American Academy of Allergy, Asthma & Immunology. All Rights Reserved.



Phone: (734) 675-0656
20645 GIBRALTAR RD.
BROWNSTOWN TWP. MI 48183
Store# 01800708

M CHARTIER DO

RX# 6718308

Barbara Ellis
Use as directed

EPIPEN AUTO INJ 0.3MG
( EPINEPHRINE )
Mfg. DEY LABS  Discard by 12/04/09
RPH: Billy J. Smith
DATE: 12/05/08
No Refill Available

Orig: 12/05/08
QTY: 2

CAUTION: FEDERAL LAW PROHIBITS THE TRANSFER OF THIS DRUG TO
ANY PERSON OTHER THAN THE PATIENT FOR WHICH IT WAS PRESCRIBED

ablet contains 4 mg of methylprednisolone, USP.

[ature].

Color: WHITE    Shape: OVAL
Imprint: TL 001

PHONE: (734)675-0656
STORE: 01800708
20645 GIBRALTAR RD
BROWNSTOWN   MI 48183
M CHARTIER
DATE: 12/04/2009
WRITTEN: 12/04/2009

RX# 6816597

BARBARA ELLIS

TAKE AS DIRECTED - PER PACKAGE
INSTRUCTIONS

METHYLPREDNISOLONE 4 MG DOSEPK
Generic for: MEDROL  4 MG DOSEPAK
                    Discard by 12/04/2010
NO REFILLS REMAINING
Mfg: JUBILANT PHARM

Qty: 21

RPH BS
DE JR

BEFORE TAKING
PRESCRIPTION
MEDICAL
THIS MEDICAL

RETAIN

TAKE
MEDICATION
WITH FOOD

IMPORTANT: TAKE OR USE
EXACTLY AS DIRECTED  DO NOT

CAUTION: FEDERAL LAW PROHIBITS THE TRANSFER OF THIS DRUG TO

# The Gluteus Maximus Muscle

## Anatomy and supply



The gluteus maximus muscle builds the most superficial layer of the dorsal gluteal musculature and thus forms the surface anatomy of the gluteal region. Hereby the gluteal fold (or crease) does not represent the lower margin of the muscle but rather results from an arcuate enhancement of the fascia. The innervation is supplied by the inferior gluteal nerve, a branch of the sacral plexus (L4-S2). Numerous vessels and nerves run under the gluteus maximus muscle, including the sciatic nerve, the pudendal nerve and the superior gluteal vessels.

The muscle originates from the sacrum (dorsal part), ilium (behind the posterior gluteal line), the thoracolumbar fascia and the sacrotuberous ligament. Its caudal fibers insert at the gluteal tuberosity of the femur. On the contrary, the cranial fibers go over into the iliotibial tract, a strong fibrous band at the outside of the thigh inserting at the lateral condyle at the tibia.

# Function

The gluteus maximus muscle is the most powerful extensor and outward rotator of the hip. Furthermore it supports the stabilization of the hip joint. The contraction of the cranial fibers leads to abduction whereas the contraction of the caudal fibers causes an adduction. The iliotibial tract enhances the lateral thigh fascia and thus relieves the pressure of the femur (tension band principle).

# Pathology

Lesions of the inferior gluteal nerve (e.g. through traumas, hernias or pelvic tumors) may lead to functional deficiency of the gluteus maximus muscle. The affected patients have tremendous difficulties walking up the stairs or standing up from the chair. The standing position itself however is commonly without pathological findings as it is usually compensated by the ischiocrural musculature. Purulent inflammations underneath the gluteus maximus muscle often remain unnoticed and may spread into neighboring structures (sinking abscess). Because of that and the high risk of nerve or vessel injury an intramuscular injection is not to be administered into the gluteus maximus muscle. The choice of injection site should be preferably the gluteus medius muscle.

## ELLIS IS SICK AND DISABLED
## PICTURE EXHIBITS

The  images in this document may be zoomed at the Dropbox link below (a free Dropbox account may have to be created).

https://www.dropbox.com/l/scl/1RWmlId2imiNiSuycUkWnn

### 1.  A Little Spot That Started Peeling



February 23, 2010
The first picture of necrotic wound  taken on.

In response to the fact that it was very difficult to see.

Notice that there is normal body hair over all the skin, it's not wiry or excessive.

**IMG_1034.JPG**

Ellis wasn't doing as well.  What looked like a pimple turn into a dime, then quarter then palm size.  The wound itched constantly, ached and began to ooze.

## 2. Ellis was very busy caring for her mother



December 16, 2009

Ellis's mother had exited rehab with pressure sores. Ellis had been diligently fighting the breakdown of her mothers's tissue by herself. This required turning her every 2 hours (round the clock), providing nutrition and primary wound care.

**IMG_0942.JPG**



January 20, 2010

As can be seen, Ellis' mom was healing but it was a slow progression. A marathon not a sprint.

Ellis suceeded in healing the sore on her left shoulder from being left in the same position in her wheelchair, first.

**IMG_0968.JPG**

2

### 3. That Little Spot That Started Peeling Is Taking Over



**IMG_1114.JPG**

March 2, 2010

Ellis begins to notice that this boil (?) is cleaning itself out. But again Ellis is working on her mother's issue more as this still seems pretty



**IMG_1329.JPG**

March 21, 2010

It is now starting self debriding by oozing a fluid. It begins to itch uncontrollably and hurt. Notic the porcelain appearance of the surrounding tissue. That's a clear sign that it's necrotic.

3

## 4. Ellis Just Keeps Losing Tissue



April 11, 2010

Bouts of uncontrollable scratching begin. And as can be seen, the wound is beginning to asquire some depthg.

**IMG_1537.JPG**



April 17, 2010

More bouts of uncontrollable scratching occurred and it's getting obvious that this is not a simple boil.

Note at far left the

sinus ends that Ellis is now dealing with in 2016.

**IMG_1728.JPG**

4

### 5. Ellis' Problem Gets Even Larger But Her Mom Is Better



April 30, 2010

Bouts of uncontrollable
scratching continue.

See
will be revealed as sinus
tunnels in 2016.

**IMG_2018.JPG**



May 1, 2010

Now Ellis' Mom, having
has lost weight has
changed pressure points
and Ellis has to be ever
vigilante.

**IMG_2033.JPG**

## 6. Ellis' Issue Finally Peaks and Ellis Sees Her Doctor



**IMG_2167.JPG**

May 8, 2010

Full thickness scarring and huge. More sinus tunnels are showing on Ellis' lower back abouve the necrotic wound.

May 10, 2010

Ellis sees her doctor who says it's INOPERABLE and prescribes a OTC gel that will help it shed.

Duoderm Gel



**IMG_2200.JPG**

May 13, 2010

Two days of bandaging with Duoderm Gel and the wound starts shedding necrotic tissue more efficiently.

### 7.  Duoderm Gel Works But New Issues Arise



May 26, 2010

Follow up visit to Dr. Michelle Chartier who says it will be at least two years before it's over. Inoperable because it's all necrotic.  And now that those tan strips are showing up it's an overly DRY complex wound bed.  Dry slows healing too.

**IMG_2310.JPG**



June 9, 2010

By early June, the tissue is starting to look normal pink and viable.

**IMG_2389.JPG**

## 8. Ellis contracts a major infection



June 24, 2010

All healing stops as the Friday before Ellis picks up a major infection from taking her mother to the blood draw station at Mercy Memorial Hospital.

Notice that the tissue looks flaky and there are no purple epithelials cells trying to skin over the wound. Infected.

**IMG_2462.JPG**



July 31, 2010

After six weeks of T-Sulfa, still not healing. Suddenly more necrotic tissue is coming out in bursts.

**IMG_2650.JPG**

8

## 9.  Healing Resumes By End of August 2010



August 23, 2010

Healing is finally resuming as evidenced by purple coloring throughout the wound.

**IMG_2755.JPG**



September 30, 2010

Healing stops dead in it's tracks due to a Carbon Monoxide leak that won't be discovered until January 2, 2011 because not only is skin flakng off again, Ellis thinks she has influenza. Meanwhile Ellis' mom is taking a turn for the worse from the CO poisoning.  Hindsight the mother's cat won't stay in the living room.

**IMG_2898.JPG**

## 10.  Carbon Monoxide Poisoning Takes It's Toll



**IMG_2990.JPG**

October 26, 2010

Not better, not worse.

Active sinuses at the lower back.  Obviously necrotic tissue in the wound bed.  Doesn't move.  And Ellis can't address it because Ellis' mom went from physical therapists debating whether to let her go back to a cane to a downward spiral.



**IMG_3026.JPG**

November 25, 2010

By Thanksgiving Day it's going backwards and shedding again

## 11.  Until the CO Leak Is Found, Wound Bed Friable



December 17, 2010

By near Christmas it's shedding again.

And, it's ALWAYS painful being full tissue thickness and encompassing the entire gluteal area.  Don't forget the sinuses at the very bottom from the earlier photos.

**IMG_3155.JPG**



January 18, 2011

Sixteen days after fixing the CO leak, look at the difference in skin tone and healing.

**IMG_3217.JPG**

11

## 12.  Ellis' Mom Gets Serious Pressure Sore and MRSA



**IMG_3262.JPG**

February 1, 2011

Ellis' mom exits the hospital with a stage 4 MRSA infected pressure sore.  For the sake of limiting this horrible issue, Ellis' mom came home looking like this. Having not been turned properly in the hospital

Once



**IMG_3677.JPG**

March 20, 2011

Ellis will not be posting anymore of these from here on in, they are too bad, in spite of the fact Ellis DID manage to get it past infection and it healed in over 50 percent.

Ellis's mom dies six months from this point from an airway obstruction due to allergies infection.

12

### 13.  No End In Sight



December 19, 2011

During the six straight months Ellis was caring for her mother's stage 4 pressure sore, Ellis did not take a lot of pictures of her own wound.  Even though painful Ellis simply didn't have time.  As seen here the sinuses on the lower back are still cycling and the scar tissue is still there.

**348.JPG**



October 13, 2012

As can be seen, there is a full thickness scar that never really ends and the sinuses up and down Ellis' back never stopped being active.  Abnormal eschar at the top through the center is necrotic tissue.

Ellis is having camera trouble and it is reflected in the change in picture sequences.

**IMG_82892JPG**

13

## 14. Chronic Wound Still Cycling



December 15, 2012
Still there and still painful. And the complex wound bed is STILL cycling showing sinuses that just refuse to go away.

**IMG_9051.JPG**



January 13, 2013

Still cycling although Ellis has hope because it appears the edges are becoming more

**IMG_0420.JPG**

14

## 15,  Another Area Starts To Peel Out



September 23, 2013

Still there and still painful.  By September Ellis is suddenly having to bandage a new area peeling out.  Bear in mind that Ells spent January 2013 to June 2013 with a massive abcess in her jaw with a failed root canal.  Plus, she's too busy trying to get well and do a short sale.

**IMG_5445.JPG**



October 30, 2013

Because it's still a dry scar full thickness with eschar, Ellis tries Prontosan a new gel from Europe made for dry and complex wound beds.

And Ellis is now trying to find an attorney to file suit.

**IMG_062.JPG**

### 16.  Prontosan Provides Some Relief



November 23, 2013

Still there and still painful.  Prontosan seems to be taking the worst off, but now it needs bandaging 24/7.  And the complex wound bed is STILL cycling.

**IMG_6391.JPG**



July 1, 2014

Had some hope that it cycling FINER meant an end was in sight.   Not a lot of sinus activity

**IMG_9238JPG**

## 17.  Chronic Sinus Starts Cycling Again



September 27, 2014

 No where close to being finished.  Starting to cycle through with sinuses AGAIN

**IMG_0479.JPG**



December 15, 2014

Same day the MTD is granted.  No where close to being finished.  Starting to cycle through with sinuses AGAIN

**IMG_7167.JPG**

### 18.  Ellis Is Sick Enough To Complain to HUD



January 9, 2015

The day Ellis made her first HUD complaint. Still there and still painful.   And the complex wound bed is STILL cycling.

**IMG_1636.JPG**



February 25, 2015

Suddenly the whole wound bed gets friable and starts shedding huge.

This is when I'm asking for accommodation from the 6th Circuit because I can't sit to type.

**IMG_3217.JPG**

## 19.  The Wound Bed Is Too Dry To Melt Eschar



March 3, 2015

A truly necrotic wound bed, the tan between the red is dry eschar and very hard to remove.

**IMG_2444.JPG**



March 28, 2015

Something NEW

Necrotic tissue AND lots of inflammation on the right side.

**IMG_2784.JPG**

## 20.  Something NEW and even more painful



May 8, 2015

Swelling mishapen and wrapping around the right hip, Ellis starts having problems with OPEN sinuses.

It's excruciating.

**IMG_3210.JPG**



August 31, 2015

Something NEW

Open sinus AND lots of inflammation on the right side.  You can see dead tissue around sinus and yet sinus starts ejecting hair knots, soft and and hard detritus.

**IMG_3607.JPG**

20

## 21. And Hair Starts Coming Out



September 2, 2015

The tip of the iceberg that is about to become hundreds of thousands of sharp bits of detritus, hair and soft detritus.

**IMG_3648.JPG**



September 10, 2015

Literally, hundreds and thousands of pieces of detritus start working out the skin on the backside. Becomes INTOLERABLE.

**IMG_3771.JPG**

## 22.  Something NEW Inflammation



February 10, 2016

Still shedding hair and detritus, it is now both sides with a regular inflammation.  :eft hip becomes engaged.

**IMG_4118.JPG**



February 17, 2016

Suddenly, Ellis' torso is involved and swollen like a drum.

**IMG_4135.JPG**

## 23.  Even More Inflammation



**IMG_4192.JPG**

February 17, 2016

Notice minimal sinuses but lots of inflammation



**IMG_1034.JPG**

February 17, 2016

Ellis' left side is swollen and lumpy.

See the speckling that is the start of the sinuses opening.

## 24.  The Lump on the Torso Persists



**IMG_4327.JPG**

March 8, 2016

The strange lump starts shedding hair and detritus.



**IMG_4401.JPG**

March 12,2016

Swelling cycles on the glutes but still plenty of sinuses shedding hair knots.

## 25.  Small Samples of What's Shedding



March 18, 2016

A TINY sample of the hard detritus.

**IMG_4471.JPG**



May 5, 2016

Swelling cycles on the torso  and plenty of sinuses shedding hair knots.

**IMG_4834.JPG**

## 26.  The Lump Persists



June 4, 2016

A SMALL SAMPLE of the hair that is now coming out of 80 percent of Ellis' body strange lump starts shedding hair and detritus.

**IMG_5162.JPG**



March 12,2016

SMALL sample of the assorted hard and soft detritus coming out of 80 percent of my body. The soft detritus usually has to come from a sinus but the hard and the hair can come from ANYWHERE (and has.)

**IMG_5170.JPG**

**27.  No Real End In Sight as the Detritus is DEEP**



June 4, 2016

The torso is fully
covered with sinuses

**IMG_5111.JPG**



June 4, 2016

The legs are now also
shedding from sinuses
with hard and soft
detritus.

**IMG_5112.JPG**

## 28.  The Latest Photos



June 18, 2016

Right leg covered in sinus tracts, notice straight line progression.  One heals and another opens right next to it.

**IMG_5317.JPG**



June 18,2016

Sinuses on backs of legs and into knee muscles.

**IMG_5313.JPG**

## 29.  The Latest Photos continued



**IMG_5272.JPG**

June 18, 2016

Ellis' back covered in sinus tracts.  One heals and another opens right next to it.



**IMG_5272.JPG**

June 18, 2016

More sinuses on torso, weird lump on left side back again,  One sinus closes up and another starts next to it.

# EXHIBIT B

**ELLIS WAS NOT THE AVERAGE REGISTERED REPRESENTATIVE**

Ellis became a Registered Representative (heretofore referred to as "RR") October 2004 after obtaining her Series 7 Brokerage License and her Accident, Life, Health and Disability Insurance License in August 2004.  (See 6th Cir. Court Case No. 15-1059, Doc 20-2, p 12)  While the licensing doesn't set Ellis apart, the Fortune 500 Investment Firm who hired her, certainly does.

That is, Ellis was a financial associate for a conservative, fraternal society, non-profit organization/  A traditional firm that has been in existence since 1917 when it was founded as the Aid Association for Lutherans to help immigrants from Europe survive accidents and hard times in their new country.  It's a company with a legacy of strong ethics, traditional values and service to the Community that actually gives back what would be profits to the fraternal community.

Whereas big investment firms like to advertise that their brokers attend the life events of their clients, Ellis actually did, by job definition.  Aside from the fact that RR's primarily meet clients in the client's homes, any day of the week, if Ellis wasn't at a member's home as their RR, she could easily be found at one of the fraternally based events.

Beyond licensing, getting a job with such an organization isn't easy.  Beyond passing the ethics portions of the licensing exams, RR's for this non-profit have to

1

have ten references within their community, undergo at least three to five interviews to make sure they "fit" and, in general, have to "check out" as being being trustworthy. Not only do RR's hold events in their local Lutheran churches, many RR's for this firm are on church financial advisory boards, boards in general and are volunteers in related community services.

And Ellis was a successful RR for this firm involved in all kinds of community outreach including, but not limited to, the local liaison Habitat for Humanity division. That is, successful RR's establish relationships outside the job that causes clients to trust them implicitly. Any inkling of "trouble" regarding Ellis' conduct would be spread throughout the community (it did) and would highly damaging to her reputation and her career(it has been). See the following email on page 4. Ellis is a pariah.

Not that any investment firm is perfect or that they don't get bad RR's who must be fired. But, there has been a public backlash regarding brokers and as a matter of process, the court system will only really sees the "bad" brokers. Because when the oversight and compliance in this self-regulated business is working, problems are handled out of court. That is, having been regulated since 1933 in response to the stock market crash of 1929, legacy firms and their brokers are taught to "work it out" as all litigation is frowned upon as giving financial

2

service providers a bad name and contribute to larger social issues such as bank runs.  And finally, there is the overall blanket responsibility to care for your fellow man.

So when Ellis resigned November 10, 2008 and started the company transition plan to care for her 1,000 plus members in her book of business, she cried.  But the career damage that Chase did to Ellis is irreparable as the opportunity to renew her relationships with most of her client's is long past.  And it involves explaining matters that most Ellis' client just weren't interested in – that's why they had Ellis as their representative.  And as most RR's wash out in the first two years, Ellis was rounding in her 5th year when she had to quit for her mother's sake and own.  That is, an RR with Ells' experience would be upwards of $80k in earning by Chase's calculations for their own RR's.  Now Ellis loved the community but no longer has a way to restart from scratch.  And Chase not only harmed Ellis having defrauded her with misrepresentations about their administration of the HAMP program, but what Chase did was exact a social death upon her too.  In that, by definition, RR's for her firm live, work and play within the same community.

And, if Ellis hadn't resigned because she was sick and her mother needed her, Ellis wouldn't be here right now, as her principal would have gotten involved

3

and their bank would have defended Ellis from Chase instead of Ellis losing 5 years in an industry she loved to chasing a loan modification she was never going to get or trying to hold Chase accountable for it.

Given that Chase had at least six opportunities to fix this situation and Ellis has clear evidence of phone and wire tapping, Ellis proposes that she was also utilized as an "object lesson" for those inside of Chase that may not have been happy about some of the tactics Chase was using, but reasonably put off of doing anything about it because of Chase's relentless use of legal harassment on other industry professionals, especially when there's already a very public history of firing compliance officer's who don't "get in line."

4

# EXHIBIT C

# DAMAGES

That Ellis suffered concrete damages from the Defendant's action is undeniable.  That the Defendant's were willing to go so far to conceal what transpired in Ellis' case is a clear indicator that much went wrong.  So what are the damages?

The House

Ellis' home at 8293 South Huron River Drive.  In fact, had Chase been honest with Ellis, given that Ellis was caring for her mother.  When you look at which payment was necessary to cure the default, Ellis could have made it.  Even sick, and especially sick, if Ellis couldn't have raised that amount from her mom's less liquid assets, her sister's would have helped at least to cure the loan default.

The Career

Most problematic since Ellis' inability to keep her health care in favor of filing suit against Chase in 2014 provided some irreparable physical damage with the Chronic Pilonidal Sinus Syndrome.  That is, Ellis will have to retrain and it can no longer be software position.  Ellis submits that Chase should pay full tuition and costs for a Master's in Financial Economics at Ohio University as they have an online program.

1

Medical costs to repair that which has been allowed to "slide" these last few years. That is dental, medical and the cost of excising the Pilonidal sinuses, not to mention penalty costs for failure to enroll and keep my Obama Care that I desperately needed.

Back taxes. As Chase was well aware, Ellis had to hold taxes for herself, her mom and the Estate. This Court should not allow Chase to penalize any third parties for their behavior. That includes fellow taxpayers.

Taxes on the house, that they've paid as part of the scheme.

The flood and hazard differential, given that six years down the road Ellis will likely be paying double what it was.

According to the actuarial tables, Ellis' mother should have lived another 5.2 years approximately. Hence Chase should pay for the lost rental income Ellis would have collected.

FICA, that is, Ellis would have been paying into her social security benefit but for Chase's failure to account for moral hazards.

Pain and suffering for stretching out an illness that the Defendant's knew within a shadow of a doubt that Ellis' illness was disabling. Given that Durfrane serves on a military tribunal, he would have to be aware that military has a tried and true calculator for percent disability,

2

Ellis requests Treble damages for the following innocent third parties.:

Ellis' silent business investor, R.E.L., who hoped to make money off of Ellis' business not have to assist Ellis in just keeping her business.

Ellis' Aunt Jeni Szuch who helped fund Ellis' lawsuit.  Since Chase started disrupting Ellis' day in court almost as soon as Ellis finally found an attorney, the car that Ellis received from her aunt and had to sell for legal fees.

Ellis' sister's who likely would have recovered at least some inheritance if Ellis hadn't been busy fighting Chase while the remains of the Estate stored in the home (as Chase well knew) went under in not one, but two floods due to sump pump failures.  If Ellis had had the funds, she would have swapped out those sums ASAP.  And, of course there was the loss on the conversion of estate assets, such as silver and gold coins and collectibles.

As to the type of job Ellis had, it could be performed well past her retirement, in fact Ellis never intended to retire, a trust in perpetuity should be created to provide x dollars of annual income to her life expectancy.

3

# EXHIBIT D

# USPS.com® - USPS Tracking®



Only applicable to visual users.
Tracking Number: 9407803699300023784961

## delivered

- Updated Delivery Day: Thursday, March 24, 2016

- Signed for By: P PEEVY  //  PROVIDENCE,  RI  02940 //  5:20 am

March 24, 2016 , 5:20 am

Delivered

PROVIDENCE, RI 02940

Your item was delivered at 5:20 am on March 24, 2016 in PROVIDENCE, RI 02940 to COMPUTERSHARE. The item was signed for by P PEEVY.

March 24, 2016 , 4:02 am

Arrived at Post Office

PROVIDENCE, RI 02904

March 23, 2016 , 11:34 pm

Departed USPS Destination Facility

PROVIDENCE, RI 02904

March 23, 2016 , 11:32 pm

Arrived at USPS Destination Facility

PROVIDENCE, RI 02904

March 22, 2016 , 8:28 pm

Arrived at USPS Facility

NASHUA, NH 03063

March 21, 2016 , 7:25 pm

Arrived at USPS Origin Facility

ALLEN PARK, MI 48101

March 21, 2016 , 3:00 pm

Departed Post Office

SOUTH ROCKWOOD, MI 48179

March 21, 2016 , 2:21 pm

Picked Up

SOUTH ROCKWOOD, MI 48179

Barbara Ann Ellis
8293 South Huron River Drive
South Rockwood, MI 48179-9513
March 21, 2016

Chase FRCA Settlement Claims Administrator
P.O. Box 43389
Providence, RI 02940-3389

To Whom It May Concern:

I, Barbara Ann Ellis, am writing this letter to inform the Chase Settlement Claims

Administrator that I wish to be excluded from the Chase Settlement Agreement reached

in *Duncan v. JP Morgan Chase Bank, N.A.*, W.D. Tex. Case No. 5:14-cv-00912-FB.

Thank you for your assistance in this matter.

Sincerely,

*Barbara Ann Ellis*

Barbara Ann Ellis

Duncan v. JPMorgan Chase Bank, N.A.                    https://eclaim.kccllc.net/caclaimforms/jpd/Faqs.aspx=q21

The Settlement Agreement provides more detail on how claims will be decided.

Top

### 15. How do I exclude myself from the Settlement?

If you don't want benefits from the Settlement, and you want to keep the right to sue or proceed in arbitration against Chase about the legal issues in this case, then you must take steps to get out of the Settlement. This is called excluding yourself - or it is sometimes referred to as "opting out" of the Settlement Class.

To exclude yourself from the Settlement, you must send a letter or other written document by mail to the Settlement Administrator. Your request must include:

- Your name and address;
- A statement that you want to be excluded from the Chase Settlement in *Duncan v. JPMorgan Chase Bank, N.A.*, W.D. Tex. Case No. 5:14-cv-00912-FB; and
- Your signature.

You must mail your exclusion request, postmarked on or before **March 23, 2016**, to Chase FCRA Settlement Claims Administrator, P.O. Box 43389, Providence, RI 02940-3389. You cannot ask to be excluded on the phone, by email, or at the website.

Top

### 16. If I do not exclude myself, can I sue Chase for the same thing later?

No. Unless you exclude yourself, you give up the right to sue Chase for the claims that the Settlement resolves. You must exclude yourself from the Settlement Class in order to maintain your own lawsuit.

Top

### 17. If I exclude myself, can I still get a payment?

No. You will not get a payment if you exclude yourself from the Settlement.

Top

### 18. Do I have a lawyer in the case?

The Court has appointed the following lawyers as Class Counsel to represent all Settlement Class Members. They are:

| | | |
|---|---|---|
| Benjamin R. Bingham<br>Royal B. Lea, III<br>BINGHAM & LEA, P.C.<br>319 Maverick Street<br>San Antonio, Texas<br>78212 | H. Anthony Hervol, Esq.<br>LAW OFFICE OF<br>H. ANTHONY HERVOL<br>4414 Centerview Drive, Suite 200<br>San Antonio, Texas 78228 | Darby Riley<br>Charles Riley<br>RILEY & RILEY<br>320 Lexington Avenue<br>San Antonio, Texas<br>78215 |

*Cut on dotted line.*

## Instructions

1. Each Click-N-Ship® label is unique. Labels are to be used as printed and used only once.  **DO NOT PHOTO COPY OR ALTER LABEL.**

2. Place your label so it does not wrap around the edge of the package.

3. Adhere your label to the package.  **A self-adhesive label** is recommended.  If tape or glue is used, **DO NOT TAPE OVER BARCODE.  Be sure all edges are secure.**

4. To mail your package with PC Postage®, you may schedule a Package Pickup online, hand to your letter carrier, take to a Post Office™, or drop in a USPS collection box.

5. Mail your package on the "Ship Date" you selected when creating this label.

## Click-N-Ship® Label Record

**Signature Confirmation™ / Insurance Number:**
**9407 8036 9930 0023 7849 61**

| | | | |
|---|---|---|---|
| Trans. #: | 369017385 | Priority Mail® Postage | $6.45 |
| Print Date: | 03/21/2016 | Insurance Fee | $0.00 |
| Ship Date: | 03/21/2016 | Signature Confirmation | $2.45 |
| Expected | | (Electronic Rate) | |
| Delivery Date: | 03/23/2016 | | |
| Insured Value: | $10.00 | Total | $8.90 |

**From:**   BARBARA A ELLIS
8293 S HURON RIVER DR
S ROCKWOOD MI 48179-9513

**To:**   CHASE FCRA SETTLEMENT CLAIMS ADMINISTRATOR
PO BOX 43389
PROVIDENCE RI 02940-3389

* Retail Pricing Priority Mail rates apply. There is no fee for USPS Tracking™ service on Priority Mail service with use of this electronic rate shipping label. Refunds for unused postage paid labels can be requested online 30 days from the print date.

**UNITED STATES POSTAL SERVICE®**   *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking™ page at usps.com*

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

PRIORITY MAIL
POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

**PRIORITY**®
**MAIL** ★

DATE OF DELIVERY SPECIFIED*

USPS TRACKING™ INCLUDED*

INSURANCE INCLUDED*

PICKUP AVAILABLE

* Domestic only

USED INTERNATIONALLY,
USTOMS DECLARATION
EL MAY BE REQUIRED.

---

**UNITED STATES POSTAL SERVICE®**

**Click-N-Ship**®

usps.com
**US POSTAGE**
**$8.80**
Flat Rate Env
Signature
Confirmation

03/21/2016

9407 8036 9930 0023 7849 61 0089 0000 0050 2940

062S000C000309

Mailed from 48179

**PRIORITY MAIL 2-DAY**™

Expected Delivery Date: 03/23/16

0006

B099

BARBARA A ELLIS
8293 S HURON RIVER DR
S ROCKWOOD MI 48179-9513

SIGNATURE REQUIRED

SHIP
TO:
CHASE FCRA SETTLEMENT CLAIMS ADMINISTRATOR
PO BOX 43389
PROVIDENCE RI 02940-3389

**USPS SIGNATURE TRACKING #**

9407 8036 9930 0023 7849 61



**UNITED STATES POSTAL SERVICE**

Date: May 12, 2016

Barbara Ellis:

The following is in response to your May 12, 2016 request for delivery information on your Signature Confirmation™/Insured <= $500 item number 9407803699300023784961. The delivery record shows that this item was delivered on March 24, 2016 at 5:20 am in PROVIDENCE, RI 02940 to P PEEVY. The scanned image of the recipient information is provided below.

Signature of Recipient :



Address of Recipient :



Thank you for selecting the Postal Service for your mailing needs.

If you require additional assistance, please contact your local Post Office or postal representative.

Sincerely,
United States Postal Service

# EXHIBIT E

 Gmail

**B Nineteetwo <4barbls@gmail.com>**

## Retainer check

1 message

**B Nineteetwo <4barbls@gmail.com>**                                  Fri, Feb 21, 2014 at 10:01 PM
To: Adam Gantz <agantz@gantzassociates.com>

Hello Adam,

Here's the authorization code for check #1003.  The number 90903934 goes in the boxes on the front.

Regards,

Barb Ellis

Chase Home Finance LLC (FL5-7730)
PO BOX 44090
Jacksonville FL 32231-4090

January 4, 2011

# CHASE

#BWNCLNN#
#0906739229951494#

007481 /FT

BARBARA A ELLIS
8293   HURON RIVER DR
SOUTH ROCKWOOD  MI  48179

### Your house is your home. We want to keep it that way.

### We need to talk—call (800) 848-9380 today.

You're going through tough times—we can help. In fact, we believe **your home loan may be eligible for a loan workout**—we may be able to change the terms of your loan, including the interest rate, to reduce the monthly payment to an amount you can afford.

**Call us today at (800) 848-9380 so we can help you turn things around. We'll discuss your current situation (outlined in the enclosed letter) and the options available to you. But we cannot stress enough that the longer you delay calling us—the fewer chances you may have to keep your home.**

It will only take a few minutes on the phone—one of our Loan Specialists will work with you to determine the option that best fits your needs. There are several options available—**call us now** and let's see which one will work best for you.

We are committed to working with you to find a way to help you keep your home. **but you must call us immediately at (800) 848-9380—the longer you delay the fewer options you may have.**

Collections Department
Chase Home Finance LLC
(800) 848-9380
(800) 582-0542 TDD / Text Telephone

P.S.  The enclosed letter outlines your loan status and **the consequences that will occur unless we receive the required financial information from you and can approve you for a loan workout.** Once you call us with the information needed, then we can work together to determine the option that will work best for you. We cannot guarantee that you will be approved, but your only chance of saving your home is by contacting us immediately. Please don't delay—call us now at **(800) 848-9380.**

FCL MTM

Chase Home Finance LLC **(FL5-7730)**
PO BOX 44090
Jacksonville, FL 32231-4090

January 4, 2011



007481

BARBARA A ELLIS
8293    HURON RIVER DR
SOUTH ROCKWOOD  MI  48179

**Acceleration Warning (Notice of Intent to Foreclose)**
Account: 0673229514 (the "Loan")
Property Address:    8293   Huron River Dr.
                     South Rockwood  MI 48179 (the "Property")

Dear Barbara A. Ellis:

Under the terms of the Mortgage or Deed of Trust ("Security Instrument") securing your Loan, Chase Home Finance LLC ("Chase") hereby notifies you of the following:

1. You are in default because you have failed to pay the required monthly installments commencing with the payment due 11/01/2010.

2. As of January 4, 2011, total monthly payments (including principal, interest, and escrow if applicable), late fees, insufficient funds (NSF) fees, and other fees and advances due under the terms of your loan documents in the total amount of $5085.60 are past due.  This past-due amount is itemized below.  If applicable, your account may have additional escrow amounts that have been paid out and are due on the Loan.  If you have any questions about the amounts detailed below, please contact us as soon as possible at (800) 848-9380.

| | |
|---|---|
| Total Monthly Payments | $4587.72 |
| Late Fees | $171.88 |
| NSF Fees | $0.00 |
| Other Fees* | $0.00 |
| Advances* | $326.00 |
| Amount Held in Suspense | $0.00 |

*Other Fees and Advances include those amounts allowed by your Note and Security Instrument. If you need additional information regarding any of these amounts, please contact us at the number provided below.*

You are also responsible for paying any amounts that become due from the date of this letter through the expiration date set forth in Paragraph 3 below.  These amounts may include, but are not limited to, taxes, insurance, inspection fees, and other fees, as permitted by applicable law.



P.O. Box 469030
Glendale, CO 80246

 5-746-53139-0000341-001-1-000-000-000-000

BARBARA A ELLIS
8293 S HURON RIVER DR
S ROCKWOOD MI 48179-9513

**Chase may be able to lower your
monthly mortgage payments.
But you need to call us now.**

January 10, 2011

Dear Barbara A Ellis:

Chase may be able to help make your mortgage more affordable if you are having difficulty making your payments. You could be eligible to take advantage of the **Home Affordable Modification Program**, part of a federal initiative to help homeowners.

**We're ready, right now, to work with you to lower your mortgage payments. You will not pay any fees for a modification, but you must call now to take advantage of this opportunity. We cannot automatically make these changes to your account - you must call 1-866-550-5705 as soon as possible.**

After you call:

- We will send you a Modification Information packet.
- The packet will include some forms for you to fill out, and a short list of documentation you'll need to provide -- like tax and income documentation, and information about any financial hardship you are experiencing.
- You will need to complete, sign and return the information to begin the evaluation process.

Once we receive all of your documentation we'll determine if you are eligible for the program. If you are, we'll send you a letter with details about your new, affordable mortgage payment -- and you will start paying that new amount during a trial period. If you make those trial payments on time and fulfill all the other program conditions, we will offer you a permanent modification to keep your payments low.

A modification may involve some or all of the following: bringing your account current, reducing the interest rate, extending the term, and/or delaying your repayment of a portion of the principal until the end of the loan.

We are here to help, but you must contact us now. If you do not qualify for the program, we will work with you on other options to help you keep your home.

Sincerely,

Chase Homeowner's Assistance Department

---

**Here's what must happen now for us to lower your mortgage payments...**

1. **Contact Chase immediately 1-866-550-5705.**

2. **You will receive a Modification Information packet in the mail.**

3. **You must complete, sign and return the packet immediately.**

We must receive the required documentation BEFORE we can review your account to see if we can lower your payments. **Don't wait - call us today!**

Account: 673229514
Property Address:
8293   HURON RIVER DR
SOUTH ROCKWOOD, MI 48179

8566R 0510

OP175



CHASE

3415 Vision Drive
OH4 7209
Columbus OH 43219-6009

January 14, 2011

Account Number Ending In: 9514

410 657 149193 ********AUTO**3-DIGIT 481
Barbara Ellis
8293 S Huron River Dr
South Rockwood, MI 48179-9513

Dear Barbara Ellis:

We strive to give you excellent service. That includes letting you know what to do if you have any problems with your mortgage account. The Real Estate Settlement Procedures Act (RESPA) provides a formal procedure for you to make service complaints to us.

You can send a formal letter, called a qualified written request, to Customer Care. A qualified written request is a letter that includes information that enables us to be able to identify your account (e.g. your name, and account number), and that contains your question about the account or a description of the problem you are having with the account.

You might send a qualified written request, for example, if you believe there is an error on your account, like a penalty or late fee you don't think you owe. **You must send this letter—in a separate envelope from your mortgage payment coupon—to us at the following address:**

> Chase
> P.O. Box 183166
> Columbus, OH 43218-3166

For more details about what a qualified written request should include, or for more information about RESPA, visit **hud.gov** and type "qualified written request" in the search box.

As always, if you have a question or complaint, you can also call our Customer Care team at **1-800-848-9136** or send us a secure e-mail from chase.com.

Sincerely,

Larry Thode
Vice President
Customer Care



© 2010 JPMorgan Chase & Co.   JPMorgan Chase Bank, N.A. Member FDIC



P.O. Box 469030
Glendale, CO 80246

 5-746-53139-0000341-001-1-000-000-000-000

BARBARA A ELLIS
8293 S HURON RIVER DR
S ROCKWOOD MI 48179-9513

**Chase may be able to lower your
monthly mortgage payments.
But you need to call us now.**

January 10, 2011

Dear Barbara A Ellis:

Chase may be able to help make your mortgage more affordable if you
are having difficulty making your payments.  You could be eligible to take
advantage of the **Home Affordable Modification Program**, part of a
federal initiative to help homeowners.

**We're ready, right now, to work with you to lower your mortgage
payments. You will not pay any fees for a modification, but you
must call now to take advantage of this opportunity. We cannot
automatically make these changes to your account - you must call
1-866-550-5705 as soon as possible.**

After you call:
- We will send you a Modification Information packet.
- The packet will include some forms for you to fill out, and a short
  list of documentation you'll need to provide -- like tax and income
  documentation, and information about any financial hardship you
  are experiencing.
- You will need to complete, sign and return the information to
  begin the evaluation process.

Once we receive all of your documentation we'll determine if you are
eligible for the program. If you are, we'll send you a letter with details
about your new, affordable mortgage payment -- and you will start paying
that new amount during a trial period. If you make those trial payments on
time and fulfill all the other program conditions, we will offer you a
permanent modification to keep your payments low.

A modification may involve some or all of the following: bringing your
account current, reducing the interest rate, extending the term, and/or
delaying your repayment of a portion of the principal until the end of the
loan.

We are here to help, but you must contact us now. If you do not qualify
for the program, we will work with you on other options to help you keep
your home.

Sincerely,

Chase Homeowner's Assistance Department

---

**Here's what must happen
now for us to lower your
mortgage payments...**

1. **Contact Chase
   immediately
   1-866-550-5705.**

2. **You will receive a
   Modification
   Information packet in
   the mail.**

3. **You must complete,
   sign and return the
   packet immediately.**

We must receive the required
documentation BEFORE we can
review your account to see if we
can lower your payments.
**Don't wait - call us today!**

Account: 673229514
Property Address:
8293   HURON RIVER DR
SOUTH ROCKWOOD, MI 48179

85666 0510
OP175